UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO:  20-CV-24549-GRAHAM

TAIANA COKE,

      Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES, LTC.,
a Liberian Corporation,

      Defendant.
_____/

      Remote Audio-Visual Communication
      Tuesday, 10:36 a.m.
      August 3, 2021

VIDEOTAPED DEPOSITION VIA VIDEOCONFERENCE OF

CORPORATE REPRESENTATIVE, ROYAL CARIBBEAN, LTD.,

AMANDA CAMPOS

Taken by Corinne Grassini, Florida Professional Reporter, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above case.



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

EXHIBIT 3

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
GERSON & SCHWARTZ, P.A.
1980 Coral Way
Miami, Florida 33145
BY:  Nicholas I. Gerson, Esquire, (Via
Videoconference)

ON BEHALF OF THE DEFENDANT:
GRAY ROBINSON
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401
BY:  Michael J. Drahos, Esquire, (Via
Videoconference)

ALSO PRESENT:
Brandon Mendiola, Videographer, (Via
Videoconference)            - - - - - -

                  I N D E X

                  - - - - - -

AMANDA CAMPOS                          PAGE
Direct Examination By Mr. Gerson        3

          EXHIBITS FOR IDENTIFICATION

PLAINTIFF'S                           PAGE
No. 1 Notice                          12
No. 2 Guest Services Log              21
No. 3 Shipboard Steering
Committee Meeting Minutes             34
No. 4 Photographs                     51
No. 4A Photograph                     77
No. 5 Own The Spill Policy            84
**RETAINED** No. 6 Interrogatories    90
No. 7 List of Prior Falls             112
No. 8 Diagram                         176
No. 9 List of Complaints              204
No. 10 Photographs                    212

DEFENDANT'S                           PAGE
**NONE**
                CERTIFIED QUESTIONS

Page 156, Line 21

*Jeannie Reporting*
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Thereupon,

THE VIDEOGRAPHER:  In the case styled Taiana Coke versus Royal Caribbean Cruise Lines, this is the video deposition of Amanda Campos, corporate representative for Royal Caribbean Cruise Lines, on August 3rd, 2021.  The time is now 10:36 a.m.

Would counsel please state their appearances for the record.

MR. GERSON:  Nick Gerson on behalf of the plaintiff, Taiana Coke.

MR. DRAHOS:  Michael Drahos on behalf of the defendant, Royal Caribbean.

Thereupon,

AMANDA CAMPOS, was called as a witness and, having been first duly sworn, was examined and testified as follows:

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. GERSON:

Q.   Good morning.  Please state your name.

A.   Amanda Campos.

Q.   And you understand you're here pursuant to a notice of taking deposition in the

lawsuit filed by Taiana Coke?

A.    Yes.

Q.    Do you have a copy with the notice with you?

A.    I've seen the notice.  I don't know if I have a copy of it in front of me.

Q.    You don't have a copy of it?

A.    I have a copy of it, I just don't have a physical copy of it, a hard copy of it.

Q.    But you have an electronic copy?

A.    Yes.

Q.    Okay.  You've had a chance to read the notice?

A.    Yes, I have.

Q.    Okay.  You understand your answers are binding on Royal Caribbean?

A.    I do.

Q.    Okay.  And Ms. Campos, how many depositions have you given as a representative on behalf Royal Caribbean?

A.    Over 50.

Q.    Over 100?

A.    Around 100.  I'm not sure if it's over 100 at this point.  It could be.

Q.    Somewhere close -- somewhere close to

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

100?

A.   Probably closer to 100 than 50.

Q.   All right.  And I know I've asked you this before, but since this is a new case, I'll have to ask you again.

So would you please give the benefit of your educational background to the members of the jury?

A.   Yes.  I attended for undergraduate at the University of Arizona, and then I went to the University of Miami School of Law, where I got a JD.  And that's my education.

Q.   All right.  And you're a member of the Florida bar?

A.   I am.

Q.   And you've been a practicing member of the Florida bar for how many years?

A.   Since 2004.

Q.   And what is your occupation at Royal Caribbean?

A.   I'm the director of guest claims and litigation.

Q.   And what do you do as director of guest claims and litigation?

A.   My role at Royal Caribbean as the

director of guest claims and litigation is to oversee in-house litigation, as well as outside litigation.  And I oversee the desk adjusters who, when a claim comes in, handle and adjust the claim.  And in addition to that, I serve as the corporate representative for cases that are litigated for passenger related cases.

Q.   You work in -- or who do you report to?

A.   I report to Paul Hehir.  That's H-E-H-I-R.

Q.   And Paul Hehir is whom?

A.   Paul Hehir is the VP of litigation.

Q.   Okay.  So essentially, you work in the legal department; is that a fair statement?

A.   No, I don't.  I work in the risk management department.  There's a separate legal department that has attorneys as well, but the group of attorneys I work with is in the risk management department.

Q.   Okay.  So when it comes time to providing sworn deposition testimony on behalf of Royal Caribbean, you're usually the person that's designated to appear on behalf of the company; correct?

**A.** Correct and incorrect. That is correct only in relation to passenger related claims and litigation. There's somebody else who's -- who is involved with all crew related matters.

**Q.** So there's another person like yourself that is designated on behalf of Royal Caribbean to address crew related matters, such as crew injuries; correct?

**A.** Yes, crew litigation. Correct. Or arbitration.

**Q.** Okay. And tell me what you did to prepare for today's deposition.

**A.** To prepare for today's deposition, I reviewed documents, a lot of documents from this case. I reviewed the complaint, the answer, and the discovery responses.

**Q.** Did you speak with any of the ship personnel that has been identified in discovery in this case?

**A.** No. I was not able to. The safety officer in this case is not on board currently, and I was not able to get in touch with him to speak with him.

**Q.** When you say he's not on board currently, he's not -- he's not assigned to a ship?

A.    He's currently on -- he's currently not on board, yes.  He's at home in his home country.

Q.    And who would that person be?

A.    His name is Dragan or Dragan, I don't know how to pronounce it properly.  It's D-R-A-G-A-N.  And his last name is Nikitovic, which is N-I-K-I-T-O-V-I-C.

Q.    Okay.  So you made an attempt to contact Dragan Nikitovic, but you weren't able to make contact with him; is that what you're telling me?

A.    Correct.  I wasn't able to get in touch with him.

Q.    Is there anyone else within Royal Caribbean on -- that was involved in either the investigation or identified in discovery in this case that you spoke with in preparation of your deposition testimony?

A.    I got information from -- not -- no, nobody that's -- that's identified in discovery.

Q.    Okay.  What about not identified in discovery?

A.    I just got general information from the ship on some cleaning procedures and overall

procedures.  But I don't know the names of the specific people, just the titles.  But nobody who was involved or had direct knowledge of this case.

Q.   What was the purpose of you speaking to people, as far as the cleaning procedures, in connection with this lawsuit?

A.   Just in general for the purpose of the deposition, to find out the general cleaning procedures and who's responsible for that area.

Q.   Was there any documentation that you reviewed to determine who would have been responsible for that area?

A.   Nothing in addition to any of the discovery that we sent to you.  So such as in discovery, I believe we gave you the job description of the public area attendant.

Q.   Okay.  You're talking about the public area attendant schedule?

A.   Not the schedule, but just in general. Also the job description was what I was talking about.

Q.   All right.  You are -- you mentioned before that you reviewed all the discovery responses.  I imagine you reviewed the public area attendant schedule in this case?

**A.** I did.

**Q.** And what is the public area attendant schedule?

**A.** It's the schedule of what areas the public attendants are cleaning or are on duty for.

**Q.** Assigned to?

**A.** Yes.

**Q.** Does the public area attendant schedule identify people by name and specify the times that they're supposed to work?

**A.** I believe it does, yes. To be honest with you, it's so small, I could barely read it.

**Q.** Okay. So you met -- you mentioned that you spoke to some people on the ship, but you aren't able to tell me who specifically?

**A.** I don't know their specific names, no. Just their titles.

**Q.** What were their titles?

**A.** One of the titles was the hotel maintenance manager.

**Q.** Okay. And the other?

**A.** The other person that provided information was the security officer.

**Q.** And who is that?

**A.** I don't know. I don't know his name.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Q. How did you know to contact him or how were you able to identify him, I guess?

A. I had questions in regards to the CCTV map we've provided you, and I contacted him to get answers on those questions.

Q. Anyone else?

A. No. That's it.

Q. Other than speaking to the safety officer and the hotel maintenance manager, did you speak with the staff captain?

A. I didn't speak to the safety officer. My testimony was that the safety officer that was on board, I was not able to get in contact with. I said that I reached out to the security officer in terms of questions that might have been related to the CCTV, which is an area of inquiry for my deposition. And no, I did not speak with the staff captain.

Q. Now, as part of your preparation for today, you mentioned that you reviewed discovery responses in this case?

A. Correct.

Q. And just for the -- just for the record, let me just show you what we're going to mark as Exhibit 1 to the deposition.

(Thereupon, Plaintiff's Exhibit No. 1 was marked for identification.)

BY MR. GERSON:

Q.   And I'd just like you to take a look at this document and ask you whether or not this is the notice of taking deposition that you reviewed in preparation for today?

So you can see it's dated for today, August 3rd, sent out on July the 14th.  This is actually the second notice of taking deposition duces tecum.

A.   It appears to look like the one that I reviewed, yes.

Q.   Okay.  Did you bring any documents with you today?

A.   I have the discovery documents that were provided to you.

Q.   Do you have with you any other documentation that you reviewed?  I think there was reference to passenger injury statements.  Do you have a copy of those?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I -- I don't have hard copies of those.  I just have what's in my system.

BY MR. GERSON:

Q.   You have electronic copies?

A.   Correct.

Q.   But you reviewed the passenger injury statements in preparation for today; correct?

A.   I reviewed the passenger injury statements from the ADVENTURE OF THE SEAS.

Q.   You didn't review the passenger injury statements for the other ships?

A.   No, I did not.  But I have access to them.

Q.   Why not?  Any particular reason why?

A.   I was just reviewing the ones from the ADVENTURE.  No particular reason.

Q.   The ADVENTURE OF THE SEAS is what kind of ship?  What -- what -- what's the class?

A.   Voyager class.

Q.   And how many ships consist in the Voyager class?

A.   There are five in total.

Q.   And the concept behind -- well, can you go ahead and name what the different vessels within the Voyager class are?

A.   It's the VOYAGER, the EXPLORER, the ADVENTURE, the NAVIGATOR and the MARINER.

Q.   And all of the Voyager -- all of the ships within the -- within this class consisting of the VOYAGER, the EXPLORER, the NAVIGATOR, and the MARINER, are -- have the same configuration; correct?

A.   They have the same outer exterior, correct.  They have the same shell, basically.  And a lot of it inside is the same.  There might be some differences throughout them, but in general, they all have the same shell.  They all look the same from the outside.

Q.   And interior, they all have the same general configuration; do they not?

A.   They might have some differences between them, but in general, yes, it would be -- it's the same class of ships.  But there might be some differences.

Q.   For the most part, they're all designed to be similar in design and configuration and that's why they're called sister class ships; correct?

A.   Correct, but there are changes made throughout the sister class ships.  They're not identical.  As the years go on, they might make some changes.  But they're -- they are sister class

ships.  Again, the shell of it is the same.  They look the same on the outside.

Q.   And for the most part, the interior design configurations are generally the same; correct?

A.   Yes.

MR. DRAHOS:  Object to the form.

THE WITNESS:  There might be some changes but --

BY MR. GERSON:

Q.   It's the same number of staterooms, more or less?

A.   I don't know.  I can't answer that question.  I didn't look into that specifically, so I don't feel comfortable answering it without knowing a hundred percent.

Q.   The same number of decks?

A.   Yes, I believe it is the same number of decks.

Q.   Okay.  And they all have a casino?

A.   Yes.

Q.   And the casino in -- on the -- on the ADVENTURE OF THE SEAS would be located in the same area or the same deck as the NAVIGATOR OF THE SEAS; correct?

A.    I believe so, yes.  But I didn't check specifically, but yes, I believe it is.

Q.    Okay.  Just might have different -- one restaurant might be called one bar, as opposed to another bar; correct?

A.    No, I can't -- again, I'm trying to reiterate that I can't say that for sure.  There might be some different changes.  There might be an added restaurant in one that's not in another one. I didn't go through it.  So I don't feel comfortable answering with a definitive yes or no as to how similar those sister class ships are.

Q.    Okay.  Well, for the most part, you would agree that the design and layout of the -- excuse me -- of the ADVENTURE OF THE SEAS is going to be the same for the sister class ships, both interior and exterior?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, the shell of the ships are going to be the same.  They're going to look the same from the outside. In the inside, there are going to be some differences, most likely, mainly aesthetic. But in terms of design, there could be differences as well.  Not -- but there

could be some differences.

BY MR. GERSON:

Q.   Okay.  But as you sit here today, you're not aware of any differences as far as to the configuration of, say, the walkway on deck 4 where Ms. Coke was injured?

A.   That wasn't --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- one of my areas of inquiry, so I didn't look into it.  I don't know.  Yes, I'm not aware.

BY MR. GERSON:

Q.   Well -- well, do you have any personal knowledge?

A.   No, I don't.

MR. DRAHOS:  Object to the form.

THE WITNESS:  No, I don't have any personal knowledge.

BY MR. GERSON:

Q.   Okay.  What is Royal Caribbean's position about how Ms. Coke was injured?  Look at topic 1 of today's notice.  What facts and information does Royal Caribbean know about how Ms. Coke was injured?

A.   Ms. Coke is claiming that she was

injured when she was walking towards the casino from the bar on deck 4, and she fell due to a hump. That's according to her guest injury statement.

Q.   Was the incident reported by Ms. Coke?

A.   Yes, it was reported by Ms. Coke the next day.  So my understanding is the incident occurred on November 10th and she reported it on November 11th.

Q.   Didn't Ms. Coke report that she tripped and fell, as opposed to just fell, as you described?

MR. DRAHOS:  Object to form.

THE WITNESS:  Ms. Coke reported that she was walking and "next thing I knew, I was," something, "the hump falling.  It was the hump of the floor.

"What could you have done to avoid this incident?

"Nothing."

I don't see the word in her -- in her guest injury statement "tripping."  I just see that she was walking and "next thing I knew I was" -- I can't read that word -- "the hump falling."

"Over the hump falling," I think it

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

says.  She was over the hump falling.  I don't see the --

BY MR. GERSON:

Q.    Ms. Campos, are you telling the members of the jury that it wasn't reported by Ms. Coke that she tripped and fell which -- on deck 4?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm not telling the jurors that.  What I'm saying is I'm reading her guest injury statement in her handwriting, that doesn't mention the word "trip" in her guest injury statement.

BY MR. GERSON:

Q.    Are you familiar with something called a guest service log report?

A.    Yes, I am.

Q.    Did you read the guest service log in part of your preparation for today's deposition?

A.    Yes.  The guest service log, it says that -- in the guest services log, it states that "Guest came to report that yesterday she had an accident right outside the casino.  She fell and tripped over and got hurt on her left knee.  Got hurt.  She wants" --

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Q.    And --

A.    I'm sorry, I'm just going to -- "she wants to make report in case something happened when she at home."

So this is the guest services log that's putting in what -- when she came to report it.

Q.    And what is a guest services log, for the members of the jury that may not be familiar with that document?

A.    So the guest services log is something that the Royal Caribbean crew member would import -- input and it would usually be a guest services officer.  So a passenger would go up to the guest services desk and they can -- that's where they would put in anything from a lost key card to a request for, you know, a dinner or something.  It's all different types of comments or issues that guests might have while on board.  When they go to the guest services log, they would input it under their booking information.  And when I say "they," I mean Royal Caribbean.

Q.    Okay.  And I was just asking, the guest services log, that is a document that's used in the ordinary course and scope of Royal

Caribbean's business; correct?

A.    That is correct.

Q.    And just, I'd like to show you, for the members of the jury, what you're referring to. Take a look at Exhibit 2.

(Thereupon, Plaintiff's Exhibit No. 2 was marked for identification.)

BY MR. GERSON:

Q.    We've got here the guest services log for the ADVENTURE OF THE SEAS; correct?

A.    That is correct.  Sorry.  Sorry.  Yes, that is correct.

Q.    And what you were reading to me before your initial testimony about Royal Caribbean's explanation, was this entry by Ms. Coke that was reported on November the 11th, 2019; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm not looking at that one.  Can you make it a little bit bigger? I'm sorry.

BY MR. GERSON:

Q.    Can you see?

A.    Yeah, you just need to make it -- you need to make it bigger, if you can.

Q.    Okay.

A.    Okay.

Q.    So when I was asking before on November the 10th, 2019 --

A.    Yes.

Q.    -- is the first -- is it your testimony this is the first entry that there is from Ms. Coke about what happened?

A.    The 11-11, 12:58.  Let me make sure. Oh, hold on.  I'm looking at the -- okay.  Let me look over here.  I'm sorry.

Yeah, that's the first one that I see, the one at 11-11, 12:58.

Q.    Okay.  So if we take a look again here at the guest service log, we have that Ms. Coke reported on November the 10th, 2019, that she tripped and fell and hurt her knee; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Wait.  Which one are you looking at, the first one?

BY MR. GERSON:

Q.    Right here.

A.    I'm confused.  Can you ask me that question again?

Q.    Sure.

Take a look at what's been marked as

Exhibit 2, which is the guest services log.

A. Okay.

Q. And you see here the entry at 11-11, on November 11th, 2019, at 12:58 and 29 seconds, that "Guest came to report yesterday that she had an accident right outside the casino. She fell and tripped over and she got hurt on her left knee. Got hurt and wants to made report in case something happens when she at home."

A. Yes. That's what I was reading before. Correct.

Q. Okay. So I just wanted to make sure we're on the same page.

A. Yeah.

Q. So -- and this information was actually reported by someone by a guest -- by the title of a guest services officer, Marisol Montalvan; correct?

A. It was -- it was inputted by Marisol. Correct.

Q. All right. And Ms. -- is it your understanding that Marisol wrote down or typed in the information that was reported by Ms. Coke as far as her explanation as to what happened?

A. Yes.

Q. Okay. Now, is this -- after this was reported, there's some other documentation in this guest services log. And can you just explain to the members of the jury after the chief complaint was documented to guest services, what are the rest of the entries and what does the rest of this record state?

A. Well, there's entries above it for the 10th that talk about that she wanted a SeaPass -- a copy of her SeaPass statement. There's another entry on the 10th that says that -- something about an account --

Q. I'm not asking you about before. I just want to know after she -- after Ms. Coke reported to guest services about her trip and fall, tell me what the next entries are and what they say, as identified in this document following 11-11-2019 at 12:58.

A. The next one is GSO Varsha referred her -- referred to other GS log, which is open for medical. Is this what you're wanting me to go over?

Q. Yes.

A. Okay. And then "GSO Varsha spoke with Ms. Terri. She mentioned roommate is at medical.

GSO will call back later on."  And then it states that "SGSO offer medical assistance.  I called the nurse and advice.  Nurse spoke with the guest and will stop today at 1600 hours -- 16:00 p.m.  Guest mention some guests help her.  There are not crew, CM, around."

Q.   What does that mean, there are not CM around?

A.   I guess -- I can interpret it to mean that when the incident happened, other guests helped her because there were no crew members around.

Q.   And did Ms. Coke eventually report to the medical infirmary?

A.   She did.  She went to the medical facility.

Q.   What day did she report to the medical infirmary?

A.   On the 11th of November.

Q.   And -- sorry, my computer froze.  Give me a second.

Here we go.

And in the guest services log -- is the fact that Ms. Taiana Coke reported to the medical infirmary, is that also documented in the

guest services log?

A.   Yeah.  I just read that, I believe.

Q.   Okay.  And then it, once again, once Ms. Coke was in the medical infirmary at approximately 6:16 p.m., there's a brief incident of the accident that states where it -- what does it say in the brief summary of the incident that was reported in the medical infirmary, according to this record by Ms. Coke?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Well, it says -- I think it says a couple different things, because on the third page, page 3 of 7, it says, "Patient says that she fell down by the casino yesterday evening and landed on her knees."

BY MR. GERSON:

Q.   No.  No.  No.  No.  No.  No. Ms. Campos, I want you to -- I want you to take a look at the guest services log and --

A.   Oh.

Q.   -- the entry and --

A.   Sorry.  I'm confused.  Okay.  You need to go slower and you need to be more specific, because you're talking about the medical records

and then you're going back and forth.  So...

Q.    I was -- I was sticking straight to the guest services log, but that's okay.  I'm happy to go as slow as you need me to go.

A.    Okay.  So right now you're still talking --

Q.    So let me just ask the question again so there's no confusion.

In the guest services log, there was an entry that you just referred to that was taken down by guest services with Ms. Coke's remarks that she tripped and fell and injured her knee, and that was at approximately 12:58 on November the 11th. Do you remember that testimony?

A.    I have that it was -- yes, I remember that testimony, and that it was at 12 -- yes, that's -- I said it a couple times now.  She came to report --

Q.    Okay.

A.    -- that she had an accident right outside the casino.  She fell and tripped over and she got hurt.

Q.    Okay.  And then we have, again, Ms. Coke reported to the medical infirmary later that day, at 6:16, where it was reported by the

guest that she tripped over a hump and fell.  Do you see that in the guest services log?  If you need me to put --

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.    -- it up on the screen for you, I'm happy to do so.

A.    Okay.  She -- "guest states that she tripped over a hump and fell."

Q.    Okay.  Then we know that Ms. Coke reported to the medical infirmary; correct?

A.    Correct.

Q.    And there was additional documentation in the form of medical records and a passenger injury statement, which we can get into in a moment.  But does Royal Caribbean dispute the fact that Ms. Coke tripped and fell?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, according to Ms. Coke, she is stating that she fell while walking towards the casino.  Nobody saw her fall.  None of our crew members saw her fall.  That's what she reported.

BY MR. GERSON:

Q.    Are you aware of any -- is Royal

Caribbean aware of any facts to contradict Ms. Coke's remarks which are identified or taken -- or which are referenced in the guest services log that she tripped and fell over a, quote, "hump" on deck 4 while she was walking to the casino?

MR. DRAHOS:  Object to the form. Asked and answered.

THE WITNESS:  At this time, Royal Caribbean has no, I guess your words were evidence or any facts disputing it.  But --

BY MR. GERSON:

Q.   Okay.

A.   -- at this point, we do not.

Q.   All right.  And in fact, it's also memorialized, Ms. Coke's explanation that she tripped and fell, it's also in her medical records; is it not?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I have in the medical records, like I said before, a couple things.  I have a slip injury.

BY MR. GERSON:

Q.   Well, that's not what Ms. Coke reported.  That's what someone else wrote down; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  But that's -- that's the same as the guest services log.  This is what someone else is writing down.  That's why -- if I could just finish my thought.

That's why when --

BY MR. GERSON:

Q.   You may.

A.   -- you asked me originally what she had said, I read exactly what she wrote, word-for-word, because what it is is the Siebel, which is somebody else writing down in the medical, which is somebody else writing down, I went straight to the source to say about the hump.

Q.   Okay.  And --

A.   So somebody else wrote it down in the Siebel and somebody else wrote it down in the medical records.  In the medical records it says, "Guest walked into medical; coherent, conversant; was walking towards the casino when she slipped and injury her left knee."

Q.   Okay.  The reference that you're making remarks to, Ms. Campos, that there was a slip, is nothing that was reported by Ms. Coke; is it?

MR. DRAHOS: Object to the form.

THE WITNESS: I believe it was, because it's -- that's like saying what was in Siebel wasn't --

BY MR. GERSON:

Q. Okay. Well --

MR. DRAHOS: Wait. Let her -- let her finish her testimony, please, Mr. Gerson. She was in the middle of an answer when you cut her off.

THE WITNESS: When you're saying it's just because somebody else put it in there, that's like saying what's in Siebel wasn't reported by Ms. Coke. What's in the medical is what they put in. The same as with Siebel. That's why, again, I referred to her actual statement that she wrote when referring to what she alleges happened.

BY MR. GERSON:

Q. Okay. Ms. Coke reported that she tripped and fell. Are you disputing that?

MR. DRAHOS: Object to the form. Asked and answered.

THE WITNESS: So what I am saying is that the best place for me to understand,

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

or for Royal Caribbean to understand exactly what happened, according to her, would be what is in her own handwriting, because whatever was put in Siebel that you wanted me to read before, was put in by someone else.  What is in medical was put in by someone else.  All of those could be accurate; all of those could not be.  But what is the most accurate of what she is saying happened, or what she is alleging, would be what she wrote in her own handwriting.

BY MR. GERSON:

Q.   Did you read her deposition testimony?

MR. DRAHOS:  Object to the form.

THE WITNESS:  She wasn't deposed.

BY MR. GERSON:

Q.   Have you -- are you familiar with something called a shipboard safety meeting minute?

A.   Yes, I am.

Q.   Was there an accident investigation conducted in this case?

A.   Yes, there was.

Q.   What's a shipboard safety meeting?

A.   That's a -- it's a monthly meeting

that's held on board the ship to discuss different safety related issues.

Q.   Is the safety meeting committee -- is the safety meeting committee -- or does a safety meeting occur -- well, strike that.

Are guest accidents discussed at safety meetings?

A.   Sometimes they are; sometimes they are not.

Q.   Okay.  And do you know whether or not Ms. Coke's incident was discussed at the safety meeting in -- subsequent to her being on the ship?

A.   Yes, it was.  It wasn't really discussed -- it was -- it was recorded down as a very -- I don't know how much of a discussion there was, but it was mentioned in the safety minute meetings.

Q.   And do you have a copy of that safety meeting?

A.   I do.  Again, though, it's very -- my copy is very small.  It's hard for me to read.  I need a flashlight or something.

Q.   Okay.  So are you familiar -- let me show you what we'll -- what we'll mark as Exhibit 3 to the depo.

(Thereupon, Plaintiff's Exhibit No. 3 was marked for identification.)

BY MR. GERSON:

Q.   And taking a look at what's been marked as Exhibit 3, do you recognize this Shipboard Steering Committee Meeting Minutes?

A.   I do.  Can you make it bigger?

Q.   And -- I can.  You have an electronic copy; don't you?

A.   Yes, but I'm in this deposition, so I don't want to, at this point with your questions, pull it up.  But if you want me to, I can.  I'm looking at a hard copy.  It's just hard for me to see.

Q.   Okay.  Is this the shipboard safety steering committee meeting minutes that was produced in this case?

A.   Yes.

Q.   All right.  And the shipboard safety steering committee meeting is -- tell the members of the jury what that is.

MR. DRAHOS:  Object to the form.

THE WITNESS:  I've already answered that question.  It's a monthly meeting that -- that they discuss various different

safety issues.

BY MR. GERSON:

Q.   And who runs them?

A.   It's -- it's run by a lot of -- hang on.

So it will be run by the captain, who's the committee chair.  And then there's committee team members that are the heads from each department.

Q.   So how often are safety meetings conducted?

A.   I believe it's monthly.

Q.   And various issues, including safety and guest accidents, are discussed at the safety meetings; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  There's -- sometimes guest incidents could be discussed at them.

It's not always, but sometimes yes.

BY MR. GERSON:

Q.   And more -- and usually prior to there being a safety meeting to discuss an accident, there's an investigation that occurs; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm sorry, you froze on

my end.  So you're going to have to ask that again.  I apologize.

BY MR. GERSON:

Q.    Sure.

The procedure, generally, within Royal Caribbean is that when someone reports that they were injured on a Royal Caribbean ship, there's an accident investigation that's conducted; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Correct.  If someone reports to the medical facility with an injury as a result of an incident, an investigation will be conducted.

BY MR. GERSON:

Q.    All right.  And there was, in fact, an investigation conducted in this case; correct?

A.    That is correct.

Q.    And the incident investigation is memorialized in something called an incident report; correct?

A.    That is correct.

Q.    And a copy of the incident report is provided to the staff captain, along with other investigative materials in connection with not just Ms. Coke's case, but other passenger injury cases

where someone is injured and reports to the medical infirmary?

A.   It's not -- a copy is not provided to them.  They have to sign off on them.

Q.   So the staff captain has to read the accident report and sign off of it to make it official; is that what you're telling me?

A.   I have to look to see who it is exactly.  I'm not quite sure of which people need to sign off on it to make it official.  I don't know if it's a staff captain for sure.  I'd have to look.

Q.   Okay.  But my point is that, Ms. Campos, that for -- in this particular case, we know that there was a safety meeting minute that -- or safety meeting that referred to Ms. Coke's fall, trip and fall on this particular ship; correct?

A.   Yes.  I mean, you've asked me this question five times.  Yes.

MR. DRAHOS:  Yeah.  Object to the form.

BY MR. GERSON:

Q.   Okay.  So taking a look at the steering committee meeting for December the 15th, 2019, this was -- this is the shipboard safety

steering committee meeting for the ADVENTURE OF THE SEAS, and we have all the attendees, the department heads, as you've indicated, are identified; correct?

A.   Correct.

Q.   All right.  And this is also -- this safety meeting is conducted in the regular course and scope of Royal Caribbean's business; correct?

A.   That is correct.

Q.   And now if we go down to page 7, do you see Ms. Coke's incident referenced?

A.   Yes.

Q.   At the top of this document -- well, who prepares this document?

A.   It's prepared by the -- the people there.  I don't know who the secretary is that's taking it all down.

Q.   Well, does the passenger prepare this document?

A.   No.

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, I don't --

BY MR. GERSON:

Q.   So all this information -- all this information that's identified in the shipboard

safety committee minute --

A.   Okay.

Q.   -- is provided and prepared by someone on -- within Royal Caribbean; correct?

A.   So this specific one, the minutes were recorded by Sylvia Smith.

Q.   Okay.  And if we look to page 7 of the meeting minute, we have an incident date of November the 10th, 2019; correct?

A.   I can't read that.  I don't know.

Q.   Well, you have a -- you have a better copy in front of you.  It's just that we're via Zoom.

A.   I can't read the copy that's in front of me either.  I've been trying to say that.  It's very small.  I can't read my copy in front of me, and I -- if you could just make yours bigger, I could read it.  I don't have the ability to zoom on mine.

Thank you.

All right.

Q.   You see right there it says "incident date"?

A.   Yep.

Q.   And so this incident that is -- we're

referring to, this is the incident for Ms. Coke; correct?

A.    Correct.

Q.    And at the top here it says we've got an incident date of November 10th, 2019, and then we have an incident -- what's the next entry over here?

A.    I can't read it.

Q.    Incident -- incident type?

A.    I honestly can't read it on either version.  On yours, if you can just make it a little bit bigger, or on mine.  My eyes have gotten very bad.  I need glasses.  I can't read it.

Q.    Ms. Campos, I mean, you've read these documents before; haven't you?

A.    I can't read it.  I don't memorize these documents.  If you could just increase it a little bit more, it would be very simple for me to read.

Thank you.  That's it.  Okay.  Now I can read it.

Q.    All right.  At the top of the meeting minutes, we have "incident date"; correct?

A.    Correct.

Q.    And then we have "incident cause,

general"; correct?

A.   Correct.

Q.   And what does it state for "incident cause, general"?

A.   "Slip, trip and/or fall."

Q.   And then the next line item we have for Ms. Coke's incident memorializing the safety meeting minute is something called "incident cause"; correct?

A.   That is correct.

Q.   And what is entered in there as the incident cause?

A.   From uneven surface.

Q.   And then you have the general location identified; correct?

A.   Correct.

Q.   And then you have the specific location identified; correct?

A.   Correct.

Q.   And what is indicated for the specific location?

A.   Lobby bar.

Q.   And then we've got a reference to the incident injury; correct?

A.   Correct.

Q.    And what is indicated there?

A.    Fracture.

Q.    Okay.  And then we also have incident level; is that correct?

A.    It says "incident level," correct.

Q.    And what does incident level mean?

A.    I guess incident level would be how severe the incident is.

Q.    And you have indicated moderate; correct?

A.    Correct.

Q.    And then incident description, it states -- what is -- what are the comments in -- or what are the notations indicated in this record as far as what the guest stated?

A.    "Guest states that she tripped over" --

MR. DRAHOS:  Object to form.

THE WITNESS:  -- "a hump" -- so it says, "Guest states that she tripped over a hump and fell, hurting her knee."

BY MR. GERSON:

Q.    And then --

A.    Oh.

Q.    -- incident body part, it's got knee;

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

correct?

A.    Correct.

Q.    And then you've got statement of injured -- of injured person, which is what you were referring to in the passenger injury statement; correct?

A.    I'm sorry, my -- my computer froze again.  Statement of injured person is taking it directly from her handwriting and putting it there. So it says, "I was walking and next thing I knew, I was over the hump falling."

Q.    The passenger injury statement is a document that's provided to the passenger in the medical infirmary; correct?

A.    Correct.  Most of the time, yes. Correct.

Q.    Okay.  So anywhere in the ship safety meeting minutes is there any reference to Ms. Coke indicating that she slipped?

A.    No.  It just has the reference to the slip, trip and/or fall as the incident cause. That's the only mention of slip.

Q.    Well, in the safety records that -- or in the records that we're referring to, Royal Caribbean categorizes slip, trips and/or falls as

one general type of incident; correct?

A.    Correct.

Q.    Royal Caribbean doesn't distinguish a slip categorically, as opposed to a trip, when those types of falls occur within the their internal records and reporting systems; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yeah.  I don't know for sure.  I can't say if there's a drop down that says just slip.  I don't -- I don't know.  I don't recall.

BY MR. GERSON:

Q.    Okay.  And now, you're also familiar with something called Siebel; correct?

A.    I'm pretty sure we went over Siebel for a while at the beginning of this deposition.

Q.    Okay.  And Siebel is a database that does what?

A.    Siebel is the guest service logs.

Q.    And in the -- well, there's a remarks comments for Siebel; correct?

A.    Yeah.  I read from them earlier in this deposition.

Q.    Okay.  Well, we went over the guest services log, but I don't believe that we went over

the Siebel comments, and I don't want to prolong this any longer than we need to, Ms. Campos.  But --

A.    Okay.  I'm --

Q.    -- isn't it true --

A.    I'm trying to tell you that when you refer to the guest services log, the program that it's in is Siebel.  So it's the same.

Q.    Okay.  All right.  So all I -- so let me clarify.

All I was referencing was that in the -- aside from the guest services log, there are also Siebel entries which also memorialize the fact that Ms. Coke reported that she tripped and fell; didn't -- isn't that so?

MR. DRAHOS:  Object to the form.

Do you want to show her what you're referring to?

THE WITNESS:  Okay.  I'm trying to -- I'm not trying to make this any more difficult or hard.  I'm trying to assist you.  I just want you to understand that the guest services log is essentially the same thing as Siebel.  So we provided you with that guest services log, but if you

look, you'll see within it are the same ones we already went over earlier. Siebel and guest services log are one and the same. That's all I'm trying to explain.

BY MR. GERSON:

Q. In the guest -- in the service history remark within Siebel, it's reported by Ms. Coke that she tripped and fell; isn't it?

MR. DRAHOS: Object to the form.

You need to show her what you're referring to.

MR. GERSON: No, I don't.

THE WITNESS: I know what he's --

MR. DRAHOS: Okay.

THE WITNESS: -- referring to, because it's what I was reading from the first time I read it, and it has a different time.

So what you were pulling up was the guest service log report. What I read from at the beginning was the service history remarks. It's going to be the exact same thing that I read before that we went over at length, word-for-word the same. It's the same entry. It's just pulled a different way. But both of them are pulled

from the same program, which is called Siebel. So it's not that she said it two separate times or it's put in two separate times, those entries from guest services log report and from service history remarks are identical.

BY MR. GERSON:

Q. Okay. Tell me, did Royal Caribbean do anything to investigate what happened to Ms. Coke?

A. Yes. The safety officer conducted an investigation of the incident.

Q. Tell me what Royal Caribbean did to investigate what happened to Ms. Coke.

A. From what I could -- from what I can see -- sorry, I'm just -- my computer is shaky again.

From what I can see, the -- the safety officer prepared an incident report. He took photographs of the area. He took her -- Ms. -- Ms. Coke's statement, and all that was placed into the incident report.

Q. So when you say that the safety officer took Ms. Coke's statement, are you telling me that aside from the passenger injury statement, that another statement of Ms. Coke was -- was taken

by a safety officer?

A. No. That would be the passenger injury statement.

Q. Okay. You don't have any other statements or information that was recorded by Ms. Coke; do you?

A. No, we do not.

Q. Okay. And just for the -- for members of the jury, what is -- what does Royal Caribbean call the area where Ms. Coke tripped and fell?

MR. DRAHOS: Object to the form.

THE WITNESS: It would be -- it would be the area that we saw on the safety minute meetings. That would be the area.

BY MR. GERSON:

Q. What does Royal Caribbean call that area? How do you describe it?

A. Well, first of all, we're -- Royal Caribbean's not quite sure exactly where she fell, as she has not been deposed and it wasn't captured on CCTV. But in general, the area where she fell would be either the lobby bar, Boleros, it's near the casino. It was that -- that area, in general. It's probably the lobby bar or -- it's really called Boleros. It's not called the lobby bar

anymore.

Q. When you say "it's really called Boleros," tell me what you mean by that.

A. Boleros is the bar that's, quote-unquote, the "lobby bar."

Q. What is your understanding about where Ms. Coke was coming from and going to prior to her fall?

A. I don't really have an understanding of that. Royal Caribbean --

Q. Okay.

A. -- doesn't have an understanding -- sorry. Royal Caribbean doesn't have an understanding of that, as she has not been deposed yet. So I don't know where exactly she was coming from and going to.

Q. Well, you mentioned that there was an accident, an investigation that was conducted in response to Ms. Coke reporting that she was involved in a trip and fall on deck 4 as she was walking towards the casino; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: There was an incident report created after she went to the medical facility and wrote down that she

fell over a hump on deck 4.

BY MR. GERSON:

Q.   And there were photographs -- or strike that.

And not only -- strike that.

In the infirmary, Ms. Coke was X-rayed and it was determined that she had a knee fracture; correct?

A.   Correct.  In the infirmary, an X-ray was taken of her left knee and she had, yes, a small avulsion --

Q.   A patella fracture?

A.   -- fracture -- a small avulsion fracture to her left kneecap.

Q.   So a patella fracture; correct?

A.   Correct.

MR. DRAHOS:  Object to the form.

THE WITNESS:  Well, actually, I shouldn't say correct, because I -- I'm saying what -- I guess I could read it directly from the medical records, but sure.

BY MR. GERSON:

Q.   Okay.  And now if we -- you mentioned before that any time -- as a matter of policy and

procedure, any time that there's an accident that's reported or that someone goes to the medical infirmary, or a passenger reports to the medical infirmary that they were injured, that generates an incident investigation; correct?

A. Correct.

Q. All right. And now, were photographs taken in connection with this particular investigation?

A. Yes.

Q. How many photographs were taken?

A. Okay. Duplicates. However many we produced to you. Some of these might be the same.

Q. Did you review the photographs in preparation of your deposition?

A. Yes, I did.

Q. Tell me everything that Royal -- well, let me just show you this. Let me show you what we'll mark, I guess, Exhibit 4 to the deposition.

(Thereupon, Plaintiff's Exhibit No. 4 was marked for identification.)

BY MR. GERSON:

Q. And I'd like you to take a look at a series of photographs. I see one, two, three, four, five, six, seven photographs that have been

produced in this case.

A. Keep on going down. There are more, though, no?

Q. Okay. Well, I stand corrected. Looks like there are a total of ten photographs. It's my understanding that seven of these photographs were photographs taken by Royal Caribbean as part of their investigation in this case.

A. Okay. Is that a question? Is there a question?

MR. DRAHOS: Object to the form.

BY MR. GERSON:

Q. Well, do you know how many photographs were taken as part of Royal Caribbean's investigation in this case?

A. All of these photographs were taken as part of Royal Caribbean's investigation of the case.

Q. Okay. So if we take a look at the first seven that's on the screen, we've got -- what do you call this area in the first photograph where my arrow is pointed?

A. There's not really a name. It's just deck 4 public area. There's no -- it's the area that leads up to the casino. There's no real

specific name for it.

Q. Well, you've mentioned before in your testimony that Royal Caribbean had no idea where the fall occurred, but we have here photographs, a total of seven, and then we've got three photographs at the bottom, which we could talk about. But just looking at these first seven, these were taken by Royal Caribbean's investigating officers; correct?

A. Correct. And I'd like to clarify. I don't think I said I have no idea. We just don't know the specific location within this walkway area of where the incident occurred. I said that it was --

Q. Okay.

A. -- the best way to describe it would be to look at the safety minute meetings of the area, the drop down area they put in there. But specifically on the walkway, we don't know specifically where she fell. It was -- you know, what area within this area she fell specifically.

Q. Well, the photographs that were taken by Royal Caribbean were taken based on the information that was provided to Royal Caribbean by Ms. Coke, in part, that she tripped and fell on a

hump, as she called it; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Correct.

BY MR. GERSON:

Q.    Is the floor surface in this particular area, if we look right here at Exhibit 1, do you recognize this floor surface?

A.    I recognize it, yes.

Q.    Okay.  Isn't it true that Ms. Coke reported that she tripped on a -- on the flooring surface that was not level?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Ms. Coke wrote down that she fell on a hump.  So that would suggest to me that it's a hump, not -- there's some kind of a hump.

BY MR. GERSON:

Q.    Does -- is the floor surface in the photograph that we're looking at, do you see how it kind of plateaus at the top here?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It -- I don't know what you mean by "plateaus."

BY MR. GERSON:

Q.    Okay.  Do you see the white marble

where my cursor is and --

A. I'm sorry, Mr. Gerson -- Mr. Gerson, will you just give me one minute. I apologize, guys. Can I just go for one minute?

MR. DRAHOS: Sure.

MR. GERSON: Sure.

MR. DRAHOS: Can we actually take a -- can we take a bathroom break? We've been going about an hour.

MR. GERSON: Sure.

THE WITNESS: Is that okay? I'm sorry. I just --

MR. DRAHOS: Yeah. No. Yeah, let's -- let's take a quick break for the restroom. That would be great.

THE WITNESS: Thank you.

MR. DRAHOS: Thank you.

THE VIDEOGRAPHER: Okay. We're going off the record at 11:34 a.m.

(Thereupon, a short recess was taken.)

THE VIDEOGRAPHER: We're going back on the record at 11:40 a.m.

BY MR. GERSON:

Q. Okay. Ms. Campos, did you review the photographs as part of your preparation for today's

deposition?

A.    I did.

Q.    You reviewed the photographs that were taken by Royal Caribbean as part of their investigation?

A.    Correct.

Q.    Okay.  Again, I'm going to show you what's been marked as Plaintiff's Exhibit 4.  Do you see the first photograph here?

A.    I do.

Q.    Okay.  Is this the general area that was photographed by Royal Caribbean's personnel in connection with their investigation of this case?

A.    Yes.  This is a photograph taken by Royal Caribbean as part of the investigation of this case.

Q.    Okay.  And in the first photograph that we're looking at, we've got different floor surfaces; correct?

A.    It's marble, yes, but it's different color marble.

Q.    We've got marble and then we've got, if we look a little ahead in the first photograph here, you see that there's this black strip, and then we've got another beige surface.  Do you see

that?

A.   Yes.

Q.   If we take a look a little lower here, we see the same marble surface and a black strip, and then another orange and black speckled tile of some sort.  Do you know what these different materials consist of?

A.   I believe that the beige, yellow-ish material is marble.  I believe that the black or the brown speckled is also marble.  That's my understanding, that those are marbles.  And that the black strip is an antiskid strip.

Q.   And what is your -- and if -- so we have an antiskid strip, which is what you're referring to as what this black portion is.  And then in between the antiskid strip, on one side of the antiskid strip we have marble, and on the other side of the antiskid strip, we have another change in the surface, which you also describe as a marble, followed by more white marble, followed by another black strip.  And this is all as you approach the casino; correct?

A.   Yeah.  I don't think that -- I think that the only change is -- the two marbles are the same, they're just different colors.  That's my

understanding. And that the black strip is the different surface, yes.

Q. If we focus in on this black strip that you're referring to, is that something -- is that black strip something that is something that could be -- I don't know why this is doing this. Excuse me for a second.

The black strip that we're looking for in this first photograph, is that something that can be removed or replaced by Royal Caribbean?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know. It was placed there by Royal Caribbean, but I don't know -- well, I guess technically, yes. Anything there can be removed or replaced by Royal Caribbean.

BY MR. GERSON:

Q. Okay. Do you know why there are -- you call them nonskid strips. Do you know why there are nonskid strips on this particular walkway?

A. I don't know.

Q. Is this entire floor surface -- or strike that.

As you approach -- well, if we're

taking a look at Exhibit 1, this photograph, what is beyond what's depicted in this -- at the top of the picture?  It looks like the floor surface changes.  Is that accurate or no?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I think the aesthetic of it changes, but my understanding, and I'm almost positive that it's still marble, just the look of it changes.

BY MR. GERSON:

Q.   So going back to, in this particular case, Ms. Coke reported that she tripped on what she described as a hump; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Correct.  She says, quote --

BY MR. GERSON:

Q.   And --

A.   Wait.  Sorry.  She -- she never -- she, in her own handwriting, never wrote -- wrote the word "tripped."  She said she fell on the hump.

Q.   In her -- in her -- in the Siebel remarks and the guest injury log, Ms. Coke reported that she tripped over a hump; correct?

MR. DRAHOS:  Object to the form.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Asked and answered.

THE WITNESS:  In -- in the -- in the Siebel, which is the guest injury, so it's the same entry, it's one entry, it's -- it's written down that she stated that she tripped over -- or it's written down that she tripped over a hump.  In her handwriting, it just says that she fell on a hump.

BY MR. GERSON:

Q.   And then -- sorry, go ahead.

A.   No.  I'm just clarifying what it says on one and what it says on the other.

Q.   And then Royal Caribbean went and sent out personnel to photograph the area where Ms. Coke reported that she tripped and fell; correct?

A.   As part of the investigation --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- into the incident, the chief safety officer took pictures of the area she stated that she fell on the hump, the general area.

BY MR. GERSON:

Q.   Okay.  If we look again at Exhibit 1, isn't it true, Ms. Campos, that this floor surface

is not a flat floor surface; is it?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I believe it's flat.  I don't know if that's the word that you're looking for.  But it is flat, I believe.  Yes.

BY MR. GERSON:

Q.   As you approach -- are you telling the members of the jury that there's no slope upward as you -- as my cursor is indicating, as you approach this black nonskid strip as you're walking toward the casino?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm not telling you that.  You asked me if the flooring is flat.  I believe it is flat.  That doesn't mean that there can't be a change in elevation.  But it is flat.  It's just --

BY MR. GERSON:

Q.   There is a change in elevation -- sorry.

There is a change in elevation in the area where Ms. Coke indicates that she tripped and fell; isn't there?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Sorry, the way I'm thinking about it is that -- I'm sorry, I was frozen again.  Okay.  Go ahead.

BY MR. GERSON:

Q.    There is a change in elevation in the area where Ms. Coke reported that she tripped and fell; isn't there?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Okay.  So I can say that there is a change of elevation in the area where you are showing me right now.  I don't know if that's the specific area that Ms. Coke fell, because she gave a general area.  We took pictures of different areas as well.  I don't -- Royal Caribbean, sitting here today, does not know exactly where she fell because it was not captured on CCTV.

BY MR. GERSON:

Q.    Well, we'll talk about --

MR. DRAHOS:  Wait.  Wait.  Wait.  Let her finish the answer.

BY MR. GERSON:

Q.    -- that in a second, but --

MR. DRAHOS:  Wait.  Wait.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Ms. Campos, did you finish your answer?

THE WITNESS:  I just -- I'm going to say this just so you understand so -- for further questioning.  I understand that those are the -- that's the area we took the pictures, there are other pictures of different areas there as well.  Royal Caribbean does not know exactly within that area where your client fell.  She has not been deposed yet.

BY MR. GERSON:

Q.   Based on the information that was reported by Ms. Coke and that was -- that she identified as or described as a hump, Royal Caribbean sent a team of their security personnel to go and photograph the area where they believed Ms. Coke reported she tripped and fell; isn't that correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  No, that's incorrect. Based on her incident, an investigation was done, not by the security team, not by a team, by one person, by the safety officer, went and took photographs of the area that

she stated that she fell.  Again, it's the general area of where she stated she fell.  We do not have the specific area where exactly she fell, as she has not been deposed and it wasn't captured on CCTV.

BY MR. GERSON:

Q.   And in the general area that was photographed as part of Royal Caribbean's investigation in this case, there is a change in the elevation that changes or slopes upward as you approach the entrance to the casino; isn't that correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes.  As you can see, there's a sign in one of the photographs that says, "Caution:  Watch your step" showing a change in elevation as a person is walking, or showing a ramp as a person is walking.  So there is a sign in that area that shows that there is a -- that they're approaching a change in elevation.

BY MR. GERSON:

Q.   Okay.  So we'll get to that in a second.

So we looked at the first -- so the

change in the elevation you're referring to is the change in elevation this entire walkway in photograph -- in the first photograph?  Is it -- or is the change in elevation just as you approach the top of this second strip in Exhibit 1, where my cursor is indicating?

A.   I don't know.  I don't know exactly. I don't know.  It's the area -- my understanding is that it's -- so that area in the picture is a slope up.

Q.   So --

A.   So I'm not exactly sure.

Q.   Okay.  Now, if we look at the second photograph that was taken as part of Royal Caribbean's investigation, this is also part of the Composite Exhibit 4, we see a closer up photograph which depicts the black metal -- excuse me, the black nonskid strip separated by the orange and black speckled marble, which then, ahead of that, is more white marble followed by the raised elevated portion of the floor surface of deck 4. Do you see that?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I see the photograph. I'm not quite sure that I'm agreeing with

how you're stating it.  But yes, I see the photograph you're talking about.  It has black, orangey, yellow, then black, and then more marble flooring.

BY MR. GERSON:

Q.    Is the reason why there are -- well, do you know the reason why there are nonskid strips in this particular area?

A.    I do not.

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.    Is the reason why there are non -- well, what are nonskid strips used for?

A.    Skidding, slipping, prevent slipping.

Q.    To help prevent slip and falls?

A.    Correct.

Q.    Do you know how the -- the nonskid strips, they consist of a black tape-like substance; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes, that's what they are.  Yes.

BY MR. GERSON:

Q.    Okay.  And they can be subject to wear and tear; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know. I suppose. I don't know.

BY MR. GERSON:

Q. And is the reason why you have nonskid strips on this particular area of the ship partly because of the fact that you have an unlevel slope in the flooring surface by the casino entrance?

MR. DRAHOS: Object to the form.

THE WITNESS: Again, I don't -- again, I don't know why the black skid strips are there.

BY MR. GERSON:

Q. Well, let's just talk about, generally, about this area. For the members of the jury, if we take a look, and I'll show you -- which is going to be also part of Composite Exhibit 4, this is another photograph that was taken in connection with this particular investigation. We have here -- well, what would you describe this view?

A. I don't know what you mean by that. How do you want me to describe?

Q. Well, do you recognize this photograph?

A. Yes.

Q. All right. What is this a photograph of?

A. It's a photograph of the general area and a photograph of a caution sign, as well as the entrance to the casino.

Q. All right. And so the casino is -- this is the main entrance to the casino; is that correct?

A. It's one of the entrances to the casino.

Q. How many entrances to the casino -- well, which casino is this?

A. There's only one casino on board.

MR. DRAHOS: Object to the form.

BY MR. GERSON:

Q. Okay. And is there -- are there any other ways to get in and out of this casino, other than walking through this entrance on deck -- on deck 4?

MR. DRAHOS: Object to the form.

THE WITNESS: I'd have to look. I'm quite sure there are, but I'm not a hundred percent if there are.

BY MR. GERSON:

Q.   Okay.  Well, at least as far as in this photograph, are there any other casinos on deck 4 that you're aware of?

A.   I'm sorry, I can hear now.  Sorry, I couldn't hear before.

Q.   Are you aware of any other casinos on deck 4?

A.   No.  There's only one casino on the ship.

Q.   Taking a look again at what's been marked as Composite Exhibit 4, this is the only -- you would agree that the casino is a high traffic area; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, it depends on -- it depends on the time of day, where the ship is.  It could be; it couldn't be.  It's not always a high traffic area, but it could be.

BY MR. GERSON:

Q.   Are you aware of any other ways to get in and out of the casino, other than this entrance that we are taking a look at in Composite Exhibit 4, photograph where it says "Casino

Hollywood"?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm pretty sure -- I think that there is, but I didn't check.  I can't say a hundred percent certainty, but I believe that that's not the only entrance.

BY MR. GERSON:

Q.   Okay.  So maybe there's another entrance, but you would agree your passengers are coming in and out of this -- out of the casino through this corridor, and in order to get through the casino, they've got to walk through this walkway, and to get out, they've got to walk down the other side of the walkway; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  No.  No.  I wouldn't agree with that.

BY MR. GERSON:

Q.   Why not?

A.   Because there might be -- and I believe there are other exits.  I don't know what you're saying about walking through the other side of the walkway.  They can walk on whichever side of the walkway that they would want to walk on.  They

could walk on the carpet.  I just -- your question is -- very specifically, I can't agree that everybody's going to go through that entrance, walk the same way and walk out the same way.

Q.   Well, it's foreseeable that passengers are going to be walking in and out of that, or walking on that particular corridor to get in and out of the casino.  Do you -- do you dispute that?

A.   No.  That's agreeable.  Yes.

Q.   Okay.  And the casino's open 24 hours a day; isn't it?

A.   No, not necessarily.

Q.   Okay.  Is it more often than not the casino is open, as opposed to closed?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know the hours of the casino.  That wasn't part of my areas of inquiry.  But it's not necessarily open 24 hours a day, no.

BY MR. GERSON:

Q.   Is the casino a popular area on the ship?

A.   Yeah.  I would consider a casino a popular area when it's open.

Q.   Casino -- so if the casino's a popular

area on the ship, then this walkway that -- where Ms. Coke was going, was an area where passengers are foreseeably expected to traverse on a daily basis while they're on this particular vessel; isn't it?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I can say that it is foreseeable that passengers are going to traverse that walkway.  They're not expected to, but passengers may and can traverse that walkway.

BY MR. GERSON:

Q.   And alcohol is served in the casino; correct?

A.   Yes, there is alcohol served in casinos on board the ships.

Q.   And the casino is open late and early into the morning; correct?

A.   Again, I don't know the exact schedule --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- but typically, yes, it is open at night and after midnight.  I just don't know the schedule.

BY MR. GERSON:

Q.   Okay.  Now, if we go back to Composite Exhibit 4 -- or strike that.

Were there any measurements taken by any of Royal Caribbean's personnel in connection with their investigation in this case?

A.   It appears that there's a photograph with a ruler.

Q.   And why was there a photograph of a ruler documented in Royal Caribbean's file as part of Royal Caribbean's investigation in this case?

A.   I don't know.

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.   Did you -- did you do anything to find out?

A.   I wasn't able to get in touch with the safety officer.

Q.   I'd like you to take a look at number 4 of the notice for today.  And I'll just read it into the record, Composite Exhibit 1, and it states, "Describe all actions taken by the defendant after it was notified of plaintiff's incident."

You mentioned before that --

A.    Okay.

Q.    -- there was -- we've already established there was an accident investigation completed; correct?

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.    Right?

A.    I'm sorry.  What?

Q.    We've already established that there was an accident investigation completed; correct?

A.    Correct.  The safety officer --

MR. DRAHOS:  Form.

THE WITNESS:  -- completed an investigation.

BY MR. GERSON:

Q.    And the safety officer also took measurements in connection with his investigation; correct?

A.    It appears so, yes.

Q.    Well, if we look at the photograph that was produced in this case, we've got -- if you look at the third photograph, we've got a ruler -- one, two, three.  Are you able to tell me what they're measuring?

A.    I just told you I'm not able to tell

you that.  I don't know what the measurement was for.

Q.    What did you do to find out what the purpose of these measurements were?

MR. DRAHOS:  Object to the form.
Asked and answered.

THE WITNESS:  I -- I tried -- I tried to get in touch with the safety officer and was unable to do so.

BY MR. GERSON:

Q.    Did you -- did you do anything to speak to the staff captain about why these measurements were taken?

A.    The staff captain has nothing to do with the investigation, would not know why.

Q.    Well, the staff captain signs off on the accident report; correct?

A.    Again, I'm not a hundred percent sure as to which three -- or which -- which people would sign off.  But they still don't oversee it.  They wouldn't know.  It's -- the staff captain would not know.

Q.    As you sit here today --

A.    I've done this for long enough to know that this --

Q.    -- has Royal Caribbean --

A.    I've done this for long enough to know that the staff captain would not know.

Q.    As you sit -- if we -- if we take a look at this accident investigation photograph, we've got what looks like to be 9 inches of height measured from the bottom of the floor surface to whatever this area is.

Do you have any idea -- you don't have any idea why they're measuring this; do you?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Maybe -- maybe he thought that's exactly where she fell and maybe he thought she fell over that coming up.  Maybe she thought that she fell over that silver piece.  I don't know.

BY MR. GERSON:

Q.    All right.  Someone within Royal Caribbean's crew felt it was necessary to take some sort of measurements as part of their investigation into Ms. Coke's incident; correct?

A.    Obviously, yes, if there are photographs of it.  Maybe that's where he believed that -- maybe he believed she fell over the silver lining that caused her to fall.

Q. Now, if we take a look at the fourth photograph here, do you see what's been marked -- we've got one, two, three, photograph four is another photograph produced by Royal Caribbean in this case. Do you see this?

A. Yes.

Q. And this photograph -- and we will -- this one will be -- we just go sequentially, 4A is another photograph of the area documented by Royal Caribbean; correct?

A. Correct.

(Thereupon, Plaintiff's Exhibit No. 4A was marked for identification.)

BY MR. GERSON:

Q. And this is another view of the black nonskid strip prior to the entrance to the casino; correct?

A. Correct.

Q. And do you see in this photograph whether or not there seems to be a gap in the nosing on this particular area?

A. I can't see that, no. Do you want to make it bigger? I don't see that.

Q. Okay. Does Royal Caribbean take measurements as part of their investigation in slip

and falls?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know.  I mean, it depends, I guess.  They could take measurements.

BY MR. GERSON:

Q.    Well, isn't it more likely than not that if someone's taking measurements in an area on the ship where someone reports that they tripped and fell, that someone is trying to determine whether or not there is, in fact, a tripping hazard?

A.    I will say that in my 14 years of experience at Royal Caribbean, I have rarely seen, in a trip and fall or a slip and fall, any measurements being taken during an investigation. So I couldn't say whether or not it's more likely for them to do anything because I have rarely seen measurements taken during an investigation.  So I don't know the purpose of these.  If it was something common, I'd probably be able to give you an answer, but it's not very common.  So I'm not quite sure why he was taking the measurements.

Q.    Since you're unable to identify the ship -- well, let me ask you this:  Did you review

the ship incident report in preparation of your deposition?

A.   No.   I just reviewed the guest statement and the photographs, which were produced to you in response to discovery.

Q.   If measurements were taken, would they have been documented?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't -- I don't know. Possibly.  But again, I -- actually, honestly, it's extremely rare.  I can't even remember another case that I've seen on an incident report measurements being taken.  I've never seen any being documented in the 14 years I've been here.

So I don't know.  I really don't know.

BY MR. GERSON:

Q.   So you're telling me as a matter of policy, that in the event that Royal Caribbean is notified of a tripping hazard, Royal Caribbean doesn't have a procedure in place to actually take measurements to identify whether, in fact, a tripping hazard exists; isn't that what you're telling me?

A.   No, not in the least.

Jeannie Reporting
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

Q.   Well, you just told me in the 14 years that you've been working for Royal Caribbean, you can't recall one time where there's been measurements taken in connection with a trip and fall?

MR. DRAHOS:  Object to the form.

THE WITNESS:  First of all, during the initial investigation done by a safety officer.  Subsequent, I have seen it, when after a claim comes in.  But you're assuming a lot of things in your questioning from when this originally happened that I don't think that you can assume.  But in general, I don't typically see them measure when they're doing the incident at the beginning.  She said that she fell over a hump.

BY MR. GERSON:

Q.   She said --

A.   I don't know --

Q.   -- that she tripped.

A.   I don't -- you're assuming that this is a tripping hazard.  You have to put that -- so your assumption is because she fell here, it is a tripping hazard.  Royal Caribbean does not believe

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

that this is a tripping hazard. So you would have to assume that that's what we believe in order for me to answer that question, which I can't do, because we do not believe that this is a tripping hazard.

Q. Does Royal Caribbean have any policies for dealing with tripping hazards?

A. Again, we do not believe that this is a tripping hazard. Do we have any policies --

Q. That wasn't my question.

A. -- regarding to dealing with tripping hazards? Yes. If Royal Caribbean sees a tripping hazard or if there is a tripping hazard, it's remedied.

Q. Okay. Tell me what that policy is called and what documentation you're referring to.

A. I would just be referring to --

MR. DRAHOS: Object to form.

THE WITNESS: -- in general, Own the Spill. So if there's anything that could cause somebody to slip, trip or fall that's on the floor or on any area of the ship, that we would fix it so it wouldn't be there anymore.

BY MR. GERSON:

Q.    Do you agree tripping hazards should be eliminated when possible?

A.    If there is a tripping hazard, yes, it should be eliminated.

Q.    And are you -- does Royal Caribbean have any written policies for dealing with potential tripping hazards?

A.    Not that I've reviewed in preparation for this deposition and not that I can recall.  I don't know if that was -- I don't know any -- nothing that I saw for this deposition that was produced.  I don't know if that was asked for, but I haven't seen any -- go ahead.

Q.    Sorry.  No, I don't want to interrupt you.

A.    Again, the only thing I can think of off the top of my head would be the Own the Spill, which says that every crew member is responsible for the general maintenance and cleanliness and hazard free area -- I don't know, I'm not quoting it exactly because I can't remember it.  But the whole thought of the Own the Spill is that if you see something that could cause a passenger or a crew member to get injured or, you know, slip and

Jeannie Reporting
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

fall or trip and fall, that they should make sure that that is -- is cleaned up and taken away.

Q.    Okay.  My -- my question for you, and we'll -- I'd like to, you know, get to that in a second.  But you made reference to a policy called Own the Spill; correct?

A.    Correct.

Q.    Does Royal Caribbean have a policy called own the trip?

A.    No.

Q.    Does the Own the Spill policy, is that a written policy?

A.    Yes.

Q.    Does the Own the Spill written policy make any reference to trip and falls?

A.    I'd have to reread it.  I don't know if it uses the word "trip."

Q.    Well, the name of the policy is Own the Spill; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Correct.

BY MR. GERSON:

Q.    "Spill" would refer to a wet area; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes, it could.  Yes.

BY MR. GERSON:

Q.    Are you aware -- in the 14 years that you've been working for Royal Caribbean and in over the hundred depositions that you've provided, or approximately 100 depositions that you've provided, can you tell me of any written policy or procedure that specifically deals with tripping hazards on Royal Caribbean ships?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm just going to look at the Own the Spill for a second, just to make sure to see if it does.

BY MR. GERSON:

Q.    Sure.

Ms. Campos?

A.    Yes.

Q.    Do you have the -- let me show you what we'll mark as Exhibit 5.

A.    I'm not aware of any policy called own the trip or any policies that Royal Caribbean has about tripping.

(Thereupon, Plaintiff's Exhibit No. 5 was marked for identification.)

BY MR. GERSON:

Q.   Okay.  You were making reference to a policy called Own the Spill a little while ago; right?

A.   Correct.

Q.   That's a written policy that Royal Caribbean has as part of their safety manual, which talks about the duties and responsibilities of crew members in the event that they identify a spill while working; correct?

A.   Correct.

Q.   And if we take a look at that Own the Spill policy, I'm showing it to you right here, this is composite exhibit -- or Composite Exhibit 5.  This is the Own the Spill document that you were referring to; correct?

A.   Correct.

Q.   Okay.  And Own the Spill is specific to liquids in restaurants, bars, and public spaces, and it references managing excess water on open decks; isn't that correct?

A.   Yes.  However, I believe it also goes on to say that all -- all employees are responsible for the ship's cleanliness and should take great pride and ownership of their working area, every

employee must be willing to do whatever is necessary to ensure the cleanliness of the ship and the highest level of guest satisfaction. So in general, the take that I have, and I believe the employees have, the crew members have, is that it's not just a spill. If you have a -- something on the floor that fell, so say somebody left a glass on the floor or a bottle on the floor, a crew member is not going to not pick it up because it's not covered under Own the Spill. They'll still pick it up to help with the cleanliness of the ship. And that could be a tripping hazard if the crew member didn't pick it up.

So my -- the general idea of Own the Spill is not specifically just for a spill. The idea of it is that crew members have to take whatever they see on the ground that shouldn't be there, they are supposed to pick up and clean up.

Q. But as you sit here today, there's no specific policy that deals with how to address a tripping hazard in Royal Caribbean's standard operating procedures or in its safety manual?

MR. DRAHOS: Object to the form.

THE WITNESS: I have not seen a specific policy just on a trip, no.

BY MR. GERSON:

Q.   Does Royal Caribbean have anything, any policies and procedures to evaluate the existence of any tripping hazards?

A.   If they see a tripping hazard --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- then it would -- I mean, I -- you are, again, assuming that this is a tripping hazard.  But again, if they see -- if they're seeing something on the floor that can cause somebody to trip, I believe, and Royal Caribbean believes that Own the Spill covers that.

BY MR. GERSON:

Q.   Okay.  All I'm asking you is whether or not there's any written policy specific to dealing with tripping hazards.

MR. DRAHOS:  Object to the form.

THE WITNESS:  Okay.  Let me continue. Let's see what we've produced.

Specific to injury -- no, I've already answered that, though.  There's no specific policy written by Royal Caribbean, an SQM that says -- that is specific to trips.

BY MR. GERSON:

Q. Okay. You would -- isn't it true that --

A. I don't even know how that policy would be written. I don't even understand that policy. But yes, there's nothing specific to trips.

Q. All right. Isn't it true that --

A. But again, Royal Caribbean believes that Own the Spill covers trips as well.

Q. So Royal Caribbean's official policy is that the -- the -- their policies and procedures to address tripping hazards are covered in the Own the Spill policy that you referenced?

A. Yes.

MR. DRAHOS: Object to the form.

THE WITNESS: The Own the Spill policy is a -- it's not taken word-for-word that if only you see a spill, that's the only thing that you can deal with. The Own the Spill policy is a thought process that every crew member is responsible for every area of the ship. So if there is anything in the ship that can cause an injury or that can cause someone to slip, trip and/or

fall, they are responsible for pointing that out and getting it cleaned up or done. And that's the thought process behind Own the Spill. It's not taken as literally.

I mean, imagine if there was a piece of, again, garbage on the floor, because it's not a spill, a crew member is still going to pick it up. So it can't be taken literally that it's just for spills that happen.

BY MR. GERSON:

Q. Okay. Going back to the sloping area that was referred to in the photographs, is Royal Caribbean aware of any other area on the ship where the same unleveled slope exists?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know. I don't know, that wasn't one of my areas of inquiry, so I didn't look into the entire ship.

BY MR. GERSON:

Q. Now, give me a second.

I -- I'd like you to take a look at defendant's answers to interrogatories in this case. Do you have a copy of them?

A.    Yes, I do.  The supplemental or the initial?

Q.    The initial answers.

A.    Okay.

Q.    We'll mark these Exhibit 5.  Excuse me, Exhibit 6.

(Thereupon, Plaintiff's Exhibit No. 6 was marked for identification.)

BY MR. GERSON:

Q.    Take a look at Exhibit 6.  This is Royal Caribbean's official answer to plaintiff's interrogatories; correct?

A.    Yes.  I'm just trying to find my copy, but I'll just look at yours.  Go ahead.

Q.    Okay.  You recognize this answer here?

A.    Yes.

Q.    Okay.  These -- these are written questions that were served upon Royal Caribbean in connection with litigation in this case.  And the first interrogatory question -- well, before I get to that, you actually signed these; correct?

A.    I don't know if I did or if Jillian did.  I don't recall.

Q.    All right.  It actually says Jillian. But you reviewed these, in part, for your

preparation for today; correct?

A.    I did.

Q.    Okay.  And according to this interrogatory answer, it says that the plaintiff failed to exercise reasonable care for her own safety.  What facts are you able to tell me that support that Ms. Coke failed to exercise reasonable care?

A.    The facts that Royal Caribbean would say that that's the basis for that is that there was a sign clearly posted on the column prior to her walking in the area that said "Caution" or use caution -- I'd have to look at the exact wording, I apologize.  There was a sign posted right there for her to see prior to walking there, "Caution:  Watch your step."  So Ms. Coke failed to see or abide by the sign and use caution and use reasonable care for her own safety while traversing the area.

Q.    Well, if we take a look first here at the answers to plaintiff's interrogatories, doesn't it -- doesn't Royal Caribbean take the position that the subject area was open and obvious, was readily perceivable through the use of ordinary senses, thereby discharging any duty to warn?  Doesn't that basically summarize what Royal

Caribbean has stated here?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Royal Caribbean is saying a lot of things.  Royal Caribbean is saying that the subject area is open and obvious and that it's easily perceived through the ordinary senses.  However, in addition to that, Royal Caribbean does post a sign, just as an extra caution, to let people know that they need to use caution in that area.  And on top of not using reasonable care for her own safety through something that's open and obvious, in addition to that she failed to -- to adhere to the sign and use reasonable care and caution for her own safety when traversing the area.

BY MR. GERSON:

Q.   So let me make sure I understand something correctly.  Royal Caribbean's position is that their -- Royal Caribbean warned Ms. Coke about a change in elevation; is that what you're telling me?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm saying that Royal

Caribbean placed a sign saying, "Caution: Watch your step," which shows a little man on a ramp evidencing that there's a change in elevation or a ramp.  So Royal Caribbean did do that prior to her traversing the area.

BY MR. GERSON:

Q.   So Royal Caribbean acknowledges that the area where Ms. Coke was traversing at the time of her fall is dangerous?

MR. DRAHOS:  Object to the form.

THE WITNESS:  No, Royal Caribbean is not saying that.  Just -- just because -- first of all, again --

BY MR. GERSON:

Q.   So what's the purpose of a warning?

MR. DRAHOS:  Wait.  Wait.  Object to the form.  Let her finish her answer.

THE WITNESS:  First of all, I'd --

MR. DRAHOS:  And then you can follow up.

THE WITNESS:  -- like to start off by saying, again, that -- again, Royal Caribbean is not quite sure that that's even the area, the exact location that she

fell on in that area of the walkway.
That's first.

Second, no.  An area is not dangerous just because there is a warning sign.  It just allows a person to have an extra -- an extra knowledge of the fact that, yes, there could be something here that could cause -- that could cause you to fall, use extra care and caution.  But that's like saying that any time you go outside and it's raining, that's dangerous.  That's not true.  That's like saying anytime you do anything in particular, that it's going to be dangerous.  That's not true.  If somebody is using regular -- is exercising care and caution for their own safety, it is not dangerous.

BY MR. GERSON:

Q.   What is the purpose of a warning?

A.   The purpose of a warning is to warn somebody of something.  But that doesn't necessarily mean that it's warning somebody of something that is dangerous.  Everybody -- Royal Caribbean has a duty to use reasonable care under the circumstances.  Likewise, does your client to

*Jeannie Reporting*
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

use reasonable care under the circumstances.

The sign, if she adhered to it, would allow her, without it even, too, to use reasonable care and caution for her own safety when she's walking. That's all it's there for.

Q. What is reasonable care according to Royal Caribbean?

A. Reasonable care --

MR. DRAHOS: Object to the form.

THE WITNESS: -- would be to pay -- for your client, would be to pay attention to her surroundings and use --

BY MR. GERSON:

Q. What --

A. -- reasonable caution while she is traversing it.

Q. What is Royal Caribbean's definition of reasonable care? Since you've now told me that you believe that my client failed to use reasonable care, I'd like to know Royal Caribbean's official position as to what constitutes reasonable care.

MR. DRAHOS: Object to the form. She just answered that.

BY MR. GERSON:

Q. You can answer.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

A.   Well, reasonable care, under those circumstances, is that there is -- the area, in general, is reasonable under the circumstances. There's nothing unreasonable about that area. Unreasonable care would be to have an area that you're unable to walk through without having incidents.  There are millions of people that have traversed that area over the last three years and the majority of them have been able -- the high majority of them, a small, tiny, less than 1 percent fraction of those people have -- have fallen.  So it is reasonable care and caution for Royal Caribbean in that specific area because people are able to walk through it day in and day out without having any issue.

Q.   Royal Caribbean doesn't dispute that there have been other people that have fallen in this particular area due to the change in elevation; does it?

MR. DRAHOS:  Object to the form.

THE WITNESS:  There have been other people that have fallen in that area for different reasons, some of them being --

BY MR. GERSON:

Q.   Okay.

A.    -- a change in elevation.

Q.    If we look again at this sign that you are referring to, this was taken also as part of Royal Caribbean's investigation; correct?

A.    Correct.

Q.    And so this "Caution:  Watch your step" sign, this is what you're referring to as Royal Caribbean's warning about the change in elevation; correct?

A.    Correct.

Q.    And so do you know when this sign was put in place?

A.    It's been there for -- I don't know the exact date, but I know that that sign has been there prior to your client's fall.

Q.    Do you know for how long?

A.    I do not know for how long, no.

Q.    Does this sign, "Caution:  Watch your step," does it tell you where to watch your step or what to watch your step for?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Under him there is an incline or a decline, so it's showing to watch your step because of a ramp.  That's what that would mean.

BY MR. GERSON:

Q.    In fact, this particular sign, it says, "Caution:  Watch your step," but it doesn't say anything about the change in inclination that you refer to; right?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know if you heard my answer to the last question.  I think I just explained it.  Do you want me to say it again?

BY MR. GERSON:

Q.    The sign that you're referring to doesn't say -- make any specific reference to "Caution:  Watch your step" about the change in the level of the floor surface; does it?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, I'm pretty sure I already made reference to what the gentleman in the picture is walking on, which does --

BY MR. GERSON:

Q.    Well, the gentleman in the picture, it looks like he's walking on a slope downward; doesn't it?

MR. DRAHOS:  Object to the form.

THE WITNESS: In general, it's just a depiction of a ramp, a change in elevation. That's -- that's what it is.

BY MR. GERSON:

Q. So you're telling me that Royal Caribbean acknowledges that there's a change in elevation and that passengers need to be made aware of the change in elevation, and that this sign that is in place right here, as identified in the photograph, is sufficient to adequately warn passengers of a subtle increase in change of elevation on this particular floor surface as they approach the casino; is that what you -- Royal Caribbean's telling me?

MR. DRAHOS: Object to the -- object to the form. Mischaracterizes her testimony.

THE WITNESS: I think what Royal Caribbean is --

BY MR. GERSON:

Q. You can answer.

A. I think what Royal Caribbean is saying is that passengers should be able to navigate that area properly by using their ordinary senses and reasonable care under the circumstances, with or

without the sign.  However, as an added precaution, Royal Caribbean placed that sign there to allow passengers to have even have more information and -- and -- and allow them to hopefully, you know -- that sign there -- is there as an extra precaution. Royal Caribbean doesn't believe that it needs it there to warn passengers, but it's there as an extra precaution, because using your reasonable senses, people would be able to traverse that area without any -- any incident.

Q.   So is Royal Caribbean warning about the change of the level of the floor surface by virtue of that sign or not?

A.   Yes.

MR. DRAHOS:  Object to the form.

THE WITNESS:  I believe I -- I don't know if you're understanding my answers, but yes, they are.  It's an added precaution.

BY MR. GERSON:

Q.   Would it have been unreasonable for the sign to indicate to passengers to watch your step because there's a change in elevation in that particular location?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't even understand what that means.  That's what it does.

BY MR. GERSON:

Q.    Do you know what it means to be reasonable?

MR. DRAHOS:  Object -- object to the form.

THE WITNESS:  That -- the purpose of that sign is to do exactly what you've just said.  So I'm not quite sure what you're asking me at all.

BY MR. GERSON:

Q.    All right.  I'm asking you whether or not it would have been unreasonable for Royal Caribbean to provide more specific information as to why passengers need to watch their step as they approach this change in the level of the flooring surface as they approach the casino?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know what more information Royal Caribbean could have put out there.

BY MR. GERSON:

Q.    Could Royal Caribbean have indicated in a sign to "Caution:  Watch your step" because

the floor changes level as you approach this particular walkway?

MR. DRAHOS: Object to the form. Asked and answered. Argumentative.

THE WITNESS: That's exactly what the sign shows and says.

BY MR. GERSON:

Q. Okay. Let's take a look again at the sign. The sign says, "Caution: Watch your step"; right?

A. Okay. If the sign just said "Caution: Watch your step" without the figure, without the person going on an incline or a ramp of some sort, I can see why you'd be asking this question. However, the sign clearly says "Caution: Watch your step" and has a diagram of what the person should be watching their step for. So I'm not quite sure what you're asking me.

Q. Well, tell me what Royal Caribbean's position is what passengers should interpret this sign to mean as they approach the casino.

A. That there's a change --

MR. DRAHOS: Object to the form.

THE WITNESS: That there's -- that there's a change in inclination.

BY MR. GERSON:

Q.   And where in this photograph -- in this sign does it indicate that there's a change in inclination?

A.   Where the diagram is.

Q.   Is the change in inclination upward or -- or downward in this particular sign?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It appears that he's walking downward.  But in general, that's a general sign to show a change in inclination.

BY MR. GERSON:

Q.   Would it have been unreasonable -- does the sign identify where exactly the change in inclination or level occurs?

MR. DRAHOS:  Object to the form.  This has already been asked and answered.  At this point, it's becoming abusive.

THE WITNESS:  It's a -- it's a gradual change.

BY MR. GERSON:

Q.   Is there anything in the sign that gives you -- the passenger, does it identify where precisely the change occurs?

MR. DRAHOS:  Object to the form.
Asked and answered.

THE WITNESS:  You know, that -- that's -- no.  I mean, it shows the general -- a general sign that shows that there's a change in inclination.  I mean, that's very reasonable for Royal Caribbean to do.

BY MR. GERSON:

Q.    Would it have been unreasonable to provide more specific information for passengers like Ms. Coke to identify the precise location of where the change in level of the flooring surface occurs?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Yes.  I believe it would be unreasonable.  Because you know why?  We'd have to do it throughout the whole change, because it's a gradual change.  So we would have to have many signs, if that's the way that you would want it, at every inch showing where there is a change.  So yes, that would be unreasonable.  That's not feasible.

BY MR. GERSON:

Q.    Okay.

A.    It's at the point of where the change starts, and it shows that there's an incline -- a change in inclination.  And I think that's a very reasonable sign for Royal Caribbean to have.

Q.    Would it have been unreasonable to have a sign posted in the area at the top of the plateau where the floor levels off?

MR. DRAHOS:  Object to the form.

THE WITNESS:  There is no need for that.

BY MR. GERSON:

Q.    Meaning in this area right here.

A.    This is showing that there's a change in inclination.  People have to use their ordinary sense and use reasonable care and take care of themselves.  If -- it would be impossible to have signs every inch of the way showing that there's a change in inclination, and that the inclination stops.  That would require a lot of signs.

Q.    Isn't it also a reasonable expectation for passengers to anticipate that when they're walking on a marble surface, that the marble surface is going to be level and not going to slope in one direction or another?

MR. DRAHOS:  Object to the form.

THE WITNESS: No.

MR. DRAHOS: Argumentative.

THE WITNESS: Not at all. I mean, I've been on -- I mean, that's like saying that you've never been in a place where it changes elevation at all.

BY MR. GERSON:

Q. Well, we live in Miami, Florida, and you go to the grocery store. Are there changes in the flooring surface as you walk through the aisle?

A. When I go to the mall --

MR. DRAHOS: Object to the form.

THE WITNESS: If you go to the mall in Florida, yes, there are changes in elevation on different levels that you go on -- on towards something and there's a change in elevation. And there's no --

BY MR. GERSON:

Q. What mall?

A. -- sign stating it.

Q. What mall are you referring to?

A. In Aventura mall --

MR. DRAHOS: Object to the form.

THE WITNESS: -- when you're walking towards the food court, there would be a

change in elevation.

BY MR. GERSON:

Q.    Okay.

A.    There's no sign stating it.  So it is reasonable to expect changes in elevation when you're walking through structures.

Q.    Would it have been unreasonable to place the sign that you're referring to adequately, in Royal Caribbean's belief, warns passengers of the change in the level, to have that signage posted in the precise area where the change occurs?

MR. DRAHOS:  Object to the form.  Asked and answered.

THE WITNESS:  The last time -- the last time I'm answering it.

MR. DRAHOS:  That's at least three or four times.

THE WITNESS:  Royal Caribbean placed the sign at the beginning of the change in elevation.  That is the most reasonable place to place the sign.  It is cautioning people that there will be a change in elevation as they're walking through that area.  That is the most reasonable place to place it.

BY MR. GERSON:

Q. Royal Caribbean acknowledges the potential of a fall hazard due to the change in level of the flooring surface, which is why you have that sign, as you call it, posted prior to the area where Ms. Coke fell?

MR. DRAHOS: Object to the form. Asked and answered. Argumentative.

At this point, it's becoming borderline abusive.

MR. GERSON: Mike -- Mike, I'm going to ask you --

MR. DRAHOS: No. No.

MR. GERSON: -- to stop making more speaking objections --

MR. DRAHOS: I don't care, Nick.

MR. GERSON: -- on the record. It's very improper. And I'm going to leave it at that. I've given you some leeway. But at this point, if you -- if you -- if you have an objection, if you think I'm being harassive or you think that -- some otherwise, there are other mechanisms in place, but speaking objections, I'd appreciate if you limited them.

Jeannie Reporting
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

MR. DRAHOS:  All right.  First of all, the person, the attorney giving the leeway here has been me.  You've been down this road repeatedly with this witness, and I've done everything in my power to be patient and cooperative with you, as has the witness.  But you are not allowed to repeatedly ask the same question over and over and over again.  That's when it becomes abusive and I have to step in and make the objection like I am.

So we're going to allow her to answer this question one more time, because apparently you're not getting it.  But we have to move on, otherwise, you are abusing the witness.

MR. GERSON:  Well, I have asked the witness different questions about signage, placement of signage, and areas where the signage may or could have been placed.  They've all been different questions.

THE WITNESS:  And they've all been answered.

MR. DRAHOS:  And you've asked about whether or not it was unreasonable for that

sign to be put in other locations, and she has repeatedly told you that it's Royal Caribbean's position that it was reasonable where it was placed.

MR. GERSON: I'd appreciate if you didn't testify, Mike.

THE WITNESS: I've -- I've already testified to that and answered this question at least five times, maybe ten. I've answered this question.

BY MR. GERSON:

Q. Okay. How many people have fallen -- or strike that.

You were asked to identify prior falls in connection with this case; correct?

A. Correct.

Q. And in review of the records, I see that the only priors or the scope of the priors that were produced in this case don't quite include -- they're not even two years worth of priors. Do you know why?

MR. DRAHOS: Object to the form.

THE WITNESS: My understanding is that what was provided to you was the three-year period prior to the date of the incident.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

So it's -- the three-year period would be two thousand -- the date of the incident was November 10th, 2019, so three-year period should be November 10th, 2016 through '19.

BY MR. GERSON:

Q. Okay. And I'll represent --

A. The first incident occurs in January '17. So it would be because there were no incidents in November or December of '16. It's the two months -- it's not even a full two months. Or it's two months that there were no incidents, which is not -- I don't see a problem with that.

Q. How many prior trip and fall incidents did you identify in connection with your investigation into prior trips and falls in this case?

MR. DRAHOS: Object to the form.

THE WITNESS: So there's produced to you in this list, I believe, are 35, one of which is your client. So it's 34. But they're not all trips and falls. They're falls within that area.

BY MR. GERSON:

Q. Isn't it true that on November

the 10th, 2019, a passenger by the name of Ligaya Lagandaon also stated that she was walking and tripped on the uneven floor, landing on her head, nose bridge, and both of her knees?

A.   Yes.  But technically speaking, that happened after your client's incident, so it shouldn't have been produced, but we did.  That was after the incident.

Q.   Okay.  So on the same day that Ms. Coke fell, we have another passenger who reported identically the same thing that happened to her as she was walking towards the casino; isn't that correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I wouldn't say she reported identically the same thing, but she reported that she fell while walking to the casino.

BY MR. GERSON:

Q.   Okay.  Let me show you what we'll mark as exhibit to -- we're up to, I guess, Exhibit 7.

(Thereupon, Plaintiff's Exhibit No. 7 was marked for identification.)

BY MR. GERSON:

Q.   And I'd like you to take a look at

this document.  And Ms. Campos, you helped prepare this document; correct?

        **A.**    Yes.  Yeah.  But Mr. Gerson, before we start going through this, can we do another five-minute bathroom break?  Is that okay?

                MR. GERSON:  Yeah, no problem.

                THE WITNESS:  Because I'd rather not interrupt you in the middle of it.

                MR. GERSON:  That's fine.

                THE WITNESS:  Okay.  Five minutes.  Sorry.  If anybody --

                MR. GERSON:  No problem.

                THE VIDEOGRAPHER:  All right.  We're going off the record at 12:41 p.m.

                (Thereupon, a short recess was taken.)

                THE VIDEOGRAPHER:  We're going back on the record at 12:48 p.m.

                MR. DRAHOS:  Nick, before we begin, I checked -- I checked during the break and it looks like we have pulled all of the guest injury statements for the priors that were produced to you.  So if you want -- and I assume you're going to want -- I can send them to you now.  If you want to take a break to review them, we can take a break

and grab lunch.  If you want to just ask on the record as we go, that's fine with me, too.  Whatever.

MR. GERSON:  Why don't you e-mail them to me.  I'd like to just go forward.

MR. DRAHOS:  Okay.

MR. GERSON:  So I'd like to -- I'd like you to e-mail them to me and I'd like to continue.

MR. DRAHOS:  Okay.  We're going to do that right now and I'm going to copy Ms. Campos on the e-mail correspondence, as well.  You should have it any second.

The e-mails are in three parts --

MR. GERSON:  Are we on the record?

MR. DRAHOS:  Yeah.  Yeah.  Just one final statement.  The e-mails are in three parts due to the size, so they're en route.

MR. GERSON:  Okay.  And I -- I just want to put on the record that we're being provided with copies of passenger injury statements which had been represented were unable to be provided to us due to the need for a manual search, although Ms. Campos was able to review them and they're now

being provided to me in the middle of the deposition and I'll do my best to roll with the punches, but I haven't seen them, so --

MR. DRAHOS:  Well, when you make comments like -- when you make comments like that, it forces me to respond.  And I'll state on the record yesterday afternoon, in the late afternoon, we discussed this.  You made the request at the time.  The agreement that had been in place between you and prior counsel for Royal Caribbean was that we weren't going to produce the guest injury statements because the information was -- was produced in a spreadsheet, and that we would reserve the opportunity for you and counsel to confer and determine whether or not any guest injury statement would be required to be disclosed after our initial disclosure.

When you and I talked about it yesterday, in the spirit of cooperation, I offered to you to begin the manual search, but that we wouldn't be able to produce it in time before the deposition, and that Mrs. Campos, as an accommodation to you,

would have access to them and be able to read any report that you wanted to ask about.  You stated to me that you weren't interested in wasting the time of having Amanda, Ms. Campos, read those statements. And so the way the call ended, from my interpretation, was that we were going to produce these guest injury statements as soon as possible following the deposition.

Since that time, this morning, an hour before the deposition, you wrote me an e-mail requesting these guest injury statements.  I immediately made the request in-house, who -- the adjuster stopped everything she was doing, and over the course of the last several hours, produced these via a manual search.  So I believe we've gone above and beyond to accommodate you in the case and I'm, again, willing to take a break to allow you all the time you need to review them before you ask any further questions.

MR. GERSON:  Okay.  And I'll just respond briefly that that couldn't be further from the truth, Mr. Drahos.  You've

known all along that my position has been the passenger injury statements are not protected.  You asked for an e-mail over a week ago citing various case law substantiating our legal position, and it's never been my position or agreement that the passenger injury statements wouldn't be provided.  And in fact, that I would -- we would go to a hearing, if necessary, and that you would need to speak with your client.  Nevertheless, let's proceed.

BY MR. GERSON:

Q.   Ms. Campos, as part of your preparation for today's deposition, you investigated the existence of incidents that were reported to the medical infirmary for passengers that tripped, slipped and fell in the area where Ms. Coke was injured on the subject ship and similar areas on sister class ships; isn't that correct?

A.   In response to your original discovery, which this was provided in part to, there was a search done for the five Voyager class ships for the three-year period preceding the plaintiff's incident of the area of these ships

that she is alleging that her fall took place. They were provided to you as part of that.  So -- and I did review -- I reviewed this list.  As I stated earlier, in terms of anything else, I did look at only for the ADVENTURE the guest injury statements for them, which is part and parcel in this list, though, too.

Q.   All right.  So this document that is compiled or has been compiled and produced, this is going to be Composite Exhibit 7.  You've seen this document; correct?

A.   This is a word doc -- this is the document?  I don't --

MR. DRAHOS:  Object to the form.

THE WITNESS:  That's not the document I have.

BY MR. GERSON:

Q.   Taking a look at what's been marked -- you're trying to look at something else that was on my desktop that has nothing to do with any litigation.

A.   I couldn't read -- I couldn't read it anyway, but from the format of it, it just didn't look --

Q.   It's okay.  I must have screenshotted

you a list of prior clients.

A. Okay.

Q. But anyway, taking a look at what -- that's why I'm asking you. We're doing this remotely, so I appreciate your patience.

Taking a look at what's been marked as Composite Exhibit 7, you're familiar with this document; correct?

A. Correct. It's a three-page document.

Q. And this identifies -- what is this document?

A. It's, again, what I just said. It's the list of prior falls, my understanding is of any nature, at that area on the five Voyager class ships for a period of three years prior to the incident.

Q. All right. Now, this would only be incidents that were reported to the medical infirmary; correct?

A. Correct and incorrect. So it would be incidents reported on board to the medical facility or -- and I'm not quite sure because I don't think any of these fall under it -- but potentially, it would be incidents that somebody reported as a claim after the incident -- after the cruise. And

if you make a claim within the system, it automatically generates an incident for that claim.

Q.   What are the total number of falls that you were able to identify as part of your search for prior incidents in this particular location and similar locations on sister class ships?

A.   And when you say "similar locations," it's the same area on the other ships.  But it's a total of 35, including your client's.  And technically -- so it would be 34 priors.  But I did realize that one of them that was produced to you occurred after hers, but it is provided.  So it's a total of 35, including your client; 34 without her.

Q.   And so you were able to identify 35 incidents that occurred either on the day of or in the three years prior for slip and falls -- slip, trip and falls in similar areas on the subject ship and on sister class ships; correct?

A.   Correct.

Q.   And so if we're -- it's my understanding that on the same day that Ms. -- Ms. Coke fell, that a passenger by the name of Lagandaon Ligaya also tripped and fell in the same area on the same day as she was approaching the

same casino, walking on the same floor surface where Ms. Coke fell; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  There was another incident in the same area on the same day, correct.  But it happened after your -- your client's.

BY MR. GERSON:

Q.    Okay.  And that's actually identified here with the information that "guest states that she tripped due to an uneven pavement and fell landing"; correct?

A.    Correct.

Q.    And that was -- do you know what time of day that happened?

A.    It happened after -- I think it happened later on in the day.  I don't know the specific time of -- I don't recall the specific time.  I think it was 10:30 at night.

Q.    And Ms. Coke's incident happened at approximately what time?

A.    I don't recall.  I'd have to look.  I know I recall when she reported it.  Hold on one second.  She reports that hers occurred at -- she reported hers occurred at 10:00.

Q.   Ms. Coke reported her incident happened at about 10:00 p.m., and the other passenger reported that her incident happened at about 10:30; correct?

A.   I believe so, yes.  But once you have the -- her guest statement, you'll know exactly the time.

Q.   Okay.  And what happened to Ms. Lagandaon as a result of her fall -- or as a result of her trip and fall?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I -- I -- I don't know what you mean by that.  What do you mean what happened?

BY MR. GERSON:

Q.   What were -- what were her injuries? Was she injured?

A.   I mean --

MR. DRAHOS:  Object to the form.

THE WITNESS:   -- I -- I can't -- yeah. I don't -- it mentions her knees, but I haven't looked -- reviewed her medical records.  I don't think that that's something that I can really talk about. That's --

BY MR. GERSON:

Q. Oh, no?

A. Her medical injuries would be protected, I believe, under HIPAA. But I don't know -- I haven't looked at them.

Q. According to -- so what you're telling me is that on the same day that Ms. Coke fell, another passenger states that she tripped due to an uneven pavement and fell, hitting her head, nose bridge and both knees. That's at least the information that was provided here; correct?

A. Correct.

MR. DRAHOS: Object to the form.

THE WITNESS: That's --

BY MR. GERSON:

Q. Okay.

A. That's the information on there. It just says "hit my head, my nose bridge" --

Q. Okay. And just so we're clear --

A. -- "and both -- and my both knees." Sorry.

Q. Okay. And so -- and just so we're clear, this only identifies passengers that reported to the medical infirmary; correct?

A. Again, correct. Or the other option

-- and again, I didn't review every single one of them -- would be if they didn't report it on board or to the medical facility on board but made a claim afterwards.  But I don't believe any of these resulted in claims.  So I think it would all be ones that were reported to the medical facility, yes.

Q.    Was an incident investigation conducted in connection with Ms. Lagandaon's claim?

A.    Yes.

Q.    And were photographs taken?

A.    I would have to go in and look.  Would you like me to do that?

Q.    Sure.

A.    Yes, there were photographs taken.  It was one -- it appears one photograph was taken.

Q.    And the photograph taken in the same general area where Ms. Coke's fall occurred?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I'm sorry, it appears that there's four photographs, two of shoes, and it's taken on the walkway.  I don't know if it's the exact same area. Again, because Royal Caribbean is unsure of exactly where your client fell, so I can't

really answer that. But in one of the photographs, you can see the entrance to the casino. So it would be the same general area.

BY MR. GERSON:

Q. And was Royal Caribbean's determination in the fall involving Ms. Ligaya Lagandaon, that she also failed to exercise reasonable care for her own safety?

A. There was no claim or lawsuit filed in this one. There was -- there's no -- I don't know what you're asking me really.

Q. Well, the fact that there was a claim or lawsuit filed doesn't make a difference about whether or not an accident investigation is conducted; right?

A. Correct.

MR. DRAHOS: Object to the form.

BY MR. GERSON:

Q. And I mean, many times an accident investigation is conducted at the time when the incident is reported or occurs; correct?

A. Correct.

Q. So when the -- in the incident involving Passenger Lagandaon, and my question for

Royal Caribbean is the fact that this passenger also reported that she tripped due to an uneven floor surface, is Royal Caribbean's position that she, too, failed to exercise reasonable care for her safety?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, if there's -- I -- within the incident report, there's no determination made.

BY MR. GERSON:

Q.    You're reviewing the incident report?

A.    There are no determinations made within it.

Q.    Well, when you say there are no determinations made within it, what do you mean?

A.    Like in -- in incident reports, it doesn't say what you're saying.  I'm not understanding what your question is.  In the incident report, it doesn't say that she failed to use reasonable care and caution for her own safety. So I'm not -- I'm not quite sure.  Are you asking me to make a determination right here right now?

Q.    No.  As part of the -- as part of the investigative process, according to the personal injury investigation conducted by Royal Caribbean,

you're familiar with those policies and procedures; aren't you?

A.   I am.

Q.   Okay.  And isn't it true that as part of the investigation in connection with personal injury investigations, there are root cause analyses conducted; correct?

A.   On crew injuries, typically there are. Which policy are you looking at?

Q.   I'm asking are you -- was any determination made by Royal Caribbean as to whether or not this passenger, Ligaya Lagandaon, failed to exercise reasonable care for her own safety?

A.   I'm sorry, you froze for a second. Can you repeat that question?

Q.   Sure.

Was there any --

A.   Does any -- all I heard -- go ahead. Go ahead.

Q.   Was there any determination as to the cause of Ms. Ligaya Lagandaon's fall on the uneven surface that is identified as having occurred on the same day that Ms. Coke fell?

A.   Do you want me to look to see what's in the incident report?  I'm -- that's what I'm not

understanding.

Q.   Sure.

A.   But I would think that's -- like that's not part of something that we would have to provide to you, because that's -- I don't believe that there is, but that's -- that's --

Q.   How about -- well, tell me as part of -- as part of Ms. Lagandaon's file, there were photographs, a total of four photographs I think you've mentioned; correct?

A.   Correct.

Q.   Okay.  And you have access to those photographs; correct?

A.   I do.

Q.   Okay.  And there was a passenger injury statement for Ms. Lagandaon, which was produced in this case?

A.   Correct.

Q.   Do you know if that was part of the document production that was -- here it is.

According to Ms. Lagandaon, if I have her -- if I'm not butchering her name -- she attributed the cause of her fall due to uneven flooring; isn't that correct?

MR. DRAHOS:   Object to the form.

THE WITNESS: It states, "What do you believe caused this incident?" And her response is, "Uneven flooring."

BY MR. GERSON:

Q. The same -- similar to what Ms. Coke reported on the same day; correct?

MR. DRAHOS: Object to the form.

BY MR. GERSON:

Q. Similar, not identical.

A. Ms. -- Ms. --

MR. DRAHOS: Same objection.

THE WITNESS: -- Coke reported it was -- Ms. Coke reported it was a hump on the floor.

BY MR. GERSON:

Q. Now, we have another incident that occurred about two weeks earlier on October 24th on the VOYAGER OF THE SEAS; do you see that?

A. What's the name? That would be easier, or the date?

Q. Just take a look at what's been marked as Exhibit 7 and I'll show you, as the members of the jury are able to see right here, referring to this incident, Jenny Gan, October 24, 2019.

A. Okay. I see that.

Q.    VOYAGER OF THE SEAS.  So that would be about two -- two weeks or so, a little over -- a little over two weeks from the time that Ms. Coke and Ms. Lagandaon reported that they fell, they were subject -- they were involved in a trip and fall; correct?

A.    Correct.  This is an incident that was reported on October 24th, '19, on board the VOYAGER OF THE SEAS.

Q.    The VOYAGER OF THE SEAS, as we already talked about, is the same class of ship, which is why you were asked to go and search similar areas on the vessel on sister class ships; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Correct.  We -- we searched three years prior at the same area on the sister class ships, the walkway up to the casino.

BY MR. GERSON:

Q.    Okay.  So in this particular incident involving Jenny Gan, her statement that -- or what was been produced so far, according to here, is that the walkway, it says the statement on -- well, you read into the record what it says for Jenny Gan.

A.   It says, "The guest was slipped and tripped by the Tavern bar.  Statement:  I was walking along the walkway by Tavern bar towards the casino to look for my friend.  The walkway was sloping upwards when I suddenly tripped and fell.  While trying to break the fall, I grabbed onto the handlebar, hit my face on it and is" -- and that's what I have.  That's what it states.

Q.   So now we have about two -- a little over two weeks before Ms. Coke and Ms. Lagandaon's fall, and we have another passenger that's reporting that she tripped and fell on a sloping upwards walkway, sustaining injuries to her face; correct?

A.   That's on the VOYAGER OF THE SEAS, correct.  That's what it appears.

Q.   And this is a trip and fall; correct?

A.   According to her, she is stating that she -- I don't know.  She doesn't state that she tripped.  She just says that she was walking along the walkway -- oh, no, she says, "and I suddenly tripped and fell."  Sorry.  Yes.  It's a trip and fall, according to her.  Yes.

Q.   Okay.  So within three weeks of Ms. Coke and Ms. Lagandaon's trip or trips, we've

got Ms. Jenny Gan, who's, similarly, reporting that she also tripped and fell due to these sloping upwards fall floor on the -- in the -- in the same general location as she approached the casino on the VOYAGER OF THE SEAS; correct?

A.   On a different ship.

MR. DRAHOS:  Object to the form.

THE WITNESS:  Correct.  So it's -- it's on --

BY MR. GERSON:

Q.   And then three days -- three days before that, on October 21st, 2019, we have an incident involving Denise Morris; don't we?

A.   Correct.

Q.   And according to what is written here, would you read into the record what you were able to investigate what the guest stated?

A.   The guest states --

Q.   Or what Ms. Morris stated.

A.   Ms. Morris states, "Was walking to the casino and walk up incline and stopped and fell on my arm and knee."

Q.   Does it also, in the -- in the documentation that I'm looking at here, it says, "Guest states that she tripped while walking on an

incline step and fell"; correct?

A.    Guest states that -- yes, that's correct.

Q.    "Walking to the casino and walk up incline and stop and fell on my arm and knee"; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Correct.

BY MR. GERSON:

Q.    And that is also on the same ship that Ms. Coke and -- or that Ms. Coke tripped and fell not even a month earlier?

A.    On October 21st, 2019, correct.

Q.    And now, about a month before that, there's an incident involving a Gwendolyn Jones; correct?

A.    Correct.

Q.    And that is also a fall that -- or you have it classified as a slip and fall on the NAVIGATOR OF THE SEAS on deck 4.  Do you know where on deck 4?

A.    No, I'm going to look right now.  This is on board the NAVIGATOR, okay.  This says that "I was going to the bathroom and slipped on wet tile."

Q.    Were photographs taken in connection

with Ms. Jones's case?

A.   No, but if you read her statement, it says "Floor was apparently -- floor was apparently been clean and was not fully dry."  Let me see if photographs were taken.

Yes, there are photographs.

Q.   And do the photographs show the same general location as Ms. Coke's fall?

MR. DRAHOS:  Object to the form.

Object to the form.

THE WITNESS:  Again, I don't know exactly where Ms. Coke fell.

BY MR. GERSON:

Q.   General location.

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know.  I mean, this -- it shows a walkway in these photographs, but I don't know -- it's not -- I can't see the entrance to the casino in these photographs.

BY MR. GERSON:

Q.   Okay.

A.   And this appears to be a slip, is what she's saying, because due to the area not being dry.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Q.    Well, did the slip occur on the sloping portion of the walkway?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't see that area in the photographs.

BY MR. GERSON:

Q.    Okay.  The next one we have is on about three weeks earlier -- excuse me, two weeks earlier, on September 7th, 2019, involving Aleida Castellano; do you see that?

A.    I do see it.

Q.    Ms. Castellano actually lives over on Miami Beach, apparently.  And what did Ms. Castellano report?

A.    So on September 7th on the NAVIGATOR OF THE SEAS, "Guest slipped and fell in front of Boleros, deck 4, and hurt her left shoulder. Slipped on incline in front of Boleros on deck 4, fell onto left side.  Pain in shoulder.  Guest unable to write due to pain."

Q.    How many inclines are there in that particular area of deck 4 as you approach the casino?  Is there more than one or is there just one?

A.    I don't --

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know.

BY MR. GERSON:

Q.   I mean, Aleida Castellano says that she slipped on an incline in front of Boleros.  You told me earlier that Boleros is what that area is referred to; correct?

A.   I said that the lobby bar is technically called the Boleros bar.  But I mean, you're -- I don't know if you're trying to pinpoint the area to the area of the photos that were attached or is the area the walkway, in general, all the way from Boleros into the casino.  Because, again, we don't know exactly where your client fell.  So I don't know what area you're referring to specifically.

Q.   Okay.  Going back --

A.   Because this just was done -- just so you know, the search was done for that walkway encompassing like the marble flooring in front of Boleros all the way to the casino.  It's more than just the photographs that we were reviewing before.

Q.   Okay.  Now, according to Royal Caribbean, Ms. Castellano was unable to fill out her passenger injury statement; correct?

A. Correct.

Q. Who filled it out for her; do you know?

A. I think the nurse on duty, I think.

Q. You had the nurse on duty fill out a passenger injury statement?

A. Yes. That's --

MR. DRAHOS: Object to the form.

THE WITNESS: If the -- if the passenger can't fill it out, the nurse will take down exactly what the guest is saying and put it on the form, unless the guest has someone with her that can write it for her.

BY MR. GERSON:

Q. According to Ms. Castellano, she fell deck 4 in front of Boleros on the sloping portion of deck 4; correct?

A. That's what she's stating, but in front of Boleros is not the photographs that we were looking at in terms of this. I mean, it's somewhat in front of Boleros but again --

Q. How many photographs do you have for Ms. Castellano's incident?

A. There's three photographs -- wait, let

me see.  There's three photographs.

Q.    All right.  And there was an accident investigation conducted; correct?

A.    Correct.

Q.    And then about --

A.    I'm not sure if this is the same location as the photographs we were looking at for this case.  It's the same general -- it's the same general area, but it's not specifically the exact same location as the photographs that you were talking about, so I don't know.

Q.    So same general area, same reference to an incline and same result in a fall; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, this is a slip and fall and this is also, I don't believe -- again, I don't know where your client fell.  But from looking at these photographs, this was not -- it's the walkway that leads up to the casino, but that walkway is long.  It's not -- I'm not -- I don't know how to describe it properly.  It's not --

BY MR. GERSON:

Q.    Are you sure that the incident

involving Ms. Castellano involved a slip as opposed to a trip?

MR. DRAHOS: Object to the form.

THE WITNESS: It states that slipped on incline in front of Boleros on deck 4. That's what it states.

BY MR. GERSON:

Q. If we look at the incident involving Corinne Cullen, we have another incident about three -- less than three weeks -- less than two weeks before Ms. Castellano's incident, on August the 24th, 2019, on the ADVENTURE OF THE SEAS; correct?

A. Correct.

Q. And what did Ms. Cullen report?

A. I believe that she reported a slip and fall. I just have to find it. Hold on.

Q. Ms. Cullen reported a trip and fall. Here it is.

A. She reported walking up the ramp --

Q. August 24th, 2019.

A. "Walking up the ramp and she tripped, hitting her head above the -- her eye."

Q. Walking up the ramp and she tripped, her head -- and it also states here what, according

to Royal Caribbean involved the -- what Ms. Corinne Cullen verbalized?  What's documented in the records?

A.    "Guest verbalized that the sole of her shoe got stuck on the marble floor, causing her to trip and fell -- fall forward."

Q.    Were photographs taken of the -- the nonskid strip in connection with Ms. Cullen's case?

A.    There are photographs taken in Ms. Cullen's case, but it's a different --

Q.    And just for the record, Ms. Campos, you're accessing all of this information on your laptop; isn't that correct?

A.    Yes.  I'm in the Riskonnect system viewing the photographs that you're asking me to look at.  That is correct.

Q.    The photographs that you're reviewing, they also show the black nonskid strip; don't they?

A.    The photographs of Ms. Cullen's show black nonskid strips, but they don't show -- it's not the same location as the ones that we were -- that we were reviewing in your client's photos.

Q.    Now, the next incident that we have that's been identified just two days before Mr. Corinne Cullen's trip and fall on the ADVENTURE OF

THE SEAS, we've got a Chrystal Cullen on August the 22nd, 2019, on the MARINER OF THE SEAS; correct?

A.    Correct.

Q.    MARINER OF THE SEAS is a sister class ship with the same general layout and configuration; correct?

A.    The same general, yes.  I don't know if it's exactly the same in this area.  But the shell of the ship would be the same and it has the same general -- in general, it's the same, but I don't know if the specific area is the exact same.

Q.    Okay.  But your search parameters were -- you've already told me the search parameters were to find the same general area where Ms. Coke fell, and similar areas on sister class ships; right?

A.    Our search parameters --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- were the same areas.  You're asking me whether or not they're the exact same.  I don't know.  But the same areas is what we searched, deck 4 before entering the casino.

BY MR. GERSON:

Q.    Okay.  And in this particular incident

on August the 22nd, 2019, Ms. Chrystal McCullen reported that she tripped and fell and hurt her left arm and elbow; correct?

A.    Correct.

Q.    And you have photographs that document the -- document the nonskid strips in other --

A.    No.

Q.    -- general areas -- no?

A.    The photographs -- the photographs --

MR. DRAHOS:  Object to the form.

THE WITNESS:  I have one photograph and there's no nonskid strips depicted. It's the marble walkway, but there's no nonskid strips depicted in the photograph.

BY MR. GERSON:

Q.    How many incidents in total were you able to identify just on the MARINER OF THE SEAS for trip and falls --

A.    On the MARINER?

Q.    -- in this area?

A.    On the MARINER?

MR. DRAHOS:  Object to the form.

BY MR. GERSON:

Q.    Excuse me, the ADVENTURE OF THE SEAS.

A.    Oh, okay, on the ADVENTURE.

MR. DRAHOS:  Same objection.

THE WITNESS:  I believe on here there's -- including your client's, 11, but I'd have to count again.  Let me just make sure.  We're talking about the ADVENTURE; correct?  Okay.  So one, two, three, four -- yes.  11, including your client's.

BY MR. GERSON:

Q.   And how many including -- are you including -- within those 11, are you including Ms. Lagandaon?

A.   I'm including Ms. -- yes, I'm including both your client and Ms. Lagandaon.  So if I don't include those two, it would be nine.

Q.   All right.  But in total, you've been able to identify 12?

A.   No.

Q.   Or excuse me.

A.   11.

Q.   Eleven -- 11 trip and falls on this particular ship in this general location; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  In the three-year period prior to this incident on board the ADVENTURE OF THE SEAS, this report contains

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

11 incidents that occurred in the area of the bars, nightclubs, pubs and lounge on deck 4, also corridors and hallways. It's an area that doesn't have a specific, specific name. So in order to be able to encompass all -- or hope to encompass everything, we had to make it more broad, because there's no specific name. It's not like the casino or a cabin. It's a public area.

BY MR. GERSON:

Q. And in all of the 30 -- in all of the incidents that have been identified where there's references to a slope causing someone to fall, what does that tell Royal Caribbean as to the safety of this particular area on this particular ship?

MR. DRAHOS: Object to the form.

THE WITNESS: It tells -- it tells Royal Caribbean that people weren't using caution when they were traversing the area.

BY MR. GERSON:

Q. So Royal Caribbean's position is that all these people that are falling in the absence of a substance and merely due because there's this change in elevation, it's all their fault and Royal

Caribbean bears no responsibility for any of it whatsoever?

A.    Okay.  It's a 35 people and not all of these 35 encompass people that fell due to a slope. That's first off.

Second of all, yes, Royal Caribbean does not see any issue with the area in question, in that there's hundreds of thousands, if not millions of people that walk through those areas, if you count how many times they walk back and through -- back and forth.  And there's less than 35 people on five different ships that have fallen in a three-year period.  Royal Caribbean does not believe that this area is -- is a hazard at all, and that if people use due care and caution for their own safety, that they wouldn't fall.

Q.    Well, these incidents that have been identified by Royal Caribbean are just incidents that were serious enough for people to go to the medical infirmary; isn't that correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, I just want to reiterate that not all these incidents are due to the slope.  These are just incidents that occurred in that area of people

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

falling.  But yes, these are incidents where people went to the medical facility as a result of their fall.  None of them --

BY MR. GERSON:

Q.  Well --

A.  None of them made any claims and none of them filed suit, except your client.

Q.  Okay.  Of all the -- of all the incidents on the vessel and sister class ships where there's a reference to falls occurring due to the elevated slope in the area, Royal Caribbean doesn't believe that they bear any responsibility for any of them; right?

MR. DRAHOS:  Object to the form.  Asked and answered.

THE WITNESS:  Royal Caribbean believes that the people who fell due to the slope were not using reasonable care under the circumstances for their own safety.

BY MR. GERSON:

Q.  And as you sit here today, the scope and parameters of your search for prior incidents was only for medically documented incidents for three years prior; correct?

MR. DRAHOS:  Object to the form.

Asked and answered.

THE WITNESS:  I mean, the way that you're putting it, it's not -- no, because the scope of it is for incidents.  I mean, we don't do it for medically documented incidents, but the incidents happen to be the ones that people went to the medical facility.  Just the way you're saying it is kind of incorrect.  But these are the incidents within our system for a three-year period on the five ships that encompass the Voyager class ship.

BY MR. GERSON:

Q.  And the databases that you searched for these prior three years is through a database called Riskonnect; correct?

A.  That is correct.

Q.  And how did you go about identifying these?

A.  Like I was explaining before, we had to do a broader search because of the area is not a specific location, so it's a little bit more difficult.  But the search was done using, I believe, deck 4, and then corridors, hallways, bars, nightclubs, it was -- it was, I believe,

whittled down to these because other things fell through that would encompass hallways or corridors. But we were able to identify these. Because, again, it's not a specific location.

Q. Do you -- as you sit here today, do you know how many -- well, strike that.

Is what you're telling the members of the jury, that even based on the number of incidents that you've identified so far that are similar in nature to Ms. Coke's fall, that it's okay because of the number that you have been able to identify?

MR. DRAHOS: Object to the form. Argumentative.

And asked and answered.

THE WITNESS: I don't understand your question.

BY MR. GERSON:

Q. Is safety important to Royal Caribbean?

A. Yes.

Q. Does it alarm Royal Caribbean that you have people that are walking to the casino, and for no apparent reason other than a change in the -- a general change in the slope, are suddenly falling

and injuring themselves, is that a concern to Royal Caribbean?

MR. DRAHOS:  Object to the form.

Mischaracterizes the evidence.

Argumentative.

BY MR. GERSON:

Q.    You can answer.

A.    I mean, I still don't really -- does -- does what alarm?  I don't understand what you're trying to ask me.  I'm sorry.

Q.    Is it acceptable to Royal Caribbean that the number of people that have fallen due to a change in the elevation in this particular walkway on this ship and on sister class ships, is it acceptable to Royal Caribbean just because of the number of passengers that you claim didn't fall?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I mean, it's -- it's not -- I mean, Royal Caribbean doesn't want anyone to get injured on their ship.  And it's not a question of being acceptable or not.  It's a question of we can't -- we can't -- if people are going to fall due to their lack of care and caution, we can't stop that.  I mean, we can't prevent that.

If people were paying attention to their surroundings and using reasonable care and caution, then Royal Caribbean believes that they wouldn't fall.  So I don't -- acceptable, I don't -- I don't believe is -- I can't really -- it's not that it's acceptable.  We don't want anyone to injure themselves, but we can't be inside of that person and we can't make that person use reasonable care and caution for their own safety.

BY MR. GERSON:

**Q.**   Does Royal Caribbean have any policies and procedures in place to evaluate trends and falls in particular areas of its ships?

**A.**   No.  Well, I mean, currently, no, we don't.  I don't believe we do.

**Q.**   I mean, in this lawsuit, you've compiled a document that identifies a very -- a number of incidents involving people who have tripped and fell or slipped and fell as a result of an uneven slope on a walkway.  We -- you can agree with that generally; correct?

MR. DRAHOS:  No.  Object to the form.  Mischaracterizes the evidence.

BY MR. GERSON:

Q.   You can answer the question.

MR. GERSON:  And Mike, I'm going to ask you to please refrain from answering -- from speaking objections.  I'm asking you nicely.

MR. DRAHOS:  Okay.  Then don't intentionally misrepresent the evidence.

MR. GERSON:  No, I'm asking a question, so I'd like the court reporter to read back the question, please.

BY MR. GERSON:

Q.   And Ms. Campos, if you would be so kind to answer my question.

(Thereupon, the question was read back.)

THE WITNESS:  I can say that within these 35 incidents, there are people who claim that they fell due to a slope.  Yes, I can say that.  It's not all of them, but there are people in here that say that. There are also people in here that say they fell because of a slip and fall.

BY MR. GERSON:

Q.   And what -- is there any particular

reason why Royal Caribbean doesn't have a policy or procedure in place to evaluate trends that occur in certain areas of its ships, such as this area?

A.   Well, actually, I really shouldn't say that, because we do.  I mean, all of those safety meeting minutes that you're seeing, you know, the ship is on top of things that are happening.  So if they do see a trend or they see something happening, they will evaluate it and they will try to remedy it.

Q.   Well, what about shore side?  Does shore side do anything to evaluate trends on its class of ships?

A.   Well, shore side will obviously be alerted by the ship itself if there is something going on on board that's causing, you know, people to injure themselves.  And then it will be remedied with the assistance of shore side.

Q.   Well, are you aware of any other cruise lines in the industry that have a procedure in place where they are able to document trends that occur on their vessels?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I -- I've worked for Royal Caribbean for my career.  I don't

Jeannie Reporting
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

know what other cruise lines do.  I've never spoken to them about it.

BY MR. GERSON:

Q.    That's fair enough.  I'm just asking you as someone who's worked for Royal Caribbean for as long as you have, are you aware of any documentation or procedures documenting accident trends on ships that Royal Caribbean operates?

A.    You were just asking me about --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- other cruise lines --

MR. DRAHOS:  Asked and answered.

THE WITNESS:  -- so I'm confused.  Are you asking me about my -- Royal?  Or are you asking about other cruise lines?  So I don't know.

BY MR. GERSON:

Q.    Sure.

Is Royal Caribbean aware of other cruise lines in the industry that have documentation that summarize and identify trends which occur on its vessels to prevent -- to prevent or ensure passenger safety?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Sitting here today as

the corporate representative of Royal Caribbean, I can't answer that.  I don't know.  I mean, speaking personally, I've heard rumblings, but I haven't seen any or know any.  I just, you know, as -- as a litigating attorney back in the day, I'd hear things.  But I can't speak on behalf of Royal Caribbean for that.  It's not part of my areas of inquiry and I haven't looked into that.

MR. GERSON:  Let's go off the record for one second.  Okay?

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  We're going off the record at 1:40 p.m.

(Thereupon, a short recess was taken.)

THE VIDEOGRAPHER:  We're going back on the record at 1:48 p.m.

BY MR. GERSON:

Q.    Okay.  Ms. Campos, of the incidents that have been produced to date, predominantly people have been complaining about the slope in the area; haven't they?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I can't say that,

because you use the words, no.  I don't think predominantly people use the word "slope" in the area.

BY MR. GERSON:

Q.    Well, what do you call it?

A.    There's different things.

MR. DRAHOS:  Object to the form.

THE WITNESS:  Of the ones that -- that I saw, there were people that had slipped on water.  The ones that I looked at, the ADVENTURE, specifically, there were a couple slips, somebody said the word "tripped" on something.  They didn't know what they tripped on.  So I don't know -- I wouldn't agree with that.  I -- but I haven't analyzed all of them the way that you're asking me to.

BY MR. GERSON:

Q.    Well, is Royal Caribbean disputing that there are numerous references over the course of even just three years about the slope causing people to fall in one way or another?

MR. DRAHOS:  Object to the form.

THE WITNESS:  In terms of the three years prior with the 35 that have been

produced, there are references to the word "slope."  I don't know if Royal -- Royal Caribbean does not agree to numerous references.

BY MR. GERSON:

Q.   So Royal Caribbean has been on notice for three years that the slope in this particular area on the subject ship and sister class ships is a problem?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Royal Caribbean has -- has had incidents on board the five vessels within three years where people have had an incident due to the slope.  I don't know -- Royal Caribbean does not agree that that is a -- in the terms that you are using, problem.  Just because someone falls, it doesn't necessarily mean that it is Royal Caribbean's fault that the fall occurs.

BY MR. GERSON:

Q.   Well, I'm not -- we're not just talking about people that are falling as a result of the slope.  We're talking about passengers that are reporting not just that they're falling, but they're going to the ship medical infirmary to get

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

medical attention to care for the fall that occurred as a result of the slope.

MR. DRAHOS:  Object to the form.

That question is entirely argumentative.  I don't understand how it's any different than the question you just asked, other than that you want to argue.

MR. GERSON:  Mike.  Mike.  If you continue, we'll stop.

MR. DRAHOS:  Well, if you continue, we'll have to stop, Nick.

MR. GERSON:  I don't think you're allowed to -- I don't think you're allowed to comment beyond what -- to the extent that you're commenting.  If we've got to certify it, then mark it for the record.

Ms. Court Reporter, please mark the -- for the record.  I would like the court reporter to please ask the question again.

BY MR. GERSON:

Q.   Ms. Campos, I'd like an answer to your question.

MR. GERSON:  And Mr. Drahos, with all due respect, if you think you have an objection, say it on the record.  If you

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

think you've got a privilege, then assert it. Other than that, I'd appreciate if you let the witness answer.

MR. DRAHOS: Okay. You need to tone it down just a little bit, please. And I'm asking you to remain professional and ask questions --

MR. GERSON: I'm trying to.

MR. DRAHOS: -- and then the witness can answer those questions. The witness will answer those questions. But you can't argue with the witness. That's not what the point of this deposition is.

MR. GERSON: I'm not arguing with the witness. I'm asking the witness --

MR. DRAHOS: You are. You are.

MR. GERSON: Okay, I'm arguing with you, which --

MR. DRAHOS: Ask your questions and she will answer them.

MR. GERSON: So go ahead, Ms. Court Reporter. If you don't mind, please reread the question, if you don't mind. Sorry.

(Thereupon, the question was read back.)

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know where the -- what is the question within that?  Are people going to the medical facility because they fell due to a slope?  Yes. There's within these 35 incidents people that stated they fell due to the slope that went to the medical facility.  That is correct.

BY MR. GERSON:

Q.   Haven't there also been passengers that have reported to Royal Caribbean that the warnings in place were insufficient to alert them that the walkway was sloping?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I believe in one of these statements that I briefly saw that we were discussing on a different ship, that someone said that there should have been a warning.  I saw one of those.  But that was a different ship and I don't know what warnings are on the other ships.

BY MR. GERSON:

Q.   So that's a yes?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't believe that's a yes.  Some answers can't have a yes or no.  So that was my answer.

BY MR. GERSON:

Q.   Okay.  Well, I can show you -- I'm happy to show you the report, and for the members of the jury.  Let me know if this refreshes your recollection as to the statement that I'm referring to.  This is a statement involving Ms. Jenny Gan, which we covered earlier.  Jenny Gan was a fall that occurred on the VOYAGER OF THE SEAS.  Do you see this passenger injury statement for Ms. Gan?

A.   Yes.  I'm pretty sure that my answer encompassed exactly this, what we were just saying.  So on this one, I believe at the end she states, if you keep on going down -- further, please.  She says, "Notices to be placed to caution" -- well, "What could you or anyone else have done to avoid the incident?"  If you go down more, I can't see.  Up, if you don't mind.  Keep on going.  Keep on going.  Like --

Q.   Hold on.  Hold on.

A.   I can pull it up myself because it's difficult with yours -- okay, here we go.  "Notices to be placed to caution that the walking is

sloping" --

Q.   The walkway, not the walking.

A.   Right.  It's so small, my glasses --
I --

Q.   That's okay.

A.   "That the walkway is sloping"
something.  If you want to read the rest of it, it
might be easier, because I can't see it.  Anyway --

MR. DRAHOS:  Or we can -- or we can
blow it up, I mean.

THE WITNESS:  Yeah, or you can make it
bigger.

BY MR. GERSON:

Q.   All right.  I'm happy to do whatever
will make it easier.

A.   What you see -- just so you know, what
-- how you see it on your screen, I'm not seeing it
the same way on mine, just so you know.  Mine's a
much smaller version.

"Notices to be" --

Q.   Understood.

A.   "Notices to be placed to caution that
the walkway is sloping.  Strips placed on that
section would definitely help."  So again, this is
a different ship.  It appears that on that ship,

whatever area she was in, there were no strips. And again, I don't know what signs were on --

Q.   Well, this is just another example --

A.   -- on the VOYAGER at the time.

Q.   Sorry.  This is just another example. In Ms. Gan's case, Ms. Gan was walking towards the walkway by the Tavern bar towards the casino, just like Ms. Coke was; right?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't -- again, I don't know exactly what Ms. Coke was doing, because she hasn't been deposed yet.  But I think it's in her interrogatories something on those lines.  I don't know exactly.  But I believe that this is the walkway that we did the search of.

BY MR. GERSON:

Q.   Okay.  But in this particular case involving Ms. Gan, she's walking from the -- toward -- from the Tavern bar towards the casino, and the walkway was sloping upwards when she suddenly tripped and fell; correct?

A.   That's what she states.  Correct.

Q.   And when asked what she believes could have caused the incident, is the sloping walkway

had marking to inform the passengers and not the tiled floor the same color, that it would have been prevented but for the slope.

A.    Again, this is on the VOYAGER.

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know if the VOYAGER has the strips.  It doesn't appear that it does.  So -- and again, I don't know if the VOYAGER has the caution sign that the ADVENTURE does.

BY MR. GERSON:

Q.    Were you able to identify -- and you were looking in your file a little while ago, were you able to identify CCTV video in connection with this incident?

A.    With -- with the Jenny Gan's?

Q.    Yes.

A.    Okay.  I'm going to have to relook, because I don't recall.  But let me look.

Nope.  Oh, it's Gan.  It's Gan with -- no -- so there is snapshot photographs from the CCTV and the area does not look the same at all on the VOYAGER.  There's one color marble, not two different color marbles.  And there doesn't appear to be any strips.  It's all the same color marble

on that ship.

Q. Difficult to see the slope in the photographs; isn't it?

MR. DRAHOS: Object to the form.

THE WITNESS: This is a completely different ship and the marble is completely different on this ship. It's not the same.

BY MR. GERSON:

Q. Well, the fact that the marble might be one marble as opposed to the other, it doesn't take away from the fact that this passenger is reporting that there was a slope, whether it's travertine or some other type of marble, this passenger, Ms. Gan, is reporting that there's a slope that caused her to trip and fall in the same approximate area that Ms. Coke alleges she fell.

MR. DRAHOS: No. Object to the form.

THE WITNESS: But the guest is also saying specifically that there should be strips and that there should be a sign. And on the ADVENTURE, there are strips and there is a sign.

BY MR. GERSON:

Q. Okay. Well, back to your remarks earlier that you were never able to -- it's my

understanding that Ms. Coke reported her incident the next day; correct?

A.     Correct.

Q.     When was Ms. Coke's incident reported?

A.     It was reported the next day, on the 11th.

Q.     And it's also Royal Caribbean's testimony that it was unable to produce any video footage in this case; correct?

A.     Correct.  Well, there wasn't any video footage saved in this case, correct.

Q.     And why wasn't there any video footage saved in this case?

A.     Because there was -- it was being blocked by a column.  So the video didn't show -- there was no -- when they viewed the video of the time that she stated it happened, they didn't see an incident occur.

Q.     Did you review that video?

A.     There's no video saved.

Q.     Okay.  Where do you get that information from that there was a column blocked obscuring the view of the incident in this case?

A.     I got that from the former attorney, the in-house attorney who was handling this case,

Nick Applin.

Q. And do you know where that information -- I mean, Nick Applin works in your office; doesn't he?

A. Correct. My understanding is he got that information from the safety officer, that he spoke with him earlier on in this case.

Q. What efforts did you undertake to investigate the existence of video footage in this case?

MR. DRAHOS: Object to the form.

THE WITNESS: I went -- I went in to see if there was any video in the system, in the Riskonnect system, and there was not. And it -- and my understanding from the attorney, in the incident report it states that there is no video footage because it was blocked. And then I spoke with Nick and that's what he relayed to me.

BY MR. GERSON:

Q. And it's also Royal Caribbean's testimony that it wasn't able to identify the precise location where Ms. Coke fell is because of the absence of the video; is that correct?

MR. DRAHOS: Object to the form.

THE WITNESS:  No.  I mean, they didn't see the incident occur on video, and they were -- there were no crew members around, so they weren't -- they don't know the exact location of the video -- I mean, of the incident.

BY MR. GERSON:

Q.   Did Royal Caribbean do anything to take Ms. Coke to show -- have her show Royal Caribbean personnel the location where she fell?

A.   Because I was unable to speak to the safety officer, I don't know if they, indeed, did that or not.

Q.   Well, as far as your file preparation and preparation in this case, is there any indication from your review of the file that Royal Caribbean asked Ms. Coke to come down and show them where she fell?

A.   No, there's nothing that I can say that they did that.  But there's nothing that I can say that they did not.  So I don't know either way. I mean, your client knows.  So when she's deposed, she'll be able to say whether or not the safety officer went with her to the location.  But on behalf of Royal Caribbean, I did everything I could

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

to determine that information and was unable to determine whether or not he went with her to the location of the incident.

Q.   As part of -- you are familiar with Royal Caribbean's policies and procedures for investigating passenger injuries; are you not?

A.   I am.

Q.   And you are extremely versed at what those procedures are; are you not?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know about extremely, but I'm versed on them, yes.

BY MR. GERSON:

Q.   All right.  And Royal Caribbean's accident or personal injury investigations require photographs and CCTV video that is supposed to be preserved and saved internally; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  If there's CCTV available that depicts the incident, then yes, it should be preserved in the system.

BY MR. GERSON:

Q.   CCTV video is used in analyzing incidents; is it not?

A.   Yes, it is.

Q.   The CCTV video that you referenced was obscured by a column, did Royal Caribbean preserve that video to show that you couldn't see the video or the -- of the incident in question?

A.   No.   There was no -- there was no CCTV footage preserved because there was nothing seen on any CCTV in relation to the incident.

Q.   What is the column that you're referring to that obscured the video footage that was not able to be preserved in this case?

A.   I'm not quite sure which column it is. It appears there's only one column, the one that has the sign on it.

Q.   Let me show you what we've already marked.   I believe these photographs were Composite Exhibit 4.

Do you have Composite Exhibit 4?

A.   I do.

Q.   All right.   Are you able to identify what the column -- which column you're referring to that obscured the view of the incident from the CCTV video that were accessed but were obscured by a column and then, I guess, destroyed?

A.   Again, I mean, I wouldn't use the word "destroyed," because it's not destroyed, it's just

not saved.  If it's not saved, then it gets taped over, so it's not destroyed.  In order to actually save the CCTV, you have to save it.  But destroyed is not the right word.

But I would say that the column would be the column in the -- my second picture, which is the one that shows the "Caution:  Watch your step" sign.

Q.   Take a look at what we'll mark -- or it's been marked already.  And are you -- is it your testimony that the CCTV video footage that you're referring to that was obscured by a column, is this column that has the -- this gray column right here?

A.   Correct.

Q.   And Royal Caribbean decided that -- well, strike that.

Are there any other video cameras in the area that were capable of depicting or capturing the entrance to the casino?

A.   That would have been the only one that would have been capable of capturing this incident from that -- from where she was walking.  That's my understanding.  According to what I was told by the previous attorney on this case, there was no CCTV

images of the actual incident that were able to be seen in such -- because of that, none was saved.

Q. So --

A. Nothing capturing the incident. There was -- there was no capturing of the incident.

Q. There was CCTV video, but it's Royal Caribbean's testimony that the video was obscured by a column, a gray column, and Royal Caribbean destroyed the video that didn't show the incident?

MR. DRAHOS: Object to the form.

THE WITNESS: My testimony couldn't have been further from what you're saying.

What Royal Caribbean --

BY MR. GERSON:

Q. Well, what did Royal -- what did Royal Caribbean do with the video footage that was accessed at one point as part of the investigation in this case?

A. Okay.

MR. DRAHOS: Object to the form.

THE WITNESS: The safety officer -- the safety officer checked to see if there was any video footage that covered or captured the incident. There was not. He was unable to see any video footage that

captured the incident.  As such, he did not save any of the video footage because there was no video footage showing the incident occurring.  But what did he do with it --

BY MR. GERSON:

Q.    And you know this --

A.    Wait.  Let me just finish.

Q.    Sorry.

A.    What did he do with it?  It did nothing because it didn't have it at one point and destroy it.  It just did not save any video footage because there was no video footage capturing the incident occurring.

Q.    Okay.  The remarks that you're -- or what you're telling -- what you're saying is that the security officer who investigated the incident documented the fact that there was no video footage that was able to capture the incident because it was obscured by this column; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, I'm not quite sure if that's documented or not for sure. But I do know that my understanding is when I tried to find out about this information, that the safety officer who went to look to

see if there was video footage that captured the incident, did not find any video footage capturing the incident. According to the -- according to Mr. Applin, it was because the area that she fell, or wherever the incident was, was being blocked by a column.  The bottom line is that there was no video footage that captured the incident.  As such, nothing was saved.

BY MR. GERSON:

Q.    How did the -- how -- why would there be a CCTV video camera that is obscured by a column?  What would be the purpose of the -- of the CCTV camera if it's obscured?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It's not pointed -- it's not pointing directly at a column.  It's going to get a broader area.  But apparently where she fell, it was not covered by CCTV.  The area was not covered by CCTV.  They were unable to see her falling on CCTV.

BY MR. GERSON:

Q.    What -- what camera are you referring

to?

A.    Specifically?

Q.    Yes.

A.    I think -- I think it would be -- I can't see the number.  If that's the starboard side and if she was walking along where Boleros was, it would be the camera that is on -- I -- I don't know the number.

Q.    Well, how do you identify it?

A.    I don't know what you mean.

Q.    How do you identify the camera that you're referring to that was incapable of capturing the incident because it was obscured by a gray column?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't know that I need to identify it.  I don't understand what you're asking me.

BY MR. GERSON:

Q.    Well -- well, how does Royal Caribbean identify which video camera it -- was in the area that wasn't able to capture the incident?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't understand.

BY MR. GERSON:

Q. Let me -- let me -- let me see if you can -- let me see if I can reask you another way you understand.

You've -- Royal Caribbean is taking the position that there was a video, one CCTV camera in the area, but it was incapable of recording the incident because it was obscured by a column; correct?

MR. DRAHOS: Object to the form.

THE WITNESS: Correct. The area was not covered by that. So the area that she fell was not covered by any of the CCTV cameras. But no, Royal Caribbean's not taking the position that there was just one. There are more than one camera in the area. But none of the cameras in the area captured her fall.

BY MR. GERSON:

Q. How many cameras were there in the area?

A. In the area, pointing in various directions, I would say four.

Q. And what are you looking at?

A. A schematic of the CCTV cameras.

Q. Okay. Just give me a second and let me locate that schematic, and I'm going to have you explain it to me. But for the record, you've testified that there were four CCTV cameras in the general area where Ms. Coke was injured; correct?

A. I guess you could say three. I was giving it more of a broad. On the other side, there's also a camera. But I guess it's three because -- I don't know. When you look at it, you tell me if it's three or four. The bottom line is that --

Q. I -- I --

A. -- none of the cameras caught the incident. If they did, it would have been saved. They didn't. I don't know why we need to keep on beating a dead horse. The incident was not saved. None of the cameras caught it. That's Royal Caribbean's position and that's what happened. So I don't know why there's still questions about this. The cameras didn't capture the area.

Q. All right. All right. Let me show you what we'll mark Exhibit 8.

(Thereupon, Plaintiff's Exhibit No. 8 was marked for identification.)

BY MR. GERSON:

Q.   All right.  Fair enough.  I'll call it Exhibit 8, just for identification purposes.

You see what's been marked as Exhibit 8, Ms. Campos?

A.   Yes.

Q.   All right.  What is -- what is this that we're looking at, or the members of the jury, that they're looking at?

A.   So this is a diagram showing where the CCTV cameras are on deck 4 near the Boleros and the casino.  So when I said four, the four I was referring to are the four with the yellow on them, the inside over there.  I don't know if you would classify that as three, because the fourth, if you go down with your cursor to the left -- up -- yep -- I don't know if you want to classify that as in the area or not.  I said it was.

Q.   All right.  The --

A.   But those are the four.

Q.   Where my cursor is pointed right here, what is this?

A.   Something for -- a dance floor.  A dance floor.  That's what it says.

Q.   Okay.  Where is the casino identified

in this schematic?

A. You made it so small, but the casino's to the right.

Q. The casino's to the right. The casino's over here; right?

A. That's the casino. Yes. That's the middle -- yeah, the casino starts where your cursor is. Go further to the left. Keep on going to the right now. I don't know what you're asking, but --

Q. Is this -- is this -- if we're looking right here where my cursor is pointing, is this the walkway where Ms. -- Ms. Coke was walking?

A. Those are stairs, I think.

Q. Okay. Are you able to show me where the entrance to the casino is in this schematic?

A. Where the CCTV camera is to the right of where you're at now. My right. Go down. Yep. That. There. I believe around there is the entrance to the casino.

Q. You believe or you know? Can you -- I'm just trying to get some -- understand the concept here.

A. That's the entrance to the casino.

Q. This is the entrance to the casino?

A. Wait. No, further back, I think,

actually.  Further back, because then you see -- yeah, it's right around there.  That's the entrance.

Q.   This is the entrance to the casino and we've got a yellow camera there; correct?

A.   Yeah.  That's a cashier.  Yes.  Correct.

Q.   And so if you were to walk from where -- and I guess the video operator is recording this, but if you were to walk from -- into this direction, this is the same direction from left to right on the screen that Ms. Coke was walking to enter into the casino; correct?

A.   Correct.  I believe so.  I don't know for sure, but that's -- she hasn't testified yet, so but if that's what you're saying.

Q.   Well, Royal Caribbean produced schematics in this case; correct?

A.   Yes.

Q.   And this is -- and one of the topics -- I'm not trying to be difficult, but one of the topics for today was the schematics identifying the video cameras in the area; correct?

A.   Correct.  But you just asked me which way your client was walking, who has not been

deposed.  So I don't know exactly where she was walking.

Q.    Okay.  Well, I want you to assume -- I want you to assume that Ms. Coke, for purposes of this question, Ms. Coke was walking to enter into the casino.  Okay?

A.    Okay.  That's a better question, because if you want me to assume it, I will.  But again, I don't know exactly where she was walking.

Q.    Sure.

For purposes of this question, Ms. Coke testified -- Ms. Coke's -- I want you to assume for purposes of this question that Ms. Coke was entering the casino through this entrance.  Correct?

A.    Correct.

MR. DRAHOS:  Object to the form.

THE WITNESS:  For purposes -- for purposes of this, sure, she was, if that's what you want me to assume.

BY MR. GERSON:

Q.    And we have right here at the -- right here, this yellow is a video camera; correct?

A.    Correct.

Q.    Or a CCTV.  What do you call that?

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

A.     It's a CCTV camera, but it didn't capture the incident.  That's the answer to the question.  It's not a --

Q.     It's your testimony because of a column obscuring the view; correct?

A.     That's my understanding.

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, I might be incorrect about a column exactly.  But my understanding is none of the cameras captured the incident.  The area that she fell was not covered.  That is Royal Caribbean's stance, that it was not covered.  He went to go and look at it, couldn't see the incident occur on any of the CCTV cameras, so nothing was saved.

BY MR. GERSON:

Q.     I'd like you to take another view, or another -- I'd like to show you a photograph.  And with that said, do you see what I'm circling with my cursor here?

A.     Yeah.  The ceiling.

Q.     This photograph that's already been marked, you recognize this photograph; correct?

A.     Yes.

Q.   This is a photograph of the entrance to the casino; correct?

A.   Correct.

Q.   And right here we have this little -- what do you call that?

A.   I don't know.  I can't --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- see what you're referring to.

A camera.

BY MR. GERSON:

Q.   Do you know why that camera was not capable of capturing Ms. Coke's fall?

A.   It didn't capture the incident.  The area she fell was not covered by any view of any CCTV cameras.

Q.   But you mentioned before that the camera, it wasn't able to capture the incident because the video was obscured by a column.  So I'd like to know which camera you're referring to.

MR. DRAHOS:  Object to the form.  It's been asked and answered.

THE WITNESS:  All -- okay.  I'm going to answer this question again as clear as I can.

Whatever cameras there were in that area the day of the incident that are still the same cameras that are there today did not capture an incident occurring.  I don't know, maybe I'm incorrect about the column specifically, but the bottom line is, is that none of the cameras captured the incident.  When the safety officer went to see if there was CCTV footage available, none of the cameras in the area captured the incident.  That's as clear as I can be.  I don't know exactly why they didn't capture the incident, but they did not.  The area was not -- nobody -- the safety officer could not see the incident occur in any of the cameras.

BY MR. GERSON:

Q.    Who determines the location and placement of CCTV cameras on Royal Caribbean ships?  That would be someone, the director of security?

A.    I don't believe that was part of my areas of inquiry.

Q.    Well --

A.    The placement of CCTV cameras.

Q.    For having worked at Royal Caribbean

for 14 years, you know who the director of global security is; don't you?

MR. DRAHOS:  Object to the form.  It is outside the scope.

THE WITNESS:  First of all, the current director of global security would not determine right now where those cameras are, because they've been placed in there a long time ago.  And I don't know who made those original choices back when the ADVENTURE was built in 2001.

MR. DRAHOS:  I need to ask for another bathroom break, please.

MR. GERSON:  No problem.

MR. DRAHOS:  And also, you know, we're going now on four hours.  Can you give me some kind of estimate as to how much longer you think you're going to go?  I need to get something to eat at some point in time, as does, I would imagine, the court reporter and everybody else involved.

MR. GERSON:  I don't have -- I don't have a ton more.

MR. DRAHOS:  What does that mean?  20 minutes?  An hour?

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

MR. GERSON: Yeah, I'd say, you know, 20 minutes max.

MR. DRAHOS: Twenty minutes. All right. Well, let me get up and use the restroom real quick and we'll get back to it. Thank you.

THE VIDEOGRAPHER: We're going off the record at 2:23 p.m.

(Thereupon, a short recess was taken.)

THE VIDEOGRAPHER: We're going back on the record at 2:28 p.m.

BY MR. GERSON:

Q. All right. Back on the record.

Ms. Campos, I was asking you a little while ago about schematics that were produced by Royal Caribbean, and you testified about three, possibly four video cameras that were in the general area and vicinity. Do you recall that testimony?

A. I do.

Q. Okay. So if we look at the schematic that's produced, we have one, two, three cameras. Are these the three cameras up top where my cursor is pointed, one that looks like it's right to the right of the word "Boleros," we've got one to the

left of that, and then we have another camera that is -- looks like it's posted right to the entrance to the casino.  Do you see those?

A.    Yes.

Q.    Are those the three cameras that you were referring to earlier?

A.    Yes.

Q.    And then we have a fourth camera at the bottom here of the schematic.  But you weren't sure one way or another if that was really capable of recording the incident.  It was just in the general area and vicinity; correct?

A.    Yes.  When you asked me that question, I just -- in that general area, I see four.  The question was how many cameras were in the area --

Q.    Okay.

A.    -- and -- yes.

Q.    So what is the distinction between yellow and red?

A.    The distinction between yellow and red is just more -- it's -- it's -- they're all cameras that -- that are functioning and working.  The distinction doesn't really -- it's -- sometimes if the camera is, like, idle because nobody is moving in it or if there's no motion picked up, or the

camera can turn yellow because there's something there for a lengthy period of time, like furniture or something, it might turn yellow.  But they're all recording.

Q.    Do you know whether or not all three of these cameras depicted in this video, the one to the left of the Boleros, the one to the right of the Boleros, and the one right at the entrance, do you know if all of those were accessed?

A.    I don't know what you mean if all -- are you asking me whether or not all of them were accessed by the safety officer?

Q.    Yes.

A.    To -- to view if the incident was captured?

Q.    Correct.

A.    Okay.  My understanding -- and again, I haven't spoken directly with him because I was unable to get in touch with him.  But my understanding is, is that he accessed the cameras that he believed, based on where she -- where he understood the incident to have occurred, and none of them depicted or had the -- showed the incident happen.

Q.    Is the destruction of video -- CCTV

materials prohibited as a matter of policy and procedure from Royal Caribbean?

MR. DRAHOS:  Object to the form.

THE WITNESS:  The destruction of videos prohibited -- I don't know.  I think that when you're saying the destruction of videos per our policy, I think that you're thinking of something different.  But in general, per our policy, it does say that. But you're not -- it's not the destruction of a video if you don't save a video.  What that policy is referring to is that if a video is saved and then destroyed, that's prohibited.

BY MR. GERSON:

Q.    Based on this schematic, would it -- does it appear that this triangle area that I'm circling -- that I'm identifying with my cursor that is in between the two yellow cameras, that would be the precise area where Ms. Coke fell; isn't it?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Again, I don't know the precise location that Ms. Coke fell, because she has not been deposed yet.

Jeannie Reporting
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

BY MR. GERSON:

Q.    Well, I -- general area.  I mean, the walkway that photographs were taken, this is the walkway, as you described the Boleros; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  But your question was specific.  The general area that -- that my understanding is, that -- that your client had an incident was in front of Boleros, walking all the way up to the casino entrance.  I don't know what specific location within that area she sustained a fall.

BY MR. GERSON:

Q.    And this camera right here that we're looking at, right, posted at the entrance of the casino, would have been the -- likely the best camera to capture the incident; right?

MR. DRAHOS:  Object to the form.

THE WITNESS:  Most likely I would think so, yes.  But it did not capture the incident.

BY MR. GERSON:

Q.    I mean, isn't it true that closed circuit television is strategically positioned and

installed pursuant to coverage requirement plans according to Royal Caribbean's policies and procedures for personal injury investigations?

MR. DRAHOS:  Object to the form.

THE WITNESS:  It is strategically placed, but you're assuming that that's an area that it needed to be strategically placed at.  I mean, there's CCTV cameras throughout the main -- the main issues with CCTV or the main goals of CCTV is really not for personal injury.  It's really for safety of the ship, and for the casino as well.  But yes, it is -- the video -- the CCTV cameras are placed per our policy.

BY MR. GERSON:

Q.    Wouldn't it make sense that the video camera, that there was a video camera at the entrance to the casino, just like we looked at in the photograph earlier?

A.    There is a video camera --

MR. DRAHOS:  Object to the form.

THE WITNESS:  -- at the entrance.

BY MR. GERSON:

Q.    But you don't know whether or not that video camera was accessed or not?

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

A.     No.

MR. DRAHOS:  Object to the form.

THE WITNESS:  The video --

MR. DRAHOS:  Asked and answered.

THE WITNESS:  The video cameras were accessed and none of the video cameras depicted or showed the fall.  The area that she fell was not -- or her fall itself was not captured by any of the cameras.

BY MR. GERSON:

Q.     Well, your explanation was that the video camera was obscured by a column?

A.     No.

MR. DRAHOS:  Object to the form.

THE WITNESS:  I think that maybe you're understanding what I said wrong then.  What I was saying is not the entire area, it's not like we have a video camera pointed and staring just at a column so we can't see anything.  It's a video camera that has a wide view.  Where she fell, my understanding was was behind or near a column, so the video camera, even though it's picking up other things, did not see her actual fall happen.  It was not

captured.  Doesn't mean that the video camera is just pointed directly at a column and that it's not seeing anything else, if that makes more sense.  I'm sorry if I didn't explain that properly.

BY MR. GERSON:

Q.    I want you to just take one more look here.

A.    And -- and I'd also like to point out that the photographs that were obtained show that the staircase was to her left.  So where you're showing it, according to the photographs that were taken, is on the other side, not where you're pointing to.  So if you go -- if you put back up the diagram of the CCTV.

Q.    Let me ask you a question and then I'll let you -- I don't understand what you're telling me, but I'll give you an opportunity.  Let me just ask my question and then I'll let you explain yourself, whatever it is that you're referring to.

But I just want you to take a look again at this photograph, which has already been referred to several times.  And based on the diagram that was produced in this case, this likely

is that photograph -- this is the CCTV camera in the diagram?

A.    I don't have -- Nick, I don't have anything up on the screen.

Q.    Oh, okay.  Take a look again at this photograph, which we've referred to several times. And you see this -- I don't know what you call this, but it's my understanding that this is the video camera that is depicted in the diagram that was produced and referred to earlier; correct?

A.    Correct.  And the diagram that we were looking at wasn't pointing in that specific direction.  But again, your client, according to these photographs, was coming from the other side. The staircase is to her left.  So that CCTV camera is actually pointing to the right, if you look at the video.  If you look at the diagram.

Q.    It's your testimony that this CCTV camera is not looking towards the area or the direction that Ms. Coke claims that she was traveling towards, which was towards the entrance of the casino?

A.    There's two ways --

MR. DRAHOS:  Object to the form.

THE WITNESS:  There's two ways to get

to the area of the casino.  So if you want to pull up the schematic of the CCTV cameras, I can show you.

BY MR. GERSON:

Q.   All right.  I'll give you that chance in a second.  I just want to finish my question and then I'll let you explain yourself.  But this video camera that we're looking at right here with my cursor, is it Royal Caribbean's testimony that this is not capable of capturing this entrance or this area right here where the nonskid strip is depicted under -- right -- just this area that I'm referring to?

MR. DRAHOS:  Object to the form.

THE WITNESS:  So on the other side of the area that you're referring to, it's pretty much the -- looks the same.  You can go on both sides.  That video camera is pointing towards -- that's where Boleros is, on the left-hand side.  These photographs are on the right-hand side of the staircase.  So if you -- it's probably best if you pull up the CCTV schematic.

BY MR. GERSON:

Q.   Okay.  So let me just make sure I

understand something correctly.

What you're telling me is that it's your understanding that this is not the area where Ms. Coke was walking at the time of her fall?

MR. DRAHOS:  Object to the form.

THE WITNESS:  No, that's not -- I think -- I really hope that you would let me explain it so you can understand what I'm saying, because I'm not saying that that's where the photographs were taken. But if you pull up the schematic, you'll be able to see that there's two entrances -- or there's two walkways that lead up to the casino that go around the staircase.

BY MR. GERSON:

Q.   Okay.  I'll show that in a second. But going back to that video camera, is there anything obscuring the view of that video, as far as you know it, that would prevent or preclude capturing someone like Ms. Coke falling in the particular area where the photographs were taken and the sign that you referred to earlier about "Caution:  Watch your step"?

MR. DRAHOS:  Object to the form.

THE WITNESS:  That -- that video

camera is not pointing in that direction.

It's pointing in the direction of the other walkway.

BY MR. GERSON:

Q.   When you say it's pointing in the direction of the other walkway, how do you know that?

A.   Because we were just looking at it and you were asking me the questions if this -- is this the general area where my client fell, and I said I don't know specifically.  But what I did just realize is that your client was walking on the other side, according to the photographs that were taken, not on that side.

Q.   I thought you told me that Royal Caribbean didn't know where exactly Ms. Coke fell.

MR. DRAHOS:  Object to the form.

THE WITNESS:  According -- according to the photographs that were taken -- I said Royal Caribbean doesn't know the specific location.  They know the general location.  So the general --

BY MR. GERSON:

Q.   Okay.

A.   -- location of where the photographs

were taken was on the other walkway on the other side, according to the photographs that we took, and according to what you were saying, that I was supposed to assume that we took the photographs of the area where she fell.

Q.   Give me a second.  All right.  I'll show you the photographs again.

A.   Of the schematic?

Q.   I was going to show you the photographs.  I mean, what -- what -- it sounds like what you're telling me, and correct me if I'm wrong, you're telling me that the photograph that we've just looked at that shows the entrance to where -- to the casino bar, there's only one photograph so far that's been produced in this case that shows the gray column and the entrance to the casino bar.  You would agree with that; correct?

MR. DRAHOS:  Object to the form.

THE WITNESS:  But Mr. Gerson, what I'm trying to explain to you is that the pathway, the walkway, there's two of them, one on each side.

BY MR. GERSON:

Q.   I understand.

A.   No, but I don't think you do.  And I'd

really appreciate if I could explain myself by you just pulling up the schematic.  It would be the easiest way --

Q.    Sure.

A.    -- to do it.

Q.    Sure.  There we go.

A.    Okay.  You can look at the schematic that I said was the staircase.  If you make it a bit bigger, please.  If you could just make it a bit bigger, a little bit bigger even, a little bit bigger, a little bit bigger, please.  Okay.

See under Boleros where we said the staircase was?  And then you have the area under the staircase with the big X that's like an opening, so you can look down to the deck below?  On the other side of that, where the three cameras are not, but there's one long camera on the -- on the bottom, that is where the pictures are taken on that side of where your client -- or the general area or the area of where your client is saying she fell.  Not the one that you were saying right in front of Boleros.  It's the other side.  They are the same marble on both sides.  You can walk into the casino from both ways.  It's like a split opening.  So if you're walking from back to back

where it says PL9, PL8, you can either go to your left or you can go to your right. From the pictures depicted from the safety officer, if you're walking towards the casino from the middle of PL8 and PL9, that's at the back of the screen, she didn't go to the left. She went to the right. The photographs were taken to the bottom right of where the staircase is.

Q. Your testimony is that Ms. Coke was walking in this general area. That's what you're telling me?

A. That's what the photos depict from the safety officer, because the staircase is to the left.

Q. Who created this diagram?

MR. DRAHOS: Object to the form.

THE WITNESS: I don't know who created it.

BY MR. GERSON:

Q. Well, how did you get it?

A. From the ship. I mean, from -- from -- from global security. But I don't know who created it.

Q. The -- what do you know about the -- the video cameras that you're referring to, are

they panoramic?

A. What do you mean "panoramic"? Do they move? No.

Q. They're stationary?

A. They're stationary. I don't think that any of those are bird's-eye. It doesn't appear that they are. That would -- I think what you mean by panoramic. But they are stationary.

Q. Are there any fisheye cameras in the area?

A. That's the bird's-eye. I don't believe so, no. But I can't tell for sure.

Q. Who would -- who on the ship would know?

A. I don't know specifically. It's a question that we would have to ask and we can provide you an answer with, if any of those cameras in the area are bird's-eye. If you want that information, we can get that to you. I didn't know that I needed to know it for this deposition.

Q. Okay. Okay. A couple more questions for you, Ms. Campos.

In addition to identifying prior incidents that were reported for people that tripped, fell in the general area on the subject

ship and sister class ships, did you also undertake any efforts to identify complaints by passengers about the area and condition of the flooring where Ms. Coke was injured?

A.    Yes.

Q.    And were you able to identify any?

A.    Yes.  I just have to locate them.

Okay.

Q.    Were you able to identify complaints by passengers with respect to this particular area where Ms. Coke was injured?

A.    There was a search run for the area where location of ship -- yeah, around that deck 4 area.

Q.    How many complaints were you able to identify?

A.    This is of just falls, it's not necessarily a slip and fall or trip and fall.  It's any falls.

By my count, I have 16.  No.  Well, that's including your client.  Oh, but there's two. So take that out.  Sorry.  So that's --

Q.    How many complaints in total --

A.    Fourteen.

Q.    -- were you able to -- 14 complaints?

A.    Well, I just have to make sure because some of them are doubles.  Hold on.

One, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13 -- 13, not including your client's.

Q.    Okay.  And would you read into the record what they are?

A.    You want me to read each and every one of these?  Yeah?

Q.    Yes, please.

MR. DRAHOS:  Object to the form.

THE WITNESS:  Okay.  The first one is -- you want me to read the whole thing or just the pertinent parts?  It says, "Brief summary of incident/accident:  Slipped on a wet floor and fell onto her knee."

BY MR. GERSON:

Q.    Well, let me -- let me -- sorry.

Let's -- if we look at -- well, I'm trying to figure out what the easiest way to do this is.

Was there an incident reported on November the 17th, 2019 by Isabella Espin Gorta?

A.    Yes.  Yes, but that would be after this incident.  I don't know why --

Q.   Okay.  Well, you produced it, so I'm asking.

A.   Okay.  Yeah.  There is.  And it says that "While coming down the stairs from deck 4 to deck 3, she hurt -- she hit her right eye against the handrail."  And the accident location is stairs between deck 4 to deck 3 by the theater.  So I don't think that was the same location.

Q.   On October 20th, 2019, was there a report by a passenger by the name of Denise Morris?

A.   Yes.  And she was identified, I'm pretty sure, on our other one as well.  She was on the prior search.

Q.   On October 7th, 2019, was there an incident reported by a Ms. Mary Jordan?

A.   Yes.

Q.   And she fell between the Boleros and the casino; correct?

A.   Correct.  That's all the information that's there.  It doesn't say --

Q.   Do you have her contact information?

A.   We don't have it -- I don't have it on this, but we could try to locate her contact information.  I don't know how -- we would be able to get the last contact information we have for

her.

Q.   All right.  Well, let me just show you what's been produced by Royal and you can explain it to me.  I'm not trying to prolong this any more, but this was -- this is what I was given, so I've got to ask you about it.

So taking a look at what's been marked, I guess, as Exhibit -- what are we up to, 9.

(Thereupon, Plaintiff's Exhibit No. 9 was marked for identification.)

BY MR. GERSON:

Q.   Exhibit 9.  This is a list of complaints that were produced in this case for just this particular ship and this particular area.  You would agree with that?

A.   Correct.  It's a list of complaints that were made to guest services for the three-year period prior to this incident for the area of deck 4.  I think it encompasses more, but yes, go ahead.

Q.   So if we look here, you had mentioned before there's a total of how many complaints?  Did you say 11 or 14?

A.   I said -- originally I said 16, but there's doubles.  So I think it's 14.  But also two

of them were after the date.  But go ahead.  I'm sure you can count it.

Q.    What's the next one before -- what's the next complaint documented by Royal Caribbean in your search for passengers that complained about the area on deck 4 where Ms. Coke was injured?

A.    Beverly Barney.

Q.    And what did she report and what -- on what day?  It looks like May the 5th, 2019?

A.    Yeah.

Q.    And what does she state?

A.    This one -- I'm just trying to understand which one is which because it's hard to -- date of -- "Date and time of accident:  May 11, 2019 at 12:00, and time reported at medical facility:  May 11th at 13:12.  Brief summary of accident:  Her feet got stuck somehow and she tripped and fell to ground on deck 4 and she sustained an injury to her right eyebrow and her right hand.  Location:  Deck 4.  Level of severity:  Minor."

Q.    And that wasn't part of your prior incident search; correct or --

A.    That was not.

MR. DRAHOS:  Object to the form.

THE WITNESS:  It was.  Beverly Barney was on the list.

BY MR. GERSON:

Q.  Okay.  On September 17th, 2018, we have a Jo Ann Horton that reported her foot got stuck and she tripped and fell?

A.  Correct.  And yes, deck 4 outside casino.

Q.  So Jo Ann Horton, she was not disclosed in the prior incidents, was she?

A.  Jo Ann Horton was.  She's on that list.

Q.  Okay.  I guess what I'm trying to understand here is we asked for complaints.  So of these complaints that are documented, can you tell me which ones from your -- based -- to the best that you can, which ones are not part of the prior incidents so we don't replicate our time and effort?

A.  Okay.  All of these on this page that we're looking at, Eugene, Jo Ann, Beverly, Mary and Denise are all on the priors list.  Taiana Coke, on the next page, is on there.  Same with Ligaya. She's on there.  We went over hers.  I guess I could go to the first page and start there.  Maybe

that's -- Carmen Acevedo is on your list. Doris Nelson is on your list. Okay. These three people are not. Let me just double-check. Charles Madison is not on the prior list. Constance is not on the prior list. And neither is Jennifer Fiori.

Q. So Charles Madison reported on the ADVENTURE that he fell on deck 4 by the Boleros and hurt her ankle; correct?

A. Let me look at where it starts. Hold on.

Yep. This Charles Madison. Let's see.

There's no incident report for Charles Madison. So that's why he would not be on the list.

Q. Was he given a passenger injury statement?

A. No. There's no incident report. He's not in Riskonnect. I just put the name in and there's no Charles Madison. That's why he's not on the list. I can check the next name for you, if you'd like. Let's see.

Constance is in Riskonnect, but for an incident that occurred on the ANTHEM in 2020. There's nothing in relation to her for anything

that happened on the ADVENTURE OF THE SEAS in 2018.

And the last one, there is no Jennifer Fiori in Riskonnect for any kind of incident.  So the reason those three are not on the priors is because there's no incident reports for them.  The last one is Isabella Espin Gorta, but we already discussed it and she didn't fall in the same area.  She fell on the stairs between deck 4 and deck 3.  Do you want me to check, though?

Q.    Sure.

A.    Okay.  No, there's no incident report.  I could just try -- no, there's no incident report.

Q.    All right.  Let me just take a look.

The -- the -- apparently it's my -- strike that.

The weather logs for this particular day and this particular time were produced in this case.  Did you review them?

A.    Briefly.  Not in-depth.  No, I didn't.

Q.    Was there anything -- was there anything in the weather logs to indicate any rough weather or rough seas -- or sea conditions?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I -- I can't see.

They're so small, it's so hard for me to

see them.  I don't think so.  I don't know. That was -- no, I don't -- I don't believe so, no.  But I'm probably not the best person to interpret deck weather logs.

BY MR. GERSON:

Q.   As you sit here today, is Royal Caribbean aware of any weather conditions that caused or contributed to any unusual rocking or swaying of the ship?

A.   No.

Q.   As part of Royal Caribbean's investigation in this case, were any -- were any witnesses or statements taken of any witnesses with Ms. Coke?

A.   No.

Q.   Were any attempts made to investigate -- to interview any witnesses that were with Ms. Coke at the time of her fall?

A.   I -- are you saying on board the ship or afterwards?

Q.   Just as part of the investigation.

A.   Oh.  No, I don't believe so.

Q.   Does Royal Caribbean have a policy for investigating witnesses that may have observed a fall like Ms. Coke's?

A.   If there's a witness nearby, it's helpful to -- to get a witness statement from them.

Q.   Do you know if anyone that was with Ms. Coke at the time of her fall was questioned or asked to provide any information about what they observed or not?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I don't believe anybody was.  The incident was reported the next day.  I don't believe anybody was -- was asked about it.

BY MR. GERSON:

Q.   The fact that the incident was reported the next day, does it make any -- does it change the policies and procedures as far as how Royal Caribbean conducts an accident investigation?

A.   No.

Q.   You would agree that written statements are important for understanding an incident and informing and understanding what happened; correct?

A.   Correct.

Q.   And as far as you know, none were taken?

A.   None were taken, except Ms. Coke's.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

Q.   I just have a couple of follow-up questions.

With respect to the privilege log, do you have the privilege log in front of you?

A.   I can get it in front -- I think I have it here.  Okay.  I have it.

Q.   On the privilege log there are four photographs of the incident scene that are dated November the 11th, 2019.

A.   Okay.

Q.   And then on December 4th, 2020, there's a total of seven photographs of the incident scene, which would bring a total of 11 photographs in this -- that were taken in this case?

A.   Yeah.  I didn't look at that like you did.  I know that all the photographs that were taken were produced to you.  There's no photographs that weren't.  I have here -- I'll count mine.  I have one, two, three, four, five, six, seven, eight, nine, ten.  I have ten.  I don't know.  There must have been -- we can try to figure that out.

Q.   Let me -- let me just double-check.  One sec.  One, two, three, four, five.

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

MR. DRAHOS:  I have 11, for what it's worth.

THE WITNESS:  Okay.  Let me try again then.  Maybe I counted wrong.  How many do you have, Nick?

BY MR. GERSON:

Q.   Oh, there are photographs here that were embedded at the bottom here.

A.   I still have ten.  Maybe I'm missing one.

MR. DRAHOS:  Well, that's possibly a copying error.

BY MR. GERSON:

Q.   I have 11.  So I guess I've got to ask you.

Okay.  Let me show you -- we'll just mark this as the next exhibit.  We'll call this Composite Exhibit 10.

(Thereupon, Plaintiff's Exhibit No. 10 was marked for identification.)

BY MR. GERSON:

Q.   All right.

A.   Okay.

Q.   This is -- this is the way it was produced to us, but if we look at the bottom here,

I see one, two, three, four photographs.  Do you see that?

A.    Yeah.

Q.    Are these -- do you know which photographs these represent?  Are these the photographs from November the 19th, starting from the bottom up, with the lady in the black dress?

A.    I'm going to ask, are you okay if I ask my counsel?  Because I'm not quite sure.

Q.    I'd prefer if you --

A.    I don't know.

Q.    -- stated --

A.    I mean, if you want an answer to it, I'm going to say I don't know.  It would appear that that would make sense, but I don't know.  When were these produced to you?

Q.    I'd have to look.  I don't -- I don't know.

A.    Yeah.  I don't know the answer to that question.  I didn't -- you didn't show those before.  I don't know.  I didn't realize -- I didn't look through the privilege log.

Q.    Well, the way that they're -- the way that they were produced, so you see, just as a matter of professionalism, I've given these

photographs in normal -- that were taken in normal size, and then there's these that are embedded in the bottom, which I don't really understand. So we have to blow them up.

A. Yeah. I don't -- I think that those were probably the first four that were taken then; right? But then there should be only seven more -- or what did you say, 11 there?

Q. Well, there are a total of 11 photographs identified on the privilege log and they've been produced.

A. Oh, okay.

Q. And all I'm asking you is if you know whether or not -- and I didn't see the ones all the way at the bottom there -- but now that you're on the record, do you know which ones were -- do you know if these were the four that were taken on the day of the incident?

A. Let me see if I can see from the incident if -- okay. Yeah, those are the four that were taken the day of the incident.

Q. Okay.

A. And it looks like the reason that they're embedded like that is because it's small, it's just small, like they're small files, I guess.

I don't know.  But yes, those are the four -- yeah, okay, that were taken on the date of the incident. When was this file opened?  Oh, okay.  Okay.

Q.    Where is the ship right now?

A.    I have no -- I don't -- I'm not sure which ship this is.  I know it's the ADVENTURE, but I don't remember where it is.  I think my counsel spoke to you about that.  Well, this could have been -- I think it's the one in the Bahamas.

MR. DRAHOS:  Yeah.  It's in Nassau, yes.

THE WITNESS:  It's in Nassau.

MR. DRAHOS:  Homeport Nassau revenue sailing.

THE WITNESS:  Okay.

MR. GERSON:  All right.  I don't have anything further for you at this time, Ms. Campos.  I appreciate your patience. And I don't have anything further for you.

MR. DRAHOS:  So Madam Court Reporter, we will read.

THE VIDEOGRAPHER:  We're going off the record at 3:12 p.m.

(Thereupon, the deposition was concluded at 3:12 p.m.)

CERTIFICATE OF SHORTHAND REPORTER


STATE OF FLORIDA    )
                    )   SS.
COUNTY OF BROWARD  )

            I, Corinne Grassini, Florida Professional Reporter, do hereby certify that I was authorized to and did stenographically report deposition of AMANDA CAMPOS, that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 215 is a true record of my stenographic notes.

            I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

            DATED, this 27th day of October 2021.



        _____
        CORINNE GRASSINI
        Florida Professional Reporter

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BROWARD

I, the undersigned authority, certify that AMANDA CAMPOS remotely appeared before me and was duly sworn.

WITNESS my hand and official seal this 27th day of October, 2021.

_Corinne Grassini_

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _
CORINNE GRASSINI
Notary Public State of Florida
My commission Expires: 11-16-22
Commission #GG 268731

JURAT PAGE

_____      )
                     )SS.
_____      )



          I, hereby certify that I have read the

foregoing transcript pages 1 to 215 and find the

same to be true and accurate.

          Any corrections made by me are set

forth on the errata page attached hereto.




                    _____

                    (AMANDA CAMPOS)




Sworn to and subscribed before me on this,
_____ day of _____, 2019.


_____
Notary Public in and for the
State of Florida at Large.
My Commission expires:



TO: AMANDA CAMPOS
c/o MICHAEL J. DRAHOS, ESQUIRE
GRAY ROBINSON
515 North Flagler Drive
Suite 650
West Palm Beach, Florida 33401


October 27, 2021

IN RE: TAIANA COKE v. RCCL
CASE NO: 20-CV-24549-GRAHAM

Dear AMANDA CAMPOS,

With reference to the examination of YOURSELF,
deponent in the above-styled cause, taken on August
3, 2021 under oath, please be advised that the
transcript of the Deposition has been transcribed
and is awaiting your signature.

Please arrange to conclude this matter at your
earliest convenience. We would suggest that you
telephone this office and arrange an appointment
suitable for all concerned.

However, if this has not been taken care of by
November 29, 2021 we shall conclude the reading and
signing of said deposition has been waived, and
shall then proceed to file the original of the said
transcript with the party who took the deposition,
without further notice to any parties.

                    Sincerely,

                    _____
                         Corinne Grassini

cc: All Counsel of Record.

ERRATA SHEET

F.R.C.P. RULE 1.310 PROVIDES IN PART:
    (e)"...Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

 PAGE/LINE              CHANGE/CORRECTION              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, _____, do hereby certify that I

have read the foregoing transcript of my

deposition, given on August 3, 2021, and that

together with any additions or corrections made

herein, it is true and correct.


                        _____
                        AMANDA CAMPOS

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

**'**

**'16** [1] - 111:10
**'17** [1] - 111:9
**'19** [2] - 111:5, 130:8

**1**

**1** [12] - 2:17, 11:25, 12:1, 17:22, 54:7, 59:1, 60:24, 65:5, 73:21, 96:11, 216:7, 218:7
**1.310** [1] - 220:2
**10** [3] - 2:22, 212:18, 212:19
**100** [6] - 4:22, 4:23, 4:24, 5:1, 5:2, 84:6
**10:00** [2] - 121:25, 122:2
**10:30** [2] - 121:19, 122:4
**10:36** [2] - 1:12, 3:8
**10th** [10] - 18:7, 22:3, 22:15, 24:9, 24:11, 39:9, 40:5, 111:3, 111:4, 112:1
**11** [14] - 143:3, 143:7, 143:10, 143:19, 143:20, 144:1, 202:4, 204:23, 205:14, 211:13, 212:1, 212:14, 214:8, 214:9
**11-11** [3] - 22:8, 22:12, 23:3
**11-11-2019** [1] - 24:18
**11-16-22** [1] - 217:17
**112** [1] - 2:21
**11:34** [1] - 55:19
**11:40** [1] - 55:22
**11th** [8] - 18:8, 21:16, 23:4, 25:19, 27:13, 165:6, 205:16, 211:9
**12** [4] - 2:17, 27:16, 143:16, 202:4
**12:00** [1] - 205:15
**12:41** [1] - 113:14
**12:48** [1] - 113:17
**12:58** [5] - 22:8, 22:12, 23:4, 24:18, 27:13
**13** [2] - 202:4
**13:12** [1] - 205:16
**14** [8] - 78:13, 79:15, 80:1, 84:3, 184:1, 201:25, 204:23, 204:25
**14th** [1] - 12:9

**156** [1] - 2:25
**15th** [1] - 37:24
**16** [2] - 201:20, 204:24
**1600** [1] - 25:4
**16:00** [1] - 25:4
**176** [1] - 2:21
**17th** [2] - 202:23, 206:4
**1980** [1] - 2:3
**19th** [1] - 213:6
**1:40** [1] - 154:15
**1:48** [1] - 154:18

**2**

**2** [4] - 2:17, 21:5, 21:6, 23:1
**20** [2] - 184:25, 185:2
**20-CV-24549-GRAHAM** [2] - 1:3, 219:10
**2001** [1] - 184:11
**2004** [1] - 5:18
**2016** [1] - 111:4
**2018** [2] - 206:4, 208:1
**2019** [24] - 21:16, 22:3, 22:15, 23:4, 37:25, 39:9, 40:5, 111:3, 112:1, 129:24, 132:12, 133:13, 135:9, 139:12, 139:21, 141:2, 142:1, 202:23, 203:9, 203:14, 205:9, 205:15, 211:9, 218:17
**2020** [2] - 207:24, 211:11
**2021** [8] - 1:12, 3:7, 216:12, 217:11, 219:9, 219:13, 219:18, 220:21
**204** [1] - 2:22
**20th** [1] - 203:9
**21** [2] - 2:17, 2:25
**212** [1] - 2:22
**215** [2] - 216:7, 218:7
**21st** [2] - 132:12, 133:13
**22nd** [2] - 141:2, 142:1
**24** [3] - 71:10, 71:19, 129:24
**24th** [4] - 129:17, 130:8, 139:12, 139:21
**268731** [1] - 217:17
**27** [1] - 219:9
**27th** [2] - 216:12, 217:11

**29** [2] - 23:4, 219:18
**2:23** [1] - 185:8
**2:28** [1] - 185:11

**3**

**3** [12] - 1:12, 2:14, 2:18, 26:13, 33:24, 34:1, 34:5, 203:5, 203:7, 208:8, 219:13, 220:21
**30** [1] - 144:12
**33145** [1] - 2:3
**33401** [2] - 2:7, 219:7
**34** [4] - 2:18, 111:21, 120:11, 120:14
**35** [10] - 111:20, 120:10, 120:14, 120:15, 145:3, 145:4, 145:12, 151:18, 155:25, 159:6
**3:12** [2] - 215:23, 215:25
**3rd** [2] - 3:7, 12:9

**4**

**4** [45] - 2:19, 17:5, 18:2, 19:7, 29:5, 49:20, 50:1, 51:19, 51:20, 52:24, 56:8, 65:16, 65:21, 67:17, 68:20, 69:4, 69:8, 69:12, 69:25, 73:3, 73:20, 133:20, 133:21, 135:17, 135:18, 135:22, 137:17, 137:18, 139:5, 141:22, 144:3, 147:24, 169:16, 169:17, 177:11, 201:13, 203:4, 203:7, 204:20, 205:6, 205:18, 205:20, 206:7, 207:7, 208:8
**4A** [3] - 2:19, 77:8, 77:12
**4th** [1] - 211:11

**5**

**5** [5] - 2:20, 84:19, 84:23, 85:15, 90:5
**50** [2] - 4:21, 5:2
**51** [1] - 2:19
**515** [2] - 2:6, 219:6

**5th** [1] - 205:9

**6**

**6** [4] - 2:20, 90:6, 90:7, 90:10
**650** [2] - 2:7, 219:7
**6:16** [2] - 26:5, 27:25

**7**

**7** [9] - 2:21, 26:13, 38:10, 39:7, 112:21, 112:22, 118:10, 119:7, 129:22
**77** [1] - 2:19
**7th** [3] - 135:9, 135:15, 203:14

**8**

**8** [5] - 2:21, 176:22, 176:23, 177:3, 177:5
**84** [1] - 2:20

**9**

**9** [5] - 2:22, 76:6, 204:9, 204:10, 204:13
**90** [1] - 2:20

**A**

**a.m** [4] - 1:12, 3:8, 55:19, 55:22
**abide** [1] - 91:16
**ability** [1] - 39:18
**able** [47] - 7:20, 7:22, 8:10, 8:13, 10:15, 11:2, 11:13, 73:17, 74:23, 74:25, 78:21, 91:6, 96:9, 96:14, 99:23, 100:9, 114:25, 115:23, 116:1, 120:4, 120:15, 129:23, 132:16, 142:17, 143:16, 144:6, 148:3, 148:11, 152:21, 163:12, 163:14, 164:25, 166:22, 167:23, 169:10, 169:19, 171:1, 172:18, 174:22, 178:14, 182:18, 195:12,

201:6, 201:9, 201:15, 201:25, 203:24
**above-styled** [1] - 219:13
**absence** [2] - 144:23, 166:24
**abusing** [1] - 109:15
**abusive** [3] - 103:19, 108:10, 109:10
**acceptable** [5] - 149:11, 149:15, 149:21, 150:5, 150:7
**access** [3] - 13:10, 116:1, 128:12
**accessed** [7] - 169:22, 171:17, 187:9, 187:12, 187:20, 190:25, 191:6
**accessing** [1] - 140:12
**accident** [23] - 19:23, 23:6, 26:6, 27:20, 32:21, 35:22, 36:8, 37:6, 49:18, 51:1, 74:3, 74:10, 75:17, 76:5, 125:15, 125:20, 138:2, 153:7, 168:15, 203:6, 205:14, 205:17, 210:16
**accidents** [2] - 33:6, 35:14
**accommodate** [1] - 116:18
**accommodation** [1] - 115:25
**according** [27] - 18:3, 26:8, 28:19, 32:2, 91:3, 95:6, 123:6, 126:24, 128:21, 130:22, 131:18, 131:23, 132:15, 136:23, 137:16, 139:25, 170:24, 173:4, 190:2, 192:12, 193:13, 196:13, 196:18, 197:2, 197:3
**account** [1] - 24:12
**accurate** [4] - 32:8, 32:9, 59:4, 218:8
**Acevedo** [1] - 207:1
**acknowledges** [3] - 93:8, 99:6, 108:2
**action** [2] - 216:10, 216:11
**actions** [1] - 73:22
**actual** [3] - 31:17, 171:1, 191:25
**added** [3] - 16:9,

100:1, 100:18
**addition** [5] - 6:5, 9:13, 92:8, 92:14, 200:23
**additional** [1] - 28:13
**additions** [1] - 220:22
**address** [3] - 7:7, 86:20, 88:13
**adequately** [2] - 99:10, 107:8
**adhere** [1] - 92:14
**adhered** [1] - 95:2
**adjust** [1] - 6:4
**adjuster** [1] - 116:14
**adjusters** [1] - 6:3
**ADVENTURE** [22] - 13:7, 13:14, 13:15, 13:25, 15:23, 16:15, 21:10, 38:1, 118:5, 139:12, 140:25, 142:24, 142:25, 143:5, 143:25, 155:11, 163:10, 164:21, 184:11, 207:7, 208:1, 215:6
**advice** [1] - 25:3
**advised** [1] - 219:13
**aesthetic** [2] - 16:23, 59:6
**afternoon** [2] - 115:8
**afterwards** [2] - 124:4, 209:20
**ago** [5] - 85:3, 117:4, 163:13, 184:9, 185:15
**agree** [13] - 16:14, 69:13, 70:10, 70:18, 71:2, 82:2, 150:22, 155:15, 156:3, 156:15, 197:17, 204:16, 210:18
**agreeable** [1] - 71:9
**agreeing** [1] - 65:25
**agreement** [2] - 115:10, 117:6
**ahead** [12] - 13:22, 56:23, 60:11, 62:3, 65:19, 82:14, 90:14, 127:18, 127:19, 158:21, 204:20, 205:1
**aisle** [1] - 106:10
**alarm** [2] - 148:22, 149:9
**alcohol** [2] - 72:13, 72:15
**Aleida** [2] - 135:9, 136:4
**alert** [1] - 159:13
**alerted** [1] - 152:15

**alleges** [2] - 31:18, 164:16
**alleging** [2] - 32:10, 118:1
**allow** [5] - 95:3, 100:2, 100:4, 109:12, 116:20
**allowed** [3] - 109:7, 157:13
**allows** [1] - 94:5
**almost** [1] - 59:8
**ALSO** [1] - 2:9
**AMANDA** [9] - 1:17, 2:14, 3:16, 216:6, 217:8, 218:14, 219:5, 219:11, 220:25
**Amanda** [3] - 3:5, 3:23, 116:5
**analyses** [1] - 127:7
**analyzed** [1] - 155:16
**analyzing** [1] - 168:23
**ankle** [1] - 207:8
**Ann** [4] - 206:5, 206:9, 206:11, 206:21
**answer** [32] - 7:15, 15:13, 31:9, 62:22, 63:2, 78:22, 81:3, 90:11, 90:15, 91:4, 93:18, 95:25, 98:8, 99:21, 109:12, 125:1, 149:7, 151:2, 151:14, 154:2, 157:21, 158:3, 158:10, 158:11, 158:20, 160:3, 160:13, 181:2, 182:24, 200:17, 213:13, 213:19
**answered** [21] - 29:7, 31:23, 34:23, 60:1, 75:6, 87:22, 95:23, 102:4, 103:18, 104:2, 107:13, 108:8, 109:23, 110:8, 110:10, 146:15, 147:1, 148:15, 153:12, 182:22, 191:4
**answering** [4] - 15:15, 16:11, 107:15, 151:4
**answers** [7] - 4:15, 11:5, 89:24, 90:3, 91:20, 100:17, 160:2
**ANTHEM** [1] - 207:24
**anticipate** [1] - 105:21
**antiskid** [5] - 57:12, 57:14, 57:16, 57:17, 57:18
**anytime** [1] - 94:12

**anyway** [3] - 118:23, 119:3, 161:8
**apologize** [3] - 36:2, 55:3, 91:14
**apparent** [1] - 148:24
**appear** [6] - 6:24, 163:7, 163:24, 188:17, 200:7, 213:14
**APPEARANCES** [1] - 2:1
**appearances** [1] - 3:10
**appeared** [1] - 217:8
**Applin** [2] - 166:1, 166:3
**applin** [1] - 173:5
**appointment** [1] - 219:16
**appreciate** [6] - 108:25, 110:5, 119:5, 158:2, 198:1, 215:18
**approach** [12] - 57:22, 58:25, 61:8, 61:10, 64:11, 65:4, 99:13, 101:17, 101:18, 102:1, 102:21, 135:22
**approached** [1] - 132:4
**approaching** [2] - 64:21, 120:25
**approximate** [1] - 164:16
**arbitration** [1] - 7:10
**area** [189] - 9:9, 9:12, 9:16, 9:18, 9:24, 10:2, 10:8, 11:16, 15:24, 47:19, 48:10, 48:13, 48:14, 48:17, 48:21, 48:23, 52:21, 52:24, 53:12, 53:18, 53:21, 54:6, 56:11, 60:15, 60:21, 60:22, 61:23, 62:6, 62:10, 62:12, 62:14, 63:6, 63:10, 63:17, 63:25, 64:2, 64:3, 64:7, 64:20, 65:8, 65:9, 66:8, 67:6, 67:15, 68:4, 69:14, 69:19, 71:21, 71:24, 72:1, 72:2, 76:8, 77:9, 77:21, 78:8, 81:22, 82:21, 83:23, 85:25, 88:23, 89:12, 89:14, 91:12, 91:18, 91:22, 92:5, 92:11, 92:17, 93:6, 93:9, 93:25,

94:1, 94:3, 96:2, 96:4, 96:5, 96:8, 96:13, 96:18, 96:22, 99:24, 100:9, 105:6, 105:12, 107:11, 107:24, 108:6, 111:23, 117:17, 117:25, 119:14, 120:9, 120:25, 121:5, 124:18, 124:23, 125:4, 130:16, 134:24, 135:4, 135:22, 136:6, 136:11, 136:12, 136:15, 138:9, 138:12, 141:8, 141:11, 141:14, 142:20, 144:1, 144:4, 144:10, 144:16, 144:20, 145:7, 145:14, 145:25, 146:11, 147:21, 152:3, 154:23, 155:3, 156:8, 162:1, 163:22, 164:16, 170:19, 173:5, 173:19, 173:21, 174:21, 175:7, 175:11, 175:12, 175:17, 175:21, 175:22, 176:5, 176:20, 177:18, 179:23, 181:11, 182:15, 183:2, 183:10, 183:14, 185:18, 186:12, 186:14, 186:15, 188:17, 188:20, 189:2, 189:7, 189:12, 190:7, 191:7, 191:18, 193:19, 194:1, 194:11, 194:12, 194:16, 195:3, 195:21, 196:10, 197:5, 198:13, 198:20, 199:10, 200:10, 200:18, 200:25, 201:3, 201:10, 201:12, 201:14, 204:15, 204:19, 205:6, 208:7
**areas** [19] - 10:4, 17:9, 62:14, 63:8, 71:18, 89:18, 109:19, 117:19, 120:18, 130:12, 141:15, 141:19, 141:22, 142:8, 145:9, 150:15, 152:3,

154:9, 183:22
**argue** [2] - 157:7, 158:12
**arguing** [2] - 158:14, 158:17
**argumentative** [6] - 102:4, 106:2, 108:8, 148:14, 149:5, 157:5
**Arizona** [1] - 5:10
**arm** [3] - 132:22, 133:5, 142:3
**arrange** [2] - 219:15, 219:16
**arrow** [1] - 52:22
**aside** [2] - 45:12, 47:24
**assert** [1] - 158:1
**assigned** [2] - 7:25, 10:6
**assist** [1] - 45:21
**assistance** [2] - 25:2, 152:18
**assume** [9] - 80:14, 81:2, 113:23, 180:3, 180:4, 180:8, 180:13, 180:20, 197:4
**assuming** [4] - 80:11, 80:22, 87:8, 190:6
**assumption** [1] - 80:24
**attached** [2] - 136:12, 218:10
**attempt** [1] - 8:9
**attempts** [1] - 209:16
**attendant** [5] - 9:16, 9:18, 9:25, 10:2, 10:8
**attendants** [1] - 10:5
**attended** [1] - 5:9
**attendees** [1] - 38:2
**attention** [3] - 95:11, 150:1, 157:1
**attorney** [8] - 109:2, 154:6, 165:24, 165:25, 166:16, 170:25, 216:9, 216:10
**attorneys** [2] - 6:18, 6:19
**attributed** [1] - 128:23
**Audio** [1] - 1:11
**Audio-Visual** [1] - 1:11
**August** [9] - 1:12, 3:7, 12:9, 139:11, 139:21, 141:1, 142:1, 219:13, 220:21
**authority** [1] - 217:7

**authorized** [1] - 216:5
**automatically** [1] - 120:2
**available** [2] - 168:20, 183:9
**Aventura** [1] - 106:22
**avoid** [2] - 18:17, 160:18
**avulsion** [2] - 50:11, 50:13
**awaiting** [1] - 219:14
**aware** [15] - 17:4, 17:11, 28:25, 29:1, 69:4, 69:7, 69:22, 84:3, 84:20, 89:14, 99:7, 152:19, 153:6, 153:19, 209:7

## B

**background** [1] - 5:7
**bad** [1] - 40:13
**Bahamas** [1] - 215:9
**bar** [19] - 5:14, 5:17, 16:4, 16:5, 18:2, 41:22, 48:22, 48:24, 48:25, 49:4, 49:5, 131:2, 131:3, 136:8, 136:9, 162:7, 162:20, 197:14, 197:17
**barely** [1] - 10:12
**Barney** [2] - 205:7, 206:1
**bars** [3] - 85:19, 144:2, 147:25
**based** [8] - 53:23, 63:13, 63:22, 148:8, 187:21, 188:16, 192:24, 206:16
**basis** [2] - 72:4, 91:10
**bathroom** [4] - 55:8, 113:5, 133:24, 184:13
**Beach** [3] - 2:7, 135:13, 219:7
**bear** [1] - 146:12
**bears** [1] - 145:1
**beating** [1] - 176:16
**becomes** [1] - 109:10
**becoming** [2] - 103:19, 108:9
**begin** [2] - 113:18, 115:22
**beginning** [4] - 44:16, 46:20, 80:16, 107:19
**BEHALF** [2] - 2:2, 2:5
**behalf** [8] - 3:11, 3:13, 4:20, 6:22, 6:24, 7:6,

154:7, 167:25
**behind** [3] - 13:21, 89:3, 191:22
**beige** [2] - 56:25, 57:8
**belief** [1] - 107:9
**believes** [5] - 87:12, 88:9, 146:16, 150:3, 162:24
**below** [1] - 198:15
**benefit** [1] - 5:6
**best** [7] - 31:25, 53:16, 115:2, 189:17, 194:23, 206:16, 209:3
**better** [2] - 39:11, 180:7
**between** [9] - 14:15, 57:16, 115:11, 186:18, 186:20, 188:19, 203:7, 203:17, 208:8
**Beverly** [3] - 205:7, 206:1, 206:21
**beyond** [3] - 59:2, 116:18, 157:14
**big** [1] - 198:14
**bigger** [12] - 21:19, 21:24, 34:7, 39:17, 40:12, 77:23, 161:12, 198:9, 198:10, 198:11
**binding** [1] - 4:16
**bird's** [3] - 200:6, 200:11, 200:18
**bird's-eye** [3] - 200:6, 200:11, 200:18
**bit** [10] - 21:19, 40:12, 40:18, 147:22, 158:5, 198:9, 198:10, 198:11
**black** [23] - 56:24, 57:4, 57:5, 57:9, 57:12, 57:15, 57:21, 58:1, 58:3, 58:5, 58:8, 61:11, 65:17, 65:18, 65:19, 66:3, 66:18, 67:11, 77:15, 140:18, 140:20, 213:7
**blocked** [4] - 165:15, 165:22, 166:18, 173:7
**blow** [2] - 161:10, 214:4
**board** [17] - 7:21, 7:24, 8:2, 11:13, 20:19, 33:1, 68:14, 72:16, 119:21, 124:2, 124:3, 130:8, 133:23, 143:24,

152:16, 156:12, 209:19
**body** [1] - 42:25
**Boleros** [27] - 48:22, 48:25, 49:3, 49:4, 135:17, 135:18, 136:5, 136:6, 136:9, 136:13, 136:21, 137:17, 137:20, 137:22, 139:5, 174:6, 177:11, 185:25, 187:7, 187:8, 189:4, 189:9, 194:19, 198:12, 198:22, 203:17, 207:7
**booking** [1] - 20:21
**borderline** [1] - 108:10
**bottle** [1] - 86:8
**bottom** [13] - 53:6, 76:7, 173:7, 176:10, 183:6, 186:9, 198:18, 199:7, 212:8, 212:25, 213:7, 214:3, 214:15
**Brandon** [1] - 2:10
**break** [9] - 55:8, 55:14, 113:5, 113:19, 113:25, 116:20, 131:6, 184:13
**bridge** [3] - 112:4, 123:10, 123:18
**Brief** [1] - 202:14
**brief** [3] - 26:5, 26:7, 205:16
**briefly** [3] - 116:24, 159:17, 208:19
**bring** [2] - 12:14, 211:13
**broad** [2] - 144:8, 176:7
**broader** [2] - 147:21, 173:19
**BROWARD** [2] - 216:3, 217:4
**brown** [1] - 57:10
**built** [1] - 184:11
**business** [2] - 21:1, 38:8
**butchering** [1] - 128:22
**BY** [215] - 2:4, 2:8, 3:21, 12:3, 13:1, 15:10, 17:2, 17:12, 17:19, 19:3, 19:14, 21:8, 21:21, 22:20, 26:17, 28:5, 28:24, 29:11, 29:22, 30:7,

31:5, 31:19, 32:13, 32:17, 34:3, 35:2, 35:20, 36:3, 36:14, 37:22, 38:23, 42:22, 44:12, 46:5, 47:7, 48:15, 50:2, 50:23, 51:22, 52:12, 54:4, 54:17, 54:24, 55:23, 58:17, 59:10, 59:17, 60:10, 60:23, 61:7, 61:19, 62:4, 62:19, 62:23, 63:12, 64:6, 64:22, 66:5, 66:11, 66:23, 67:4, 67:13, 68:16, 69:1, 69:21, 70:8, 70:19, 71:20, 72:12, 73:1, 73:14, 74:6, 74:15, 75:10, 76:17, 77:14, 78:6, 79:17, 80:18, 82:1, 83:22, 84:2, 84:14, 85:1, 87:1, 87:14, 88:1, 89:11, 89:21, 90:9, 92:18, 93:7, 93:15, 94:18, 95:13, 95:24, 96:24, 98:1, 98:11, 98:21, 99:4, 99:20, 100:20, 101:3, 101:12, 101:23, 102:7, 103:1, 103:13, 103:22, 104:8, 104:24, 105:11, 106:7, 106:18, 107:2, 108:1, 110:11, 111:6, 111:24, 112:19, 112:24, 117:12, 118:17, 121:8, 122:15, 123:1, 123:15, 125:5, 125:19, 126:10, 129:4, 129:8, 129:15, 130:19, 132:10, 133:9, 134:13, 134:21, 135:6, 136:3, 137:15, 138:24, 139:7, 141:24, 142:15, 142:23, 143:8, 144:11, 144:21, 146:4, 146:20, 147:13, 148:18, 149:6, 150:12, 151:1, 151:12, 151:24, 153:3, 153:17, 154:19, 155:4, 155:18, 156:5, 156:20, 157:20, 159:10, 159:23,

160:4, 161:13, 162:17, 163:11, 164:8, 164:23, 166:20, 167:7, 168:13, 168:22, 171:14, 172:5, 173:11, 173:24, 174:19, 175:1, 175:19, 177:1, 180:21, 181:17, 182:11, 183:17, 185:12, 188:15, 189:1, 189:14, 189:23, 190:15, 190:23, 191:10, 192:6, 194:4, 194:24, 195:15, 196:4, 196:23, 197:23, 199:19, 202:17, 204:12, 206:3, 209:5, 210:12, 212:6, 212:13, 212:21

## C

**c/o** [1] - 219:5
**cabin** [1] - 144:9
**camera** [41] - 173:13, 173:15, 173:25, 174:7, 174:11, 174:21, 175:7, 175:16, 176:8, 178:16, 179:5, 180:23, 181:1, 182:10, 182:12, 182:18, 182:20, 186:1, 186:8, 186:24, 187:1, 189:15, 189:18, 190:17, 190:20, 190:25, 191:12, 191:18, 191:20, 191:23, 192:2, 193:1, 193:9, 193:15, 193:19, 194:8, 194:18, 195:17, 196:1, 198:17
**cameras** [41] - 170:18, 175:14, 175:17, 175:20, 175:25, 176:4, 176:13, 176:17, 176:20, 177:11, 179:23, 181:10, 181:16, 182:16, 183:1, 183:3, 183:7, 183:10, 183:16, 183:19, 183:24,

184:7, 185:17, 185:22, 185:23, 186:5, 186:15, 186:21, 187:6, 187:20, 188:19, 190:8, 190:14, 191:5, 191:6, 191:9, 194:3, 198:16, 199:25, 200:9, 200:17

campos [2] - 116:5, 177:5

Campos [25] - 3:5, 3:23, 4:18, 19:4, 26:19, 30:23, 37:14, 40:14, 45:2, 55:24, 60:25, 63:1, 84:16, 113:1, 114:12, 114:24, 115:25, 117:13, 140:11, 151:13, 154:20, 157:21, 185:14, 200:22, 215:18

CAMPOS [9] - 1:17, 2:14, 3:16, 216:6, 217:8, 218:14, 219:5, 219:11, 220:25

capable [5] - 170:19, 170:22, 182:13, 186:10, 194:10

captain [11] - 11:10, 11:18, 35:6, 36:23, 37:5, 37:11, 75:12, 75:14, 75:16, 75:21, 76:3

capture [10] - 172:18, 174:22, 176:20, 181:2, 182:14, 182:18, 183:4, 183:13, 189:18, 189:21

captured [14] - 48:20, 62:17, 64:5, 171:24, 172:1, 173:2, 173:9, 175:18, 181:11, 183:7, 183:10, 187:15, 191:9, 192:1

capturing [10] - 170:20, 170:22, 171:4, 171:5, 172:12, 173:3, 174:12, 182:13, 194:10, 195:20

card [1] - 20:16

care [33] - 91:5, 91:8, 91:17, 92:12, 92:15, 94:9, 94:16, 94:24, 95:1, 95:4, 95:6, 95:8, 95:18, 95:20,

95:21, 96:1, 96:5, 96:12, 99:25, 105:15, 108:16, 125:9, 126:4, 126:20, 127:13, 145:15, 146:18, 149:24, 150:2, 150:10, 157:1, 219:18

career [1] - 152:25

CARIBBEAN [2] - 1:8, 1:16

Caribbean [151] - 3:3, 3:6, 3:14, 4:16, 4:20, 5:20, 5:25, 6:23, 7:7, 8:16, 17:23, 20:12, 20:22, 28:16, 29:1, 29:9, 32:1, 36:6, 36:7, 39:4, 43:25, 44:3, 47:8, 47:12, 48:9, 48:16, 49:10, 49:13, 52:7, 53:3, 53:23, 53:24, 56:4, 56:15, 58:10, 58:13, 58:16, 60:14, 62:15, 63:9, 63:16, 76:1, 77:4, 77:10, 77:24, 78:14, 79:19, 79:20, 80:2, 80:25, 81:6, 81:12, 82:6, 83:8, 84:4, 84:9, 84:21, 85:7, 87:2, 87:12, 87:23, 88:9, 89:14, 90:18, 91:9, 91:21, 92:1, 92:3, 92:4, 92:8, 92:21, 93:1, 93:4, 93:8, 93:12, 93:24, 94:24, 95:7, 96:13, 96:16, 99:6, 99:19, 99:22, 100:2, 100:6, 100:11, 101:15, 101:21, 101:24, 104:7, 105:4, 107:18, 108:2, 115:12, 124:24, 126:1, 126:25, 127:11, 136:24, 140:1, 144:15, 144:19, 145:1, 145:6, 145:13, 145:18, 146:11, 146:16, 148:20, 148:22, 149:2, 149:11, 149:15, 149:19, 150:3, 150:13, 152:1, 152:25, 153:5, 153:8, 153:19, 154:2, 154:8, 155:19, 156:3, 156:6,

156:11, 156:15, 159:12, 167:8, 167:10, 167:17, 167:25, 169:2, 170:16, 171:8, 171:13, 171:16, 174:20, 175:5, 179:17, 183:19, 183:25, 185:16, 188:2, 196:16, 196:20, 205:4, 209:7, 209:23, 210:16

Caribbean's [42] - 17:20, 21:1, 21:14, 38:8, 48:19, 52:14, 52:17, 53:8, 56:12, 64:8, 65:15, 73:5, 73:10, 73:11, 76:19, 86:21, 88:11, 90:11, 92:20, 95:17, 95:20, 97:4, 97:8, 99:14, 102:19, 107:9, 110:3, 125:6, 126:3, 144:22, 156:19, 165:7, 166:21, 168:5, 168:14, 171:7, 175:14, 176:18, 181:13, 190:2, 194:9, 209:11

Carmen [1] - 207:1

carpet [1] - 71:1

CASE [2] - 1:3, 219:10

case [62] - 1:22, 3:2, 5:4, 7:15, 7:19, 7:21, 8:18, 9:3, 9:25, 11:21, 20:3, 23:8, 32:22, 34:17, 36:16, 36:25, 37:14, 52:1, 52:8, 52:15, 52:18, 56:13, 56:16, 59:12, 64:9, 73:6, 73:11, 74:21, 77:5, 79:12, 89:25, 90:19, 110:15, 110:19, 111:17, 116:19, 117:4, 128:17, 134:1, 138:8, 140:8, 140:10, 162:6, 162:18, 165:9, 165:11, 165:13, 165:23, 165:25, 166:7, 166:10, 167:15, 169:10, 170:25, 171:18, 179:18, 192:25, 197:15, 204:14, 208:18, 209:12, 211:15

cases [3] - 6:6, 6:7,

36:25

cashier [1] - 179:6

casino [89] - 15:20, 15:22, 18:1, 19:23, 23:6, 26:15, 27:21, 28:21, 29:5, 30:20, 48:23, 49:21, 52:25, 57:22, 61:12, 64:11, 67:8, 68:6, 68:7, 68:8, 68:11, 68:12, 68:13, 68:14, 68:18, 69:9, 69:13, 69:23, 70:11, 70:13, 71:8, 71:14, 71:17, 71:21, 71:23, 71:25, 72:13, 72:17, 77:16, 99:13, 101:18, 102:21, 112:12, 112:18, 121:1, 125:3, 130:18, 131:4, 132:4, 132:21, 133:4, 134:19, 135:23, 136:13, 136:21, 138:20, 141:23, 144:9, 148:23, 162:7, 162:20, 170:20, 177:12, 177:25, 178:6, 178:7, 178:15, 178:19, 178:23, 178:24, 179:4, 179:13, 180:6, 180:14, 182:2, 186:3, 189:10, 189:17, 190:12, 190:18, 193:22, 194:1, 195:14, 197:14, 197:17, 198:24, 199:4, 203:18, 206:8

Casino [1] - 69:25

casino's [5] - 71:10, 71:25, 178:2, 178:4, 178:5

casinos [3] - 69:3, 69:7, 72:16

Castellano [7] - 135:10, 135:12, 135:14, 136:4, 136:24, 137:16, 139:1

Castellano's [2] - 137:24, 139:11

categorically [1] - 44:4

categorizes [1] - 43:25

caught [2] - 176:13, 176:17

caused [5] - 76:25,

129:2, 162:25, 164:15, 209:8

causing [4] - 140:5, 144:14, 152:16, 155:21

caution [21] - 68:5, 91:13, 91:17, 92:9, 92:10, 92:16, 94:9, 94:16, 95:4, 95:15, 96:12, 126:20, 144:20, 145:15, 149:24, 150:3, 150:10, 160:17, 160:25, 161:22, 163:9

Caution [14] - 64:16, 91:12, 91:15, 93:1, 97:6, 97:18, 98:3, 98:14, 101:25, 102:9, 102:11, 102:15, 170:7, 195:23

cautioning [1] - 107:21

cc [1] - 219:24

CCTV [47] - 11:3, 11:16, 48:21, 62:18, 64:5, 163:14, 163:22, 168:16, 168:19, 168:23, 169:1, 169:5, 169:7, 169:22, 170:3, 170:11, 170:25, 171:6, 173:13, 173:15, 173:21, 173:22, 173:23, 175:6, 175:13, 175:25, 176:4, 177:11, 178:16, 180:25, 181:1, 181:16, 182:16, 183:9, 183:19, 183:24, 187:25, 190:8, 190:10, 190:14, 192:15, 193:1, 193:15, 193:18, 194:2, 194:23

ceiling [1] - 181:22

certain [1] - 152:3

certainty [1] - 70:5

CERTIFICATE [2] - 216:1, 217:1

CERTIFIED [1] - 2:24

certify [5] - 157:16, 216:5, 217:7, 218:6, 220:19

CERTIFY [1] - 216:8

chair [1] - 35:7

chance [2] - 4:12,

Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

194:5

**change** [56] - 57:18, 57:24, 61:17, 61:20, 61:22, 62:5, 62:10, 64:9, 64:17, 64:21, 65:1, 65:2, 65:4, 92:22, 93:3, 96:18, 97:1, 97:8, 98:4, 98:14, 99:2, 99:6, 99:8, 99:11, 100:12, 100:23, 101:17, 102:22, 102:25, 103:3, 103:6, 103:11, 103:15, 103:21, 103:25, 104:6, 104:12, 104:18, 104:21, 105:1, 105:3, 105:13, 105:18, 106:17, 107:1, 107:10, 107:11, 107:19, 107:22, 108:3, 144:25, 148:24, 148:25, 149:13, 210:15

**CHANGE/ CORRECTION** [1] - 220:6

**changes** [14] - 14:22, 14:25, 15:9, 16:8, 59:4, 59:7, 59:9, 64:10, 102:1, 106:6, 106:9, 106:14, 107:5, 220:2

**Charles** [5] - 207:3, 207:6, 207:11, 207:13, 207:20

**check** [6] - 16:1, 70:4, 207:3, 207:21, 208:9, 211:24

**checked** [3] - 113:19, 171:22

**chief** [2] - 24:4, 60:20

**choices** [1] - 184:10

**Chrystal** [2] - 141:1, 142:1

**circling** [2] - 181:20, 188:18

**circuit** [1] - 189:25

**circumstances** [6] - 94:25, 95:1, 96:2, 96:3, 99:25, 146:19

**citing** [1] - 117:4

**claim** [12] - 6:4, 80:10, 119:25, 120:1, 120:2, 124:4, 124:9, 125:10, 125:13, 149:16, 151:19

**claiming** [1] - 17:25

**claims** [7] - 5:21, 5:24,

6:1, 7:3, 124:5, 146:6, 193:20

**clarify** [2] - 45:10, 53:10

**clarifying** [1] - 60:12

**class** [27] - 13:16, 13:17, 13:19, 13:23, 14:2, 14:16, 14:20, 14:23, 14:25, 16:12, 16:16, 117:19, 117:23, 119:14, 120:6, 120:19, 130:11, 130:13, 130:17, 141:4, 141:15, 146:9, 147:12, 149:14, 152:13, 156:8, 201:1

**classified** [1] - 133:19

**classify** [2] - 177:15, 177:17

**clean** [2] - 86:18, 134:4

**cleaned** [2] - 83:2, 89:2

**cleaning** [4] - 8:25, 9:5, 9:8, 10:5

**cleanliness** [4] - 82:20, 85:24, 86:2, 86:11

**clear** [4] - 123:19, 123:23, 182:24, 183:11

**clearly** [2] - 91:11, 102:15

**client** [21] - 63:10, 94:25, 95:11, 95:19, 111:21, 117:11, 120:14, 124:25, 136:14, 138:17, 143:13, 146:7, 167:22, 179:25, 189:8, 193:13, 196:10, 196:12, 198:19, 198:20, 201:21

**client's** [8] - 97:15, 112:6, 120:10, 121:7, 140:22, 143:3, 143:7, 202:5

**clients** [1] - 119:1

**close** [2] - 4:25

**closed** [2] - 71:14, 189:24

**closer** [2] - 5:2, 65:16

**CM** [2] - 25:6, 25:7

**coherent** [1] - 30:19

**coke** [96] - 17:6, 17:21, 17:24, 17:25, 18:4, 18:5, 18:9, 18:13, 19:6, 21:15,

22:7, 22:14, 23:23, 24:14, 25:13, 26:4, 26:9, 27:24, 28:10, 28:17, 28:20, 30:24, 31:20, 40:1, 43:18, 45:14, 46:7, 47:9, 47:13, 47:25, 48:6, 48:10, 49:7, 49:19, 50:6, 53:25, 54:9, 54:13, 59:12, 59:23, 60:15, 61:23, 62:6, 62:13, 63:14, 63:18, 72:2, 91:7, 91:16, 92:21, 93:9, 104:11, 108:6, 112:10, 117:18, 120:23, 121:2, 122:1, 123:7, 127:23, 129:5, 129:13, 130:3, 131:10, 131:25, 133:11, 134:12, 141:15, 162:8, 162:11, 164:16, 165:1, 166:23, 167:9, 167:17, 176:5, 178:12, 179:12, 180:4, 180:5, 180:12, 180:13, 188:20, 188:24, 193:20, 195:4, 195:20, 196:16, 199:9, 201:4, 201:11, 205:6, 209:14, 209:18, 210:4

**Coke** [8] - 3:3, 3:12, 4:1, 25:24, 29:23, 31:14, 129:12, 206:22

**COKE** [2] - 1:5, 219:10

**Coke's** [1] - 121:20

**coke's** [19] - 27:11, 29:2, 29:15, 33:11, 36:25, 37:16, 38:11, 41:7, 47:20, 47:23, 76:21, 124:18, 134:8, 148:10, 165:4, 180:12, 182:13, 209:25, 210:25

**color** [5] - 56:21, 163:2, 163:23, 163:24, 163:25

**colors** [1] - 57:25

**column** [32] - 91:11, 165:15, 165:22, 169:2, 169:8, 169:11, 169:12, 169:20, 169:23, 170:5, 170:6,

170:12, 170:13, 171:8, 172:19, 173:7, 173:14, 173:18, 174:14, 175:9, 181:5, 181:9, 182:19, 183:5, 191:12, 191:19, 191:23, 192:2, 197:16

**comfortable** [2] - 15:15, 16:11

**coming** [6] - 49:7, 49:15, 70:11, 76:14, 193:14, 203:4

**comment** [1] - 157:14

**commenting** [1] - 157:15

**comments** [6] - 20:18, 42:13, 44:21, 45:1, 115:5

**commission** [1] - 217:17

**Commission** [2] - 217:17, 218:21

**Committee** [2] - 2:18, 34:6

**committee** [9] - 33:3, 33:4, 34:16, 34:20, 35:7, 35:8, 37:24, 38:1, 39:1

**common** [2] - 78:21, 78:22

**Communication** [1] - 1:11

**company** [1] - 6:24

**compiled** [3] - 118:9, 150:19

**complained** [1] - 205:5

**complaining** [1] - 154:22

**complaint** [3] - 7:15, 24:4, 205:4

**complaints** [10] - 201:2, 201:9, 201:15, 201:23, 201:25, 204:14, 204:17, 204:22, 206:14, 206:15

**Complaints** [1] - 2:22

**completed** [3] - 74:4, 74:10, 74:13

**completely** [2] - 164:5, 164:6

**Composite** [12] - 65:16, 67:17, 69:12, 69:24, 73:2, 73:21, 85:14, 118:10, 119:7, 169:15, 169:17, 212:18

**composite** [1] - 85:14

**computer** [3] - 25:20, 43:7, 47:15

**concept** [2] - 13:21, 178:22

**concern** [1] - 149:1

**concerned** [1] - 219:17

**conclude** [2] - 219:15, 219:18

**concluded** [1] - 215:25

**condition** [1] - 201:3

**conditions** [2] - 208:22, 209:7

**conducted** [14] - 32:22, 35:11, 36:8, 36:13, 36:16, 38:7, 47:10, 49:18, 124:9, 125:16, 125:21, 126:25, 127:7, 138:3

**conducts** [1] - 210:16

**confer** [1] - 115:17

**configuration** [5] - 14:4, 14:13, 14:19, 17:5, 141:6

**configurations** [1] - 15:4

**confused** [3] - 22:22, 26:23, 153:13

**confusion** [1] - 27:8

**connected** [1] - 216:10

**connection** [16] - 9:6, 36:24, 51:8, 56:13, 67:19, 73:5, 74:17, 80:4, 90:19, 110:15, 111:15, 124:9, 127:5, 133:25, 140:8, 163:14

**consider** [1] - 71:23

**consist** [3] - 13:18, 57:7, 66:18

**consisting** [1] - 14:2

**Constance** [2] - 207:4, 207:23

**constitutes** [1] - 95:21

**contact** [7] - 8:10, 8:11, 11:1, 11:13, 203:21, 203:23, 203:25

**contacted** [1] - 11:4

**contains** [1] - 143:25

**continue** [4] - 87:19, 114:9, 157:9, 157:10

**contradict** [1] - 29:1

**contributed** [1] - 209:8

**convenience** [1] - 219:16

**Jeannie Reporting**
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

conversant [1] - 30:19
cooperation [1] - 115:21
cooperative [1] - 109:6
copies [3] - 12:24, 13:2, 114:21
copy [21] - 4:3, 4:6, 4:7, 4:8, 4:9, 4:10, 12:21, 24:10, 33:18, 33:21, 34:9, 34:13, 36:22, 37:3, 39:12, 39:14, 39:16, 89:25, 90:13, 114:11
copying [1] - 212:12
Coral [1] - 2:3
Corinne [6] - 1:19, 139:9, 140:1, 140:25, 216:4, 219:23
CORINNE [2] - 216:15, 217:16
corporate [3] - 3:5, 6:5, 154:1
CORPORATE [1] - 1:16
Corporation [1] - 1:8
correct [248] - 6:25, 7:1, 7:2, 7:8, 7:9, 8:13, 11:22, 13:3, 13:5, 14:5, 14:7, 14:21, 14:22, 15:5, 15:25, 16:5, 21:1, 21:2, 21:10, 21:11, 21:12, 21:16, 22:16, 23:11, 23:18, 23:20, 28:11, 28:12, 29:25, 35:15, 35:23, 36:8, 36:10, 36:16, 36:17, 36:20, 36:21, 37:17, 38:4, 38:5, 38:8, 38:9, 39:4, 39:9, 40:2, 40:3, 40:23, 40:24, 41:1, 41:2, 41:9, 41:10, 41:15, 41:16, 41:18, 41:19, 41:24, 41:25, 42:4, 42:5, 42:10, 42:11, 43:1, 43:2, 43:6, 43:14, 43:15, 43:16, 44:1, 44:2, 44:6, 44:14, 44:21, 49:21, 50:8, 50:9, 50:15, 50:16, 50:19, 51:5, 51:6, 53:9, 53:10, 54:1, 54:3, 56:6, 56:19, 57:22, 59:13, 59:15, 59:24, 60:16, 63:19, 64:12, 66:16, 66:19, 66:25, 68:9,

69:14, 70:15, 72:14, 72:18, 74:4, 74:10, 74:11, 74:18, 75:17, 76:21, 77:10, 77:11, 77:17, 77:18, 83:6, 83:7, 83:19, 83:21, 83:24, 85:5, 85:10, 85:11, 85:16, 85:17, 85:21, 90:12, 90:21, 91:1, 97:4, 97:5, 97:9, 97:10, 110:15, 110:16, 112:13, 113:2, 117:20, 118:11, 119:8, 119:9, 119:19, 119:20, 120:19, 120:20, 121:2, 121:6, 121:12, 121:13, 122:4, 123:11, 123:12, 123:24, 123:25, 125:17, 125:22, 125:23, 127:7, 128:10, 128:11, 128:13, 128:18, 128:24, 129:6, 130:6, 130:7, 130:13, 130:15, 131:14, 131:16, 131:17, 132:5, 132:8, 132:14, 133:1, 133:3, 133:6, 133:8, 133:13, 133:16, 133:17, 136:7, 136:25, 137:1, 137:18, 138:3, 138:4, 138:13, 139:13, 139:14, 140:13, 140:16, 141:2, 141:3, 141:6, 142:3, 142:4, 143:6, 143:21, 145:20, 146:24, 147:16, 147:17, 150:23, 159:9, 162:22, 162:23, 165:2, 165:3, 165:9, 165:10, 165:11, 166:5, 166:24, 168:17, 170:15, 172:19, 175:9, 175:11, 176:5, 179:5, 179:7, 179:13, 179:14, 179:18, 179:23, 179:24, 180:15, 180:16, 180:23, 180:24, 181:5, 181:24, 182:2, 182:3, 186:12,

187:16, 189:4, 193:10, 193:11, 197:11, 197:17, 203:18, 203:19, 204:17, 205:23, 206:7, 207:8, 210:21, 210:22, 220:23
corrected [1] - 52:4
correction [1] - 220:3
corrections [2] - 218:9, 220:22
correctly [2] - 92:20, 195:1
correspondence [1] - 114:12
corridor [2] - 70:12, 71:7
corridors [3] - 144:3, 147:24, 148:2
Counsel [1] - 219:24
counsel [7] - 3:9, 115:11, 115:16, 213:9, 215:7, 216:9, 216:10
count [5] - 143:4, 145:10, 201:20, 205:2, 211:19
counted [1] - 212:4
country [1] - 8:3
COUNTY [2] - 216:3, 217:4
couple [6] - 26:12, 27:17, 29:20, 155:12, 200:21, 211:1
course [4] - 20:25, 38:7, 116:16, 155:20
court [6] - 106:25, 151:10, 157:17, 157:18, 158:21, 184:20
Court [1] - 215:20
COURT [1] - 1:1
coverage [1] - 190:1
covered [11] - 86:10, 88:13, 160:10, 171:23, 173:21, 175:12, 175:13, 181:12, 181:14, 182:15
covers [2] - 87:13, 88:10
created [4] - 49:24, 199:15, 199:17, 199:23
crew [20] - 7:4, 7:7, 7:8, 7:9, 20:12, 25:5, 25:11, 28:22, 76:19, 82:19, 82:25, 85:8,

86:5, 86:8, 86:13, 86:16, 88:22, 89:7, 127:8, 167:3
Cruise [2] - 3:3, 3:6
cruise [6] - 119:25, 152:20, 153:1, 153:11, 153:15, 153:20
CRUISES [1] - 1:8
Cullen [5] - 139:9, 139:15, 139:18, 140:2, 141:1
Cullen's [4] - 140:8, 140:10, 140:19, 140:25
current [1] - 184:6
cursor [11] - 55:1, 61:10, 65:6, 177:16, 177:21, 178:7, 178:11, 181:21, 185:23, 188:18, 194:9
cut [1] - 31:10

## D

D-R-A-G-A-N [1] - 8:7
daily [1] - 72:3
dance [2] - 177:23, 177:24
dangerous [6] - 93:10, 94:3, 94:11, 94:14, 94:17, 94:23
database [2] - 44:17, 147:15
databases [1] - 147:14
date [12] - 39:8, 39:23, 40:5, 40:23, 97:14, 110:25, 111:2, 129:20, 154:21, 205:1, 205:14, 215:2
Date [1] - 205:14
dated [2] - 12:8, 211:8
DATED [1] - 216:12
days [3] - 132:11, 140:24
dead [1] - 176:16
deal [1] - 88:20
dealing [4] - 81:7, 81:11, 82:7, 87:17
deals [2] - 84:8, 86:20
Dear [1] - 219:11
December [3] - 37:24, 111:10, 211:11
decided [1] - 170:16
deck [40] - 15:24, 17:5, 18:2, 19:6, 29:5, 49:20, 50:1, 52:24, 65:21, 68:19,

68:20, 69:4, 69:8, 133:20, 133:21, 135:17, 135:18, 135:22, 137:17, 137:18, 139:5, 141:22, 144:3, 147:24, 177:11, 198:15, 201:13, 203:4, 203:5, 203:7, 204:19, 205:6, 205:18, 205:20, 206:7, 207:7, 208:8, 209:4
decks [3] - 15:17, 15:19, 85:21
decline [1] - 97:23
defendant [2] - 3:14, 73:23
DEFENDANT [1] - 2:5
Defendant [1] - 1:9
DEFENDANT'S [1] - 2:23
defendant's [1] - 89:24
definitely [1] - 161:24
definition [1] - 95:17
definitive [1] - 16:11
Denise [3] - 132:13, 203:10, 206:22
department [6] - 6:15, 6:17, 6:18, 6:20, 35:9, 38:2
depict [1] - 199:12
depicted [9] - 59:2, 142:12, 142:14, 187:6, 187:23, 191:7, 193:9, 194:11, 199:3
depicting [1] - 170:19
depiction [1] - 99:2
depicts [2] - 65:17, 168:20
depo [1] - 33:25
deponent [1] - 219:13
deposed [9] - 32:16, 48:20, 49:14, 63:11, 64:5, 162:12, 167:22, 180:1, 188:25
DEPOSITION [1] - 1:15
deposition [34] - 3:4, 3:25, 6:22, 7:12, 7:13, 8:19, 9:8, 11:17, 11:25, 12:6, 12:10, 19:19, 32:14, 34:10, 44:16, 44:23, 51:15, 51:19, 56:1, 79:2, 82:10, 82:12, 115:2, 115:24,

116:9, 116:11, 117:14, 158:13, 200:20, 215:24, 216:6, 219:19, 219:20, 220:21

**Deposition** [2] - 1:22, 219:14

**depositions** [3] - 4:19, 84:5, 84:6

**depth** [1] - 208:19

**Describe** [1] - 73:22

**describe** [6] - 48:17, 53:16, 57:19, 67:20, 67:23, 138:22

**described** [4] - 18:11, 59:13, 63:15, 189:4

**description** [3] - 9:16, 9:20, 42:12

**design** [4] - 14:19, 15:4, 16:14, 16:24

**designated** [2] - 6:24, 7:6

**designed** [1] - 14:19

**desk** [2] - 6:3, 20:15

**desktop** [1] - 118:20

**destroy** [1] - 172:11

**destroyed** [7] - 169:23, 169:25, 170:2, 170:3, 171:9, 188:13

**destruction** [4] - 187:25, 188:4, 188:6, 188:10

**determination** [5] - 125:7, 126:9, 126:22, 127:11, 127:20

**determinations** [2] - 126:12, 126:15

**determine** [6] - 9:11, 78:10, 115:17, 168:1, 168:2, 184:7

**determined** [1] - 50:7

**determines** [1] - 183:18

**diagram** [10] - 102:16, 103:5, 177:10, 192:15, 192:25, 193:2, 193:9, 193:11, 193:17, 199:15

**Diagram** [1] - 2:21

**difference** [1] - 125:14

**differences** [7] - 14:9, 14:14, 14:17, 16:23, 16:25, 17:1, 17:4

**different** [32] - 13:22, 16:3, 16:8, 20:18, 26:12, 33:1, 34:25, 46:17, 46:25, 56:18,

56:20, 57:6, 57:25, 58:2, 62:14, 63:8, 96:23, 106:15, 109:18, 109:21, 132:6, 140:10, 145:12, 155:6, 157:6, 159:18, 159:21, 161:25, 163:24, 164:6, 164:7, 188:8

**difficult** [5] - 45:21, 147:23, 160:24, 164:2, 179:21

**dinner** [1] - 20:17

**direct** [1] - 9:3

**DIRECT** [1] - 3:20

**Direct** [1] - 2:14

**direction** [8] - 105:24, 179:11, 193:13, 193:20, 196:1, 196:2, 196:6

**directions** [1] - 175:23

**directly** [5] - 43:9, 50:21, 173:18, 187:18, 192:2

**director** [6] - 5:21, 5:23, 6:1, 183:20, 184:1, 184:6

**discharging** [1] - 91:24

**disclosed** [2] - 115:19, 206:10

**disclosure** [1] - 115:19

**discovery** [12] - 7:16, 7:18, 8:17, 8:21, 8:23, 9:14, 9:15, 9:23, 11:20, 12:16, 79:5, 117:22

**discuss** [3] - 33:1, 34:25, 35:22

**discussed** [7] - 33:6, 33:11, 33:14, 35:14, 35:18, 115:9, 208:7

**discussing** [1] - 159:18

**discussion** [1] - 33:15

**dispute** [3] - 28:16, 71:8, 96:16

**disputing** [3] - 29:10, 31:21, 155:19

**distinction** [3] - 186:18, 186:20, 186:23

**distinguish** [1] - 44:3

**DISTRICT** [2] - 1:1, 1:2

**DIVISION** [1] - 1:2

**doc** [1] - 118:12

**document** [23] - 12:5, 20:10, 20:24, 24:17,

38:13, 38:14, 38:19, 43:13, 85:15, 113:1, 113:2, 118:8, 118:11, 118:13, 118:15, 119:8, 119:9, 119:11, 128:20, 142:5, 142:6, 150:19, 152:21

**documentation** [8] - 9:10, 12:19, 24:2, 28:13, 81:16, 132:24, 153:7, 153:21

**documented** [13] - 24:5, 25:25, 73:10, 77:9, 79:7, 79:15, 140:2, 146:23, 147:5, 172:17, 172:22, 205:4, 206:15

**documenting** [1] - 153:7

**documents** [6] - 7:14, 12:14, 12:16, 40:15, 40:17

**done** [12] - 18:17, 63:23, 75:24, 76:2, 80:8, 89:2, 109:5, 117:23, 136:18, 136:19, 147:23, 160:18

**Doris** [1] - 207:1

**double** [2] - 207:3, 211:24

**double-check** [2] - 207:3, 211:24

**doubles** [2] - 202:2, 204:25

**down** [31] - 23:22, 26:14, 27:11, 29:24, 30:4, 30:12, 30:13, 30:16, 30:17, 33:14, 38:10, 38:17, 44:9, 49:25, 52:2, 53:18, 54:13, 60:5, 60:6, 70:14, 109:3, 137:11, 148:1, 158:5, 160:16, 160:19, 167:17, 177:16, 178:17, 198:15, 203:4

**downward** [3] - 98:23, 103:7, 103:10

**Dragan** [3] - 8:5, 8:10

**DRAHOS** [231] - 3:13, 12:22, 15:7, 16:18, 17:8, 17:16, 18:12, 19:8, 21:17, 22:17, 26:10, 28:4, 28:18,

29:6, 29:18, 30:1, 31:1, 31:7, 31:22, 32:15, 34:22, 35:16, 35:24, 36:9, 37:20, 38:21, 42:18, 44:7, 45:16, 46:9, 46:14, 48:11, 49:22, 50:17, 52:11, 54:2, 54:12, 54:21, 55:5, 55:7, 55:13, 55:17, 58:11, 59:5, 59:14, 59:25, 60:18, 61:2, 61:13, 61:25, 62:8, 62:21, 62:25, 63:20, 64:13, 65:23, 66:10, 66:20, 67:1, 67:9, 68:15, 68:21, 69:15, 70:2, 70:16, 71:15, 72:6, 72:21, 73:13, 74:5, 74:12, 75:5, 76:11, 78:2, 79:8, 80:6, 81:18, 83:20, 83:25, 84:10, 86:23, 87:6, 87:18, 88:16, 89:16, 92:2, 92:24, 93:11, 93:17, 93:20, 95:9, 95:22, 96:20, 97:21, 98:6, 98:16, 98:25, 99:15, 100:15, 100:25, 101:6, 101:19, 102:3, 102:23, 103:8, 103:17, 104:1, 104:14, 105:8, 105:25, 106:2, 106:12, 106:23, 107:12, 107:16, 108:7, 108:13, 108:16, 109:1, 109:24, 110:22, 111:18, 112:14, 113:18, 114:6, 114:10, 114:16, 115:4, 118:14, 121:3, 122:11, 122:19, 123:13, 124:19, 125:18, 126:6, 128:25, 129:7, 129:11, 130:14, 132:7, 133:7, 134:9, 134:15, 135:3, 136:1, 137:8, 138:14, 139:3, 141:18, 142:10, 142:22, 143:1, 143:22, 144:17, 145:21, 146:14, 146:25, 148:13, 149:3, 149:17, 150:24, 151:7,

152:23, 153:10, 153:12, 153:24, 154:24, 155:7, 155:23, 156:10, 157:3, 157:10, 158:4, 158:9, 158:16, 158:19, 159:1, 159:15, 159:25, 161:9, 162:9, 163:5, 164:4, 164:17, 166:11, 166:25, 168:10, 168:18, 171:10, 171:20, 172:20, 173:16, 174:15, 174:23, 175:10, 180:17, 181:7, 182:7, 182:21, 184:3, 184:12, 184:15, 184:24, 185:3, 188:3, 188:22, 189:5, 189:19, 190:4, 190:21, 191:2, 191:4, 191:14, 193:24, 194:14, 195:5, 195:24, 196:17, 197:18, 199:16, 202:11, 205:25, 208:23, 210:7, 212:1, 212:11, 215:10, 215:13, 215:20, 219:5

**drahos** [1] - 2:8

**Drahos** [3] - 3:13, 116:25, 157:23

**dress** [1] - 213:7

**Drive** [2] - 2:6, 219:6

**drop** [2] - 44:9, 53:18

**dry** [2] - 134:4, 134:25

**duces** [1] - 12:11

**due** [25] - 18:2, 96:18, 108:3, 114:18, 114:23, 121:11, 123:8, 126:2, 128:23, 132:2, 134:24, 135:20, 144:24, 145:4, 145:15, 145:24, 146:10, 146:17, 149:12, 149:23, 151:19, 156:14, 157:24, 159:5, 159:7

**duly** [2] - 3:17, 217:9

**duplicates** [1] - 51:12

**during** [4] - 78:16, 78:19, 80:7, 113:19

**duties** [1] - 85:8

**duty** [5] - 10:5, 91:24,

94:24, 137:4, 137:5

## E

e)"...Any [1] - 220:2
e-mail [5] - 114:4, 114:8, 114:12, 116:12, 117:3
e-mails [2] - 114:14, 114:17
earliest [1] - 219:16
early [1] - 72:17
easier [3] - 129:20, 161:8, 161:15
easiest [2] - 198:3, 202:20
easily [1] - 92:6
eat [1] - 184:19
education [1] - 5:12
educational [1] - 5:7
effort [1] - 206:19
efforts [2] - 166:8, 201:2
eight [2] - 202:4, 211:21
either [7] - 8:16, 39:15, 40:10, 48:22, 120:16, 167:21, 199:1
elbow [1] - 142:3
electronic [3] - 4:10, 13:2, 34:8
elevated [2] - 65:21, 146:11
elevation [30] - 61:18, 61:20, 61:22, 62:5, 62:10, 64:10, 64:17, 64:21, 65:1, 65:2, 65:4, 92:22, 93:4, 96:19, 97:1, 97:9, 99:2, 99:7, 99:8, 99:12, 100:23, 106:6, 106:15, 106:17, 107:1, 107:5, 107:20, 107:23, 144:25, 149:13
eleven [1] - 143:20
eliminated [2] - 82:3, 82:5
embedded [3] - 212:8, 214:2, 214:24
employee [3] - 86:1, 216:9, 216:9
employees [2] - 85:23, 86:5
en [1] - 114:18
encompass [5] - 144:6, 144:7, 145:4,

147:12, 148:2
encompassed [1] - 160:14
encompasses [1] - 204:20
encompassing [1] - 136:20
end [2] - 36:1, 160:15
ended [1] - 116:6
ensure [2] - 86:2, 153:23
enter [2] - 179:13, 180:5
entered [2] - 41:11, 220:3
entering [2] - 141:23, 180:14
entire [4] - 58:23, 65:2, 89:19, 191:17
entirely [1] - 157:4
entrance [31] - 64:11, 67:8, 68:6, 68:8, 68:19, 69:23, 70:7, 70:10, 71:3, 77:16, 125:2, 134:19, 170:20, 178:15, 178:19, 178:23, 178:24, 179:3, 179:4, 180:14, 182:1, 186:2, 187:8, 189:11, 189:16, 190:18, 190:22, 193:21, 194:10, 197:13, 197:16
entrances [3] - 68:10, 68:12, 195:12
entries [5] - 24:6, 24:8, 24:16, 45:13, 47:4
entry [10] - 21:15, 22:6, 23:3, 24:11, 26:22, 27:10, 40:6, 46:24, 60:4
errata [1] - 218:10
ERRATA [1] - 220:1
error [1] - 212:12
Espin [2] - 202:23, 208:6
Esquire [2] - 2:4, 2:8
ESQUIRE [1] - 219:5
essentially [2] - 6:14, 45:23
established [2] - 74:3, 74:9
estimate [1] - 184:17
Eugene [1] - 206:21
evaluate [5] - 87:3, 150:14, 152:2, 152:9, 152:12
evening [1] - 26:15

event [2] - 79:19, 85:9
eventually [1] - 25:13
evidence [4] - 29:10, 149:4, 150:25, 151:8
evidencing [1] - 93:3
exact [10] - 46:21, 72:19, 91:13, 93:25, 97:14, 124:23, 138:9, 141:11, 141:21, 167:5
exactly [29] - 30:10, 32:2, 37:9, 48:19, 49:15, 62:16, 63:9, 64:4, 65:7, 65:12, 76:13, 82:22, 101:9, 102:5, 103:15, 122:6, 124:25, 134:12, 136:14, 137:11, 141:8, 160:14, 162:11, 162:14, 180:1, 180:9, 181:9, 183:12, 196:16
examination [1] - 219:12
EXAMINATION [1] - 3:20
Examination [1] - 2:14
examined [1] - 3:18
example [2] - 162:3, 162:5
except [2] - 146:7, 210:25
excess [1] - 85:20
excuse [7] - 16:15, 58:7, 65:17, 90:5, 135:8, 142:24, 143:18
exercise [5] - 91:5, 91:7, 125:8, 126:4, 127:13
exercising [1] - 94:15
Exhibit [44] - 11:25, 12:1, 21:5, 21:6, 23:1, 33:24, 34:1, 34:5, 51:19, 51:20, 54:7, 56:8, 59:1, 60:24, 65:5, 65:16, 67:17, 69:12, 69:25, 73:3, 73:21, 77:12, 84:19, 84:23, 85:15, 90:5, 90:6, 90:7, 90:10, 112:21, 112:22, 118:10, 119:7, 129:22, 169:16, 169:17, 176:22, 176:23, 177:3, 177:4, 204:8, 204:10, 212:18, 212:19

exhibit [4] - 85:14, 112:21, 204:13, 212:17
EXHIBITS [1] - 2:15
existence [3] - 87:4, 117:15, 166:9
exists [2] - 79:23, 89:15
exits [1] - 70:22
expect [1] - 107:5
expectation [1] - 105:20
expected [2] - 72:3, 72:10
experience [1] - 78:14
Expires [1] - 217:17
expires [1] - 218:21
explain [10] - 24:3, 46:4, 176:3, 192:5, 192:20, 194:7, 195:8, 197:20, 198:1, 204:3
explained [1] - 98:9
explaining [1] - 147:20
explanation [4] - 21:15, 23:24, 29:15, 191:11
EXPLORER [2] - 13:24, 14:3
extent [1] - 157:14
exterior [2] - 14:6, 16:17
extra [6] - 92:9, 94:5, 94:6, 94:9, 100:5, 100:8
extremely [3] - 79:11, 168:8, 168:12
eye [5] - 139:23, 200:6, 200:11, 200:18, 203:5
eyebrow [1] - 205:19
eyes [1] - 40:12

## F

F.R.C.P [1] - 220:2
face [2] - 131:7, 131:13
facility [11] - 25:16, 36:11, 49:25, 119:21, 124:3, 124:6, 146:2, 147:8, 159:4, 159:8, 205:16
fact [17] - 25:24, 28:16, 29:14, 36:15, 45:13, 67:7, 78:11, 79:22, 94:6, 98:2, 117:8, 125:13,

126:1, 164:9, 164:11, 172:17, 210:13
facts [5] - 17:22, 29:1, 29:10, 91:6, 91:9
failed [9] - 91:5, 91:7, 91:16, 92:14, 95:19, 125:8, 126:4, 126:19, 127:12
fair [3] - 6:15, 153:4, 177:2
fall [72] - 24:15, 28:22, 28:23, 37:16, 37:17, 41:5, 43:21, 49:8, 49:20, 53:4, 76:25, 78:15, 80:5, 81:21, 83:1, 89:1, 93:10, 94:8, 97:15, 108:3, 111:14, 118:1, 119:23, 122:9, 122:10, 124:18, 125:7, 127:21, 128:23, 130:6, 131:6, 131:11, 131:17, 131:23, 132:3, 133:18, 133:19, 134:8, 138:13, 138:16, 139:17, 139:18, 140:6, 140:25, 144:14, 145:16, 146:3, 148:10, 149:16, 149:23, 150:4, 151:23, 155:22, 156:19, 157:1, 160:10, 164:15, 175:18, 182:13, 189:13, 191:7, 191:8, 191:25, 195:4, 201:18, 208:7, 209:18, 209:25, 210:4
fallen [6] - 96:12, 96:17, 96:22, 110:12, 145:12, 149:12
falling [12] - 18:15, 18:24, 18:25, 19:1, 43:11, 144:23, 146:1, 148:25, 156:22, 156:24, 173:23, 195:20
falls [20] - 43:25, 44:5, 66:15, 78:1, 83:15, 110:14, 111:16, 111:22, 111:23, 119:13, 120:3, 120:17, 120:18, 142:18, 143:20,

 Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

146:10, 150:15, 156:17, 201:17, 201:19

**Falls** [1] - 2:21

**familiar** [8] - 19:15, 20:9, 32:18, 33:23, 44:13, 119:7, 127:1, 168:4

**far** [12] - 9:5, 17:4, 23:24, 42:15, 69:2, 130:22, 148:9, 167:14, 195:18, 197:15, 210:15, 210:23

**fault** [2] - 144:25, 156:19

**feasible** [1] - 104:23

**feet** [1] - 205:17

**fell** [114] - 18:2, 18:10, 19:6, 19:23, 22:16, 23:6, 26:14, 27:12, 27:21, 28:1, 28:9, 28:17, 28:20, 29:4, 29:16, 31:21, 42:21, 45:14, 46:8, 48:10, 48:19, 48:21, 50:1, 53:20, 53:21, 53:25, 54:14, 59:21, 60:8, 60:16, 60:21, 61:24, 62:7, 62:13, 62:17, 63:10, 63:18, 64:1, 64:2, 64:4, 76:13, 76:14, 76:15, 76:24, 78:10, 80:17, 80:24, 86:7, 94:1, 108:6, 112:10, 112:17, 117:17, 120:23, 120:24, 121:2, 121:11, 123:7, 123:9, 124:25, 127:23, 130:4, 131:5, 131:12, 131:22, 132:2, 132:21, 133:1, 133:5, 133:11, 134:12, 135:16, 135:19, 136:15, 137:16, 138:18, 140:6, 141:15, 142:2, 145:4, 146:17, 148:1, 150:21, 151:19, 151:23, 159:5, 159:7, 162:22, 164:16, 166:23, 167:10, 167:18, 173:6, 173:20, 175:13, 181:12, 182:15, 188:20, 188:24, 191:8,

191:21, 196:10, 196:16, 197:5, 198:21, 200:25, 202:16, 203:17, 205:18, 206:6, 207:7, 208:8

**felt** [1] - 76:19

**figure** [3] - 102:12, 202:20, 211:22

**file** [7] - 73:10, 128:8, 163:13, 167:14, 167:16, 215:3, 219:19

**filed** [5] - 1:22, 4:1, 125:10, 125:14, 146:7

**files** [1] - 214:25

**fill** [3] - 136:24, 137:5, 137:10

**filled** [1] - 137:2

**final** [1] - 114:17

**financially** [1] - 216:10

**fine** [2] - 113:9, 114:2

**finish** [7] - 30:5, 31:8, 62:22, 63:1, 93:18, 172:7, 194:6

**Fiori** [2] - 207:5, 208:3

**first** [29] - 3:17, 22:5, 22:6, 22:11, 22:19, 46:16, 48:18, 52:20, 52:21, 53:7, 56:9, 56:17, 56:23, 58:9, 64:25, 65:3, 80:7, 90:20, 91:19, 93:14, 93:19, 94:2, 109:1, 111:8, 145:5, 184:5, 202:12, 206:25, 214:6

**fisheye** [1] - 200:9

**five** [14] - 13:20, 37:19, 51:25, 110:9, 113:5, 113:10, 117:23, 119:14, 145:12, 147:11, 156:12, 202:3, 211:20, 211:25

**five-minute** [1] - 113:5

**fix** [1] - 81:23

**Flagler** [2] - 2:6, 219:6

**flashlight** [1] - 33:22

**flat** [6] - 61:1, 61:3, 61:5, 61:16, 61:18

**Floor** [1] - 134:3

**floor** [33] - 18:16, 54:5, 54:7, 54:18, 56:18, 58:23, 59:3, 60:25, 61:1, 65:21, 76:7, 81:22, 86:7, 86:8, 87:11, 89:6, 98:15, 99:12, 100:12,

102:1, 105:7, 112:3, 121:1, 126:3, 129:14, 132:3, 134:3, 140:5, 163:2, 177:23, 177:24, 202:16

**flooring** [12] - 54:10, 61:15, 66:4, 67:8, 101:17, 104:12, 106:10, 108:4, 128:24, 129:3, 136:20, 201:3

**FLORIDA** [3] - 1:2, 216:2, 217:3

**Florida** [13] - 1:19, 1:21, 2:3, 2:7, 5:14, 5:17, 106:8, 106:14, 216:4, 216:15, 217:16, 218:20, 219:7

**focus** [1] - 58:3

**follow** [2] - 93:20, 211:1

**follow-up** [1] - 211:1

**followed** [3] - 57:20, 65:20

**following** [2] - 24:17, 116:9

**follows** [1] - 3:18

**food** [1] - 106:25

**foot** [1] - 206:5

**footage** [20] - 165:9, 165:11, 165:12, 166:9, 166:17, 169:6, 169:9, 170:11, 171:16, 171:23, 171:25, 172:2, 172:3, 172:11, 172:12, 172:17, 173:1, 173:3, 173:8, 183:9

**FOR** [1] - 2:15

**forces** [1] - 115:6

**foregoing** [3] - 216:6, 218:7, 220:20

**foreseeable** [2] - 71:5, 72:8

**foreseeably** [1] - 72:3

**form** [193] - 12:22, 15:7, 16:18, 17:8, 17:16, 18:12, 19:8, 21:17, 22:17, 26:10, 28:4, 28:14, 28:18, 29:6, 29:18, 30:1, 31:1, 31:22, 32:15, 34:22, 35:16, 35:24, 36:9, 37:21, 38:21, 42:18, 44:7, 45:16, 46:9, 48:11, 49:22, 50:17, 52:11, 54:2,

54:12, 54:21, 58:11, 59:5, 59:14, 59:25, 60:18, 61:2, 61:13, 61:25, 62:8, 63:20, 64:13, 65:23, 66:10, 66:20, 67:1, 67:9, 68:15, 68:21, 69:15, 70:2, 70:16, 71:15, 72:6, 72:21, 73:13, 74:5, 74:12, 75:5, 76:11, 78:2, 79:8, 80:6, 81:18, 83:20, 83:25, 84:10, 86:23, 87:6, 87:18, 88:16, 89:16, 92:2, 92:24, 93:11, 93:18, 95:9, 95:22, 96:20, 97:21, 98:6, 98:16, 98:25, 99:16, 100:15, 100:25, 101:7, 101:19, 102:3, 102:23, 103:8, 103:17, 104:1, 104:14, 105:8, 105:25, 106:12, 106:23, 107:12, 108:7, 110:22, 111:18, 112:14, 118:14, 121:3, 122:11, 122:19, 123:13, 124:19, 125:18, 126:6, 128:25, 129:7, 130:14, 132:7, 133:7, 134:9, 134:10, 134:15, 135:3, 136:1, 137:8, 137:12, 138:14, 139:3, 141:18, 142:10, 142:22, 143:22, 144:17, 145:21, 146:14, 146:25, 148:13, 149:3, 149:17, 150:24, 152:23, 153:10, 153:24, 154:24, 155:7, 155:23, 156:10, 157:3, 159:1, 159:15, 159:25, 162:9, 163:5, 164:4, 164:17, 166:11, 166:25, 168:10, 168:18, 171:10, 171:20, 172:20, 173:16, 174:15, 174:23, 175:10, 180:17, 181:7, 182:7, 182:21, 184:3, 188:3, 188:22, 189:5,

189:19, 190:4, 190:21, 191:2, 191:14, 193:24, 194:14, 195:5, 195:24, 196:17, 197:18, 199:16, 202:11, 205:25, 208:23, 210:7, 220:2

**format** [1] - 118:23

**former** [1] - 165:24

**forth** [3] - 27:1, 145:11, 218:10

**forward** [2] - 114:5, 140:6

**four** [25] - 51:25, 77:3, 107:17, 124:21, 128:9, 143:6, 175:23, 176:4, 176:10, 177:12, 177:13, 177:20, 184:16, 185:17, 186:14, 202:3, 211:7, 211:20, 211:25, 213:1, 214:6, 214:17, 214:20, 215:1

**fourteen** [1] - 201:24

**fourth** [3] - 77:1, 177:15, 186:8

**fraction** [1] - 96:11

**fracture** [6] - 42:2, 50:7, 50:12, 50:13, 50:14, 50:15

**free** [1] - 82:21

**friend** [1] - 131:4

**front** [16] - 4:6, 39:12, 39:14, 39:16, 135:16, 135:18, 136:5, 136:20, 137:17, 137:20, 137:22, 139:5, 189:9, 198:22, 211:4, 211:5

**froze** [4] - 25:20, 35:25, 43:7, 127:14

**frozen** [1] - 62:3

**full** [1] - 111:11

**fully** [1] - 134:4

**functioning** [1] - 186:22

**furniture** [1] - 187:2

**FURTHER** [1] - 216:8

## G

**Gan** [12] - 129:24, 130:21, 130:25, 132:1, 160:9, 160:10, 160:12,

162:6, 162:19, 163:20, 164:14

**Gan's** [2] - 162:6, 163:16

**gap** [1] - 77:20

**garbage** [1] - 89:6

**general** [60] - 8:24, 9:7, 9:8, 9:19, 14:9, 14:13, 14:15, 41:1, 41:4, 41:14, 44:1, 48:21, 48:23, 56:11, 60:22, 62:13, 64:2, 64:7, 68:4, 80:14, 81:19, 82:20, 86:4, 86:14, 96:3, 99:1, 103:10, 103:11, 104:4, 104:5, 124:18, 125:4, 132:4, 134:8, 134:14, 136:12, 138:8, 138:9, 138:12, 141:5, 141:7, 141:10, 141:14, 142:8, 143:21, 148:25, 176:5, 185:18, 186:12, 186:14, 188:9, 189:2, 189:7, 196:10, 196:21, 196:22, 198:19, 199:10, 200:25

**generally** [4] - 15:4, 36:5, 67:15, 150:23

**generates** [2] - 51:4, 120:2

**gentleman** [2] - 98:19, 98:22

**GERSON** [245] - 2:2, 3:11, 3:21, 12:3, 13:1, 15:10, 17:2, 17:12, 17:19, 19:3, 19:14, 21:8, 21:21, 22:20, 26:17, 28:5, 28:24, 29:11, 29:22, 30:7, 31:5, 31:19, 32:13, 32:17, 34:3, 35:2, 35:20, 36:3, 36:14, 37:22, 38:23, 42:22, 44:12, 46:5, 46:12, 47:7, 48:15, 50:2, 50:23, 51:22, 52:12, 54:4, 54:17, 54:24, 55:6, 55:10, 55:23, 58:17, 59:10, 59:17, 60:10, 60:23, 61:7, 61:19, 62:4, 62:19, 62:23, 63:12, 64:6, 64:22, 66:5, 66:11, 66:23, 67:4, 67:13, 68:16, 69:1,

69:21, 70:8, 70:19, 71:20, 72:12, 73:1, 73:14, 74:6, 74:15, 75:10, 76:17, 77:14, 78:6, 79:17, 80:18, 82:1, 83:22, 84:2, 84:14, 85:1, 87:1, 87:14, 88:1, 89:11, 89:21, 90:9, 92:18, 93:7, 93:15, 94:18, 95:13, 95:24, 96:24, 98:1, 98:11, 98:21, 99:4, 99:20, 100:20, 101:3, 101:12, 101:23, 102:7, 103:1, 103:13, 103:22, 104:8, 104:24, 105:11, 106:7, 106:18, 107:2, 108:1, 108:11, 108:14, 108:17, 109:17, 110:5, 110:11, 111:6, 111:24, 112:19, 112:24, 113:6, 113:9, 113:12, 114:4, 114:7, 114:15, 114:19, 116:23, 117:12, 118:17, 121:8, 122:15, 123:1, 123:15, 125:5, 125:19, 126:10, 129:4, 129:8, 129:15, 130:19, 132:10, 133:9, 134:13, 134:21, 135:6, 136:3, 137:15, 138:24, 139:7, 141:24, 142:15, 142:23, 143:8, 144:11, 144:21, 146:4, 146:20, 147:13, 148:18, 149:6, 150:12, 151:1, 151:3, 151:9, 151:12, 151:24, 153:3, 153:17, 154:11, 154:19, 155:4, 155:18, 156:5, 156:20, 157:8, 157:12, 157:20, 157:23, 158:8, 158:14, 158:17, 158:21, 159:10, 159:23, 160:4, 161:13, 162:17, 163:11, 164:8, 164:23, 166:20, 167:7,

168:13, 168:22, 171:14, 172:5, 173:11, 173:24, 174:19, 175:1, 175:19, 177:1, 180:21, 181:17, 182:11, 183:17, 184:14, 184:22, 185:1, 185:12, 188:15, 189:1, 189:14, 189:23, 190:15, 190:23, 191:10, 192:6, 194:4, 194:24, 195:15, 196:4, 196:23, 197:23, 199:19, 202:17, 204:12, 206:3, 209:5, 210:12, 212:6, 212:13, 212:21, 215:16

**Gerson** [8] - 2:4, 2:14, 3:11, 31:8, 55:2, 113:3, 197:19

**GG** [1] - 217:17

**given** [7] - 4:19, 108:19, 204:5, 207:16, 213:25, 220:4, 220:21

**glass** [1] - 86:7

**glasses** [2] - 40:13, 161:3

**global** [3] - 184:1, 184:6, 199:22

**goals** [1] - 190:10

**Gorta** [2] - 202:23, 208:6

**grab** [1] - 114:1

**grabbed** [1] - 131:6

**gradual** [2] - 103:20, 104:18

**GRASSINI** [2] - 216:15, 217:16

**Grassini** [3] - 1:19, 216:4, 219:23

**GRAY** [2] - 2:6, 219:6

**gray** [4] - 170:13, 171:8, 174:13, 197:16

**great** [2] - 55:15, 85:24

**grocery** [1] - 106:9

**ground** [2] - 86:17, 205:18

**group** [1] - 6:19

**GS** [1] - 24:20

**GSO** [3] - 24:19, 24:24, 25:1

**guess** [18] - 11:2, 25:9, 29:9, 42:7,

50:20, 51:19, 58:14, 78:4, 112:21, 169:23, 176:6, 176:8, 179:9, 204:8, 206:13, 206:24, 212:14, 214:25

**guest** [75] - 5:21, 5:24, 6:1, 18:3, 18:21, 19:11, 19:13, 19:16, 19:18, 19:20, 19:21, 20:5, 20:8, 20:11, 20:13, 20:14, 20:20, 20:24, 21:9, 22:14, 23:1, 23:16, 23:17, 24:3, 24:5, 24:15, 25:3, 25:23, 26:1, 26:20, 27:3, 27:9, 27:11, 28:1, 28:2, 28:8, 29:3, 30:3, 33:6, 35:14, 35:18, 42:15, 42:16, 44:19, 44:24, 45:7, 45:12, 45:23, 45:25, 46:3, 46:6, 46:19, 47:4, 59:23, 60:3, 79:3, 86:3, 113:21, 115:13, 115:18, 116:8, 116:12, 118:5, 121:10, 122:6, 131:1, 132:17, 132:18, 133:2, 135:19, 137:11, 137:12, 140:4, 164:18, 204:18

**Guest** [8] - 2:17, 19:22, 23:5, 25:4, 30:19, 42:20, 132:25, 135:16

**guests** [3] - 20:19, 25:5, 25:10

**guys** [1] - 55:4

**Gwendolyn** [1] - 133:15

---

## H

**H-E-H-I-R** [1] - 6:11

**hallways** [3] - 144:3, 147:24, 148:2

**hand** [4] - 194:20, 194:21, 205:20, 217:10

**handle** [1] - 6:4

**handlebar** [1] - 131:7

**handling** [1] - 165:25

**handrail** [1] - 203:6

**handwriting** [6] - 19:12, 32:3, 32:12, 43:9, 59:20, 60:8

**hang** [1] - 35:4

**happy** [4] - 27:3, 28:7, 160:6, 161:14

**harassive** [1] - 108:22

**hard** [8] - 4:9, 12:23, 33:21, 34:13, 45:21, 205:13, 208:25

**hazard** [18] - 78:12, 79:20, 79:23, 80:23, 80:25, 81:1, 81:5, 81:9, 81:13, 82:4, 82:21, 86:12, 86:21, 87:5, 87:9, 108:3, 145:14

**hazards** [8] - 81:7, 81:12, 82:2, 82:8, 84:8, 87:4, 87:17, 88:13

**head** [6] - 82:18, 112:3, 123:9, 123:18, 139:23, 139:25

**heads** [2] - 35:8, 38:3

**hear** [3] - 69:5, 69:6, 154:7

**heard** [3] - 98:8, 127:18, 154:4

**hearing** [1] - 117:9

**Hehir** [3] - 6:10, 6:12, 6:13

**height** [1] - 76:6

**held** [1] - 33:1

**help** [4] - 25:5, 66:15, 86:11, 161:24

**helped** [2] - 25:11, 113:1

**helpful** [1] - 210:2

**hereby** [3] - 216:5, 218:6, 220:19

**herein** [1] - 220:23

**hereto** [1] - 218:10

**high** [3] - 69:13, 69:19, 96:9

**highest** [1] - 86:3

**HIPAA** [1] - 123:4

**history** [3] - 46:6, 46:20, 47:5

**hit** [3] - 123:18, 131:7, 203:5

**hitting** [2] - 123:9, 139:23

**hold** [7] - 22:9, 121:23, 139:17, 160:22, 202:2, 207:9

**Hollywood** [1] - 70:1

**home** [4] - 8:2, 20:4, 23:9

**homeport** [1] - 215:13

**honest** [1] - 10:11

**honestly** [2] - 40:10,



*Jeannie Reporting*
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

79:11
**hope** [2] - 144:6, 195:7
**hopefully** [1] - 100:4
**horse** [1] - 176:16
**Horton** [3] - 206:5, 206:9, 206:11
**hotel** [2] - 10:19, 11:9
**hour** [3] - 55:9, 116:10, 184:25
**hours** [6] - 25:4, 71:10, 71:16, 71:19, 116:16, 184:16
**house** [3] - 6:2, 116:14, 165:25
**hump** [27] - 18:2, 18:15, 18:16, 18:24, 18:25, 19:1, 28:1, 28:9, 29:4, 30:14, 42:19, 42:21, 43:11, 50:1, 54:1, 54:14, 54:15, 54:16, 59:13, 59:21, 59:24, 60:7, 60:9, 60:22, 63:15, 80:17, 129:13
**hundred** [5] - 15:16, 68:23, 70:5, 75:18, 84:5
**hundreds** [1] - 145:8
**hurt** [10] - 19:24, 19:25, 22:16, 23:7, 23:8, 27:22, 135:17, 142:2, 203:5, 207:8
**hurting** [1] - 42:21

**I**

**idea** [6] - 53:3, 53:11, 76:9, 76:10, 86:14, 86:16
**identical** [3] - 14:24, 47:6, 129:9
**identically** [2] - 112:11, 112:16
**IDENTIFICATION** [1] - 2:15
**identification** [12] - 12:2, 21:7, 34:2, 51:21, 77:13, 84:24, 90:8, 112:23, 176:24, 177:3, 204:11, 212:20
**identified** [21] - 7:18, 8:17, 8:21, 8:22, 24:17, 29:2, 38:3, 38:25, 41:15, 41:18, 63:15, 99:9, 121:9, 127:22, 140:24, 144:13, 145:18,

148:9, 177:25, 203:11, 214:10
**identifies** [3] - 119:10, 123:23, 150:19
**identify** [29] - 10:9, 11:2, 78:24, 79:22, 85:9, 103:15, 103:24, 104:11, 110:14, 111:15, 120:4, 120:15, 142:17, 143:16, 148:3, 148:12, 153:21, 163:12, 163:14, 166:22, 169:19, 174:9, 174:11, 174:17, 174:21, 201:2, 201:6, 201:9, 201:16
**identifying** [4] - 147:18, 179:22, 188:18, 200:23
**idle** [1] - 186:24
**images** [1] - 171:1
**imagine** [3] - 9:24, 89:5, 184:20
**immediately** [1] - 116:13
**import** [1] - 20:12
**important** [2] - 148:19, 210:19
**impossible** [1] - 105:16
**improper** [1] - 108:18
**IN** [2] - 219:10, 220:2
**in-depth** [1] - 208:19
**in-house** [3] - 6:2, 116:14, 165:25
**incapable** [2] - 174:12, 175:7
**inch** [2] - 104:21, 105:17
**inches** [1] - 76:6
**incident** [161] - 18:4, 18:6, 18:18, 25:10, 26:5, 26:7, 33:11, 36:12, 36:18, 36:19, 36:22, 38:11, 39:8, 39:22, 39:25, 40:1, 40:5, 40:6, 40:9, 40:23, 40:25, 41:3, 41:7, 41:8, 41:12, 41:24, 42:3, 42:5, 42:6, 42:7, 42:8, 42:12, 42:25, 43:21, 44:1, 47:11, 47:18, 47:21, 49:23, 51:5, 53:13, 60:19, 63:22, 73:24, 76:21, 79:1, 79:13, 80:16, 100:10, 110:25,

111:2, 111:8, 112:6, 112:8, 117:25, 119:16, 119:25, 120:2, 121:5, 121:20, 122:1, 122:3, 124:8, 125:22, 125:24, 126:8, 126:11, 126:16, 126:19, 127:25, 129:2, 129:16, 129:24, 130:7, 130:20, 132:13, 133:15, 137:24, 138:25, 139:8, 139:9, 139:11, 140:23, 141:25, 143:24, 156:14, 160:19, 162:25, 163:15, 165:1, 165:4, 165:18, 165:23, 166:16, 167:2, 167:6, 168:3, 168:20, 169:4, 169:7, 169:21, 170:22, 171:1, 171:4, 171:5, 171:9, 171:24, 172:1, 172:3, 172:13, 172:16, 172:18, 173:2, 173:3, 173:6, 173:9, 174:13, 174:22, 175:8, 176:14, 176:16, 181:2, 181:11, 181:15, 182:14, 182:18, 183:2, 183:4, 183:8, 183:11, 183:13, 183:15, 186:11, 187:14, 187:22, 187:23, 189:9, 189:18, 189:22, 202:22, 202:25, 203:15, 204:19, 205:23, 207:13, 207:18, 207:24, 208:3, 208:5, 208:11, 208:12, 210:9, 210:13, 210:20, 211:8, 211:13, 214:18, 214:20, 214:21, 215:2
**incident/accident** [1] - 202:15
**incidents** [36] - 35:18, 96:7, 111:10, 111:12, 111:14, 117:15, 119:18, 119:21, 119:24,

120:5, 120:16, 142:16, 144:1, 144:13, 145:17, 145:18, 145:23, 145:24, 146:1, 146:9, 146:22, 146:23, 147:4, 147:6, 147:10, 148:9, 150:20, 151:18, 154:20, 156:12, 159:6, 168:24, 200:24, 206:10, 206:18
**inclination** [11] - 98:4, 102:25, 103:4, 103:6, 103:12, 103:16, 104:6, 105:3, 105:14, 105:18
**incline** [10] - 97:23, 102:13, 105:2, 132:21, 133:1, 133:5, 135:18, 136:5, 138:13, 139:5
**inclines** [1] - 135:21
**include** [2] - 110:19, 143:14
**including** [12] - 35:13, 120:10, 120:14, 143:3, 143:7, 143:9, 143:10, 143:12, 143:13, 201:21, 202:5
**incorrect** [6] - 7:1, 63:21, 119:20, 147:9, 181:9, 183:5
**increase** [2] - 40:17, 99:11
**indeed** [1] - 167:12
**indicate** [3] - 100:22, 103:3, 208:21
**indicated** [6] - 38:3, 41:20, 42:1, 42:9, 42:14, 101:24
**indicates** [1] - 61:23
**indicating** [3] - 43:19, 61:10, 65:6
**indication** [1] - 167:16
**industry** [2] - 152:20, 153:20
**infirmary** [18] - 25:14, 25:18, 25:25, 26:4, 26:8, 27:24, 28:11, 37:2, 43:14, 50:6, 50:9, 51:3, 51:4, 117:16, 119:19, 123:24, 145:20, 156:25
**inform** [1] - 163:1
**information** [32] -

8:20, 8:24, 10:23, 17:23, 20:21, 23:15, 23:23, 38:24, 38:25, 48:5, 53:24, 63:13, 100:3, 101:15, 101:21, 104:10, 115:14, 121:10, 123:11, 123:17, 140:12, 165:22, 166:2, 166:6, 168:1, 172:24, 200:19, 203:19, 203:21, 203:24, 203:25, 210:5
**informing** [1] - 210:20
**initial** [5] - 21:14, 80:8, 90:2, 90:3, 115:19
**injure** [2] - 150:7, 152:17
**injured** [19] - 17:6, 17:21, 17:24, 18:1, 27:12, 36:7, 37:1, 43:4, 43:8, 51:4, 82:25, 117:18, 122:17, 149:20, 176:5, 201:4, 201:11, 205:6
**injuries** [6] - 7:8, 122:16, 123:3, 127:8, 131:13, 168:6
**injuring** [1] - 149:1
**injury** [42] - 12:20, 13:4, 13:6, 13:8, 18:3, 18:21, 19:11, 19:13, 28:15, 29:21, 30:21, 36:12, 36:25, 41:24, 43:5, 43:12, 47:24, 48:3, 59:23, 60:3, 87:21, 88:24, 113:21, 114:21, 115:13, 115:18, 116:8, 116:12, 117:2, 117:7, 118:5, 126:25, 127:6, 128:16, 136:25, 137:6, 160:12, 168:15, 190:3, 190:11, 205:19, 207:16
**input** [2] - 20:13, 20:20
**inputted** [1] - 23:19
**inquiry** [6] - 11:16, 17:10, 71:18, 89:19, 154:9, 183:22
**inside** [4] - 14:8, 16:22, 150:8, 177:14
**installed** [1] - 190:1
**insufficient** [1] - 159:13

**intentionally** [1] - 151:8
**interested** [2] - 116:4, 216:10
**interior** [3] - 14:12, 15:3, 16:17
**internal** [1] - 44:6
**internally** [1] - 168:17
**interpret** [3] - 25:9, 102:20, 209:4
**interpretation** [1] - 116:7
**Interrogatories** [1] - 2:20
**interrogatories** [4] - 89:24, 90:12, 91:20, 162:13
**interrogatory** [2] - 90:20, 91:4
**interrupt** [2] - 82:15, 113:8
**interview** [1] - 209:17
**investigate** [5] - 47:9, 47:13, 132:17, 166:9, 209:16
**investigated** [2] - 117:15, 172:16
**investigating** [3] - 53:8, 168:6, 209:24
**investigation** [47] - 8:17, 32:21, 35:23, 36:8, 36:13, 36:16, 36:18, 47:11, 49:18, 51:5, 51:9, 52:8, 52:15, 52:17, 56:5, 56:13, 56:15, 60:17, 63:22, 64:9, 65:15, 67:19, 73:6, 73:11, 74:3, 74:10, 74:14, 74:17, 75:15, 76:5, 76:20, 77:25, 78:16, 78:19, 80:8, 97:4, 111:16, 124:8, 125:15, 125:21, 126:25, 127:5, 138:3, 171:17, 209:12, 209:21, 210:16
**investigations** [3] - 127:6, 168:15, 190:3
**investigative** [2] - 36:24, 126:24
**involved** [8] - 7:4, 8:16, 9:3, 49:20, 130:5, 139:1, 140:1, 184:21
**involving** [11] - 125:7, 125:25, 130:21, 132:13, 133:15, 135:9, 139:1, 139:8,

150:20, 160:9, 162:19
**Isabella** [2] - 202:23, 208:6
**ish** [1] - 57:8
**issue** [2] - 96:15, 145:7
**issues** [5] - 20:18, 33:2, 35:1, 35:13, 190:9
**item** [1] - 41:6
**itself** [2] - 152:15, 191:8

**J**

**January** [1] - 111:8
**JD** [1] - 5:12
**Jennifer** [2] - 207:5, 208:2
**Jenny** [7] - 129:24, 130:21, 130:24, 132:1, 160:9, 160:10, 163:16
**Jillian** [2] - 90:22, 90:24
**Jo** [4] - 206:5, 206:9, 206:11, 206:21
**job** [2] - 9:15, 9:20
**Jones** [1] - 133:15
**Jones's** [1] - 134:1
**Jordan** [1] - 203:15
**July** [1] - 12:9
**JURAT** [1] - 218:1
**jurors** [1] - 19:10
**jury** [13] - 5:8, 19:5, 20:9, 21:4, 24:4, 34:21, 48:9, 61:9, 67:16, 129:23, 148:8, 160:7, 177:8

**K**

**keep** [6] - 52:2, 160:16, 160:20, 176:15, 178:8
**key** [1] - 20:16
**kind** [7] - 13:15, 54:16, 54:20, 147:9, 151:14, 184:17, 208:3
**knee** [12] - 19:24, 22:16, 23:7, 27:12, 30:21, 42:21, 42:25, 50:7, 50:10, 132:22, 133:5, 202:16
**kneecap** [1] - 50:14
**knees** [5] - 26:16, 112:4, 122:21,

123:10, 123:20
**knowing** [1] - 15:16
**knowledge** [4] - 9:3, 17:14, 17:18, 94:6
**known** [1] - 117:1
**knows** [1] - 167:22

**L**

**lack** [1] - 149:24
**lady** [1] - 213:7
**Lagandaon** [11] - 112:2, 120:24, 122:9, 125:8, 125:25, 127:12, 128:16, 128:21, 130:4, 143:11, 143:13
**Lagandaon's** [5] - 124:9, 127:21, 128:8, 131:10, 131:25
**landed** [1] - 26:15
**landing** [2] - 112:3, 121:12
**laptop** [1] - 140:13
**Large** [2] - 1:21, 218:20
**last** [9] - 8:7, 96:8, 98:8, 107:14, 107:15, 116:16, 203:25, 208:2, 208:6
**late** [2] - 72:17, 115:8
**Law** [1] - 5:11
**law** [1] - 117:4
**lawsuit** [5] - 4:1, 9:6, 125:10, 125:14, 150:18
**layout** [2] - 16:14, 141:5
**lead** [1] - 195:13
**leads** [2] - 52:25, 138:20
**least** [5] - 69:2, 79:25, 107:16, 110:9, 123:10
**leave** [1] - 108:18
**leeway** [2] - 108:19, 109:2
**left** [20] - 19:24, 23:7, 30:21, 50:10, 50:14, 86:7, 135:17, 135:19, 142:3, 177:16, 178:8, 179:11, 186:1, 187:7, 192:11, 193:15, 194:20, 199:2, 199:6, 199:14
**left-hand** [1] - 194:20

**legal** [3] - 6:15, 6:17, 117:5
**length** [1] - 46:23
**lengthy** [1] - 187:2
**less** [5] - 15:12, 96:10, 139:10, 145:11
**level** [16] - 42:4, 42:5, 42:6, 42:7, 54:11, 86:3, 98:15, 100:12, 101:17, 102:1, 103:16, 104:12, 105:23, 107:10, 108:4, 205:20
**levels** [2] - 105:7, 106:15
**Liberian** [1] - 1:8
**Ligaya** [6] - 112:1, 120:24, 125:7, 127:12, 127:21, 206:23
**likely** [6] - 16:23, 78:7, 78:17, 189:17, 189:20, 192:25
**likewise** [1] - 94:25
**limited** [1] - 108:25
**line** [4] - 41:6, 173:7, 176:10, 183:6
**Line** [1] - 2:25
**lines** [6] - 152:20, 153:1, 153:11, 153:15, 153:20, 162:14
**Lines** [2] - 3:4, 3:6
**lining** [1] - 76:25
**liquids** [1] - 85:19
**list** [16] - 111:20, 118:3, 118:7, 119:1, 119:13, 204:13, 204:17, 206:2, 206:12, 206:22, 207:1, 207:2, 207:4, 207:5, 207:15, 207:21
**List** [2] - 2:21, 2:22
**literally** [2] - 89:4, 89:9
**litigated** [1] - 6:6
**litigating** [1] - 154:6
**litigation** [10] - 5:22, 5:24, 6:1, 6:2, 6:3, 6:13, 7:3, 7:9, 90:19, 118:21
**live** [1] - 106:8
**lives** [1] - 135:12
**lobby** [6] - 41:22, 48:22, 48:24, 48:25, 49:5, 136:8
**locate** [3] - 176:2, 201:7, 203:23
**located** [1] - 15:23
**location** [32] - 41:14,

41:18, 41:21, 53:12, 93:25, 100:24, 104:11, 120:6, 132:4, 134:8, 134:14, 138:7, 138:10, 140:21, 143:21, 147:22, 148:4, 166:23, 167:5, 167:10, 167:24, 168:3, 183:18, 188:24, 189:12, 196:21, 196:22, 196:25, 201:13, 203:6, 203:8, 205:20
**locations** [3] - 110:1, 120:6, 120:8
**log** [36] - 19:16, 19:18, 19:20, 19:21, 20:5, 20:8, 20:11, 20:20, 20:24, 21:9, 22:14, 23:1, 24:3, 24:20, 25:23, 26:1, 26:20, 27:3, 27:9, 28:2, 29:3, 30:3, 44:25, 45:7, 45:12, 45:23, 45:25, 46:3, 46:19, 47:5, 59:23, 211:3, 211:4, 211:7, 213:22, 214:10
**Log** [1] - 2:17
**logs** [4] - 44:19, 208:16, 208:21, 209:4
**look** [86] - 12:4, 12:12, 14:10, 15:2, 15:14, 16:21, 17:10, 17:21, 21:5, 22:10, 22:13, 22:25, 26:20, 34:4, 37:8, 37:12, 37:23, 39:7, 46:1, 51:23, 52:19, 53:17, 54:6, 56:23, 57:3, 59:1, 59:9, 60:24, 65:13, 67:16, 68:22, 69:11, 69:24, 73:19, 74:20, 74:22, 76:5, 77:1, 84:11, 85:12, 89:19, 89:23, 90:10, 90:14, 91:13, 91:19, 97:2, 102:8, 112:25, 118:5, 118:18, 118:19, 118:24, 119:3, 119:6, 121:22, 124:12, 127:24, 129:21, 131:4, 133:22, 139:8, 140:16, 163:19, 163:22, 170:9, 172:25,



*Jeannie Reporting*
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

176:9, 181:14, 185:21, 192:7, 192:22, 193:5, 193:16, 193:17, 198:7, 198:15, 202:19, 204:7, 204:21, 207:9, 208:13, 211:16, 212:25, 213:17, 213:22

**looked** [7] - 64:25, 122:22, 123:5, 154:9, 155:10, 190:18, 197:13

**looking** [25] - 21:18, 22:9, 22:19, 34:13, 53:7, 54:19, 56:18, 58:8, 61:5, 127:9, 132:24, 137:21, 138:7, 138:18, 163:13, 175:24, 177:8, 177:9, 178:10, 189:16, 193:12, 193:19, 194:8, 196:8, 206:21

**looks** [10] - 52:4, 59:3, 76:6, 98:23, 113:20, 185:24, 186:2, 194:17, 205:9, 214:23

**lost** [1] - 20:16

**lounge** [1] - 144:2

**lower** [1] - 57:3

**LTC** [1] - 1:8

**LTD** [1] - 1:16

**lunch** [1] - 114:1

## M

**Madam** [1] - 215:20

**Madison** [5] - 207:4, 207:6, 207:11, 207:14, 207:20

**mail** [5] - 114:4, 114:8, 114:12, 116:12, 117:3

**mails** [2] - 114:14, 114:17

**main** [4] - 68:8, 190:9, 190:10

**maintenance** [3] - 10:20, 11:9, 82:20

**majority** [2] - 96:9, 96:10

**mall** [5] - 106:11, 106:13, 106:19, 106:21, 106:22

**man** [1] - 93:2

**management** [2] -

6:17, 6:20

**manager** [2] - 10:20, 11:9

**managing** [1] - 85:20

**manual** [5] - 85:7, 86:22, 114:24, 115:22, 116:17

**map** [1] - 11:4

**marble** [26] - 54:25, 56:20, 56:21, 56:22, 57:4, 57:9, 57:10, 57:17, 57:20, 59:8, 65:19, 65:20, 66:4, 105:22, 136:20, 140:5, 142:13, 163:23, 163:25, 164:6, 164:9, 164:10, 164:13, 198:23

**marbles** [3] - 57:11, 57:24, 163:24

**MARINER** [7] - 13:25, 14:4, 141:2, 141:4, 142:17, 142:19, 142:21

**Marisol** [3] - 23:17, 23:19, 23:22

**mark** [11] - 11:25, 33:24, 51:19, 84:19, 90:5, 112:20, 157:16, 157:17, 170:9, 176:22, 212:17

**marked** [24] - 12:2, 21:7, 22:25, 34:2, 34:5, 51:21, 56:8, 69:12, 77:2, 77:13, 84:24, 90:8, 112:23, 118:18, 119:6, 129:21, 169:15, 170:10, 176:24, 177:4, 181:24, 204:8, 204:11, 212:20

**marking** [1] - 163:1

**Mary** [2] - 203:15, 206:21

**material** [1] - 57:9

**materials** [3] - 36:24, 57:7, 188:1

**matter** [5] - 50:25, 79:18, 188:1, 213:25, 219:15

**matters** [2] - 7:4, 7:7

**max** [1] - 185:2

**McCullen** [1] - 142:1

**mean** [63] - 20:22, 25:7, 25:9, 28:19, 37:18, 38:22, 40:14, 42:6, 49:3, 54:23,

61:17, 67:22, 69:16, 78:3, 87:8, 89:5, 94:22, 97:25, 102:21, 104:4, 104:6, 106:3, 106:4, 122:13, 122:18, 125:20, 126:7, 126:15, 134:16, 136:4, 136:9, 137:21, 138:15, 147:2, 147:4, 149:8, 149:18, 149:19, 149:25, 150:16, 150:18, 152:5, 154:3, 156:18, 161:10, 166:3, 167:1, 167:5, 167:22, 169:24, 174:10, 184:24, 187:10, 189:2, 189:24, 190:8, 192:1, 197:10, 199:21, 200:2, 200:8, 213:13

**meaning** [1] - 105:12

**means** [2] - 101:2, 101:4

**measure** [1] - 80:15

**measured** [1] - 76:7

**measurement** [1] - 75:1

**measurements** [15] - 73:4, 74:17, 75:4, 75:13, 76:20, 77:25, 78:5, 78:8, 78:16, 78:19, 78:23, 79:6, 79:13, 79:22, 80:4

**measuring** [2] - 74:24, 76:10

**mechanisms** [1] - 108:23

**medical** [44] - 24:21, 24:25, 25:2, 25:14, 25:15, 25:17, 25:25, 26:4, 26:8, 26:25, 27:24, 28:11, 28:14, 29:16, 29:19, 30:12, 30:18, 30:19, 31:15, 32:6, 36:11, 37:1, 43:14, 49:25, 50:21, 51:2, 51:3, 117:16, 119:18, 119:21, 122:22, 123:3, 123:24, 124:3, 124:6, 145:20, 146:2, 147:7, 156:25, 157:1, 159:4, 159:8, 205:15

**medically** [2] - 146:23, 147:5

**meeting** [22] - 32:19, 32:24, 32:25, 33:3, 33:4, 33:5, 33:12, 33:19, 34:16, 34:20, 34:24, 35:22, 37:15, 37:16, 37:24, 38:1, 38:7, 39:8, 40:22, 41:8, 43:18, 152:6

**Meeting** [2] - 2:18, 34:6

**meetings** [6] - 33:7, 33:17, 35:10, 35:15, 48:14, 53:17

**member** [9] - 5:13, 5:16, 20:12, 82:19, 82:25, 86:9, 86:13, 88:22, 89:7

**members** [20] - 5:7, 19:5, 20:9, 21:4, 24:4, 25:11, 28:22, 34:20, 35:8, 48:8, 61:9, 67:15, 85:9, 86:5, 86:16, 129:22, 148:7, 160:6, 167:3, 177:8

**memorialize** [1] - 45:13

**memorialized** [2] - 29:15, 36:19

**memorializing** [1] - 41:7

**memorize** [1] - 40:16

**Mendiola** [1] - 2:10

**mention** [3] - 19:12, 25:5, 43:22

**mentioned** [12] - 9:22, 10:13, 11:20, 24:25, 33:16, 49:17, 50:24, 53:2, 73:25, 128:10, 182:17, 204:21

**mentions** [1] - 122:21

**merely** [1] - 144:24

**met** [1] - 10:13

**metal** [1] - 65:17

**MIAMI** [1] - 1:2

**Miami** [4] - 2:3, 5:11, 106:8, 135:13

**MICHAEL** [1] - 219:5

**Michael** [2] - 2:8, 3:13

**middle** [5] - 31:9, 113:8, 115:1, 178:7, 199:4

**midnight** [1] - 72:23

**might** [17] - 11:15, 14:8, 14:14, 14:16, 14:24, 15:8, 16:3, 16:4, 16:8, 20:19, 51:13, 70:21, 161:8, 164:9, 181:8, 187:3

**Mike** [6] - 108:11,

110:6, 151:3, 157:8

**millions** [2] - 96:7, 145:9

**mind** [3] - 158:22, 158:23, 160:20

**mine** [4] - 39:19, 40:12, 161:18, 211:19

**Mine's** [1] - 161:18

**minor** [1] - 205:21

**minute** [11] - 32:19, 33:16, 37:15, 39:1, 39:8, 41:8, 48:14, 53:17, 55:3, 55:4, 113:5

**Minutes** [2] - 2:18, 34:6

**minutes** [9] - 34:16, 39:5, 40:23, 43:18, 113:10, 152:6, 184:25, 185:2, 185:3

**mischaracterizes** [3] - 99:16, 149:4, 150:25

**misrepresent** [1] - 151:8

**missing** [1] - 212:9

**moderate** [1] - 42:9

**moment** [1] - 28:16

**Montalvan** [1] - 23:18

**month** [2] - 133:12, 133:14

**monthly** [3] - 32:25, 34:24, 35:12

**months** [3] - 111:11, 111:12

**morning** [3] - 3:22, 72:18, 116:10

**Morris** [4] - 132:13, 132:19, 132:20, 203:10

**most** [9] - 14:18, 15:3, 16:13, 16:23, 32:9, 43:15, 107:20, 107:24, 189:20

**motion** [1] - 186:25

**move** [2] - 109:15, 200:3

**moving** [1] - 186:24

**MR** [474] - 3:11, 3:13, 3:21, 12:3, 12:22, 13:1, 15:7, 15:10, 16:18, 17:2, 17:8, 17:12, 17:16, 17:19, 18:12, 19:3, 19:8, 19:14, 21:8, 21:17, 21:21, 22:17, 22:20, 26:10, 26:17, 28:4, 28:5, 28:18, 28:24, 29:6, 29:11, 29:18, 29:22, 30:1, 30:7,

 **Jeannie Reporting**
Your Wish Is Our Job!   **www.jeanniereporting.com**
**305-577-1705**

31:1, 31:5, 31:7, 31:19, 31:22, 32:13, 32:15, 32:17, 34:3, 34:22, 35:2, 35:16, 35:20, 35:24, 36:3, 36:9, 36:14, 37:20, 37:22, 38:21, 38:23, 42:18, 42:22, 44:7, 44:12, 45:16, 46:5, 46:9, 46:12, 46:14, 47:7, 48:11, 48:15, 49:22, 50:2, 50:17, 50:23, 51:22, 52:11, 52:12, 54:2, 54:4, 54:12, 54:17, 54:21, 54:24, 55:5, 55:6, 55:7, 55:10, 55:13, 55:17, 55:23, 58:11, 58:17, 59:5, 59:10, 59:14, 59:17, 59:25, 60:10, 60:18, 60:23, 61:2, 61:7, 61:13, 61:19, 61:25, 62:4, 62:8, 62:19, 62:21, 62:23, 62:25, 63:12, 63:20, 64:6, 64:13, 64:22, 65:23, 66:5, 66:10, 66:11, 66:20, 66:23, 67:1, 67:4, 67:9, 67:13, 68:15, 68:16, 68:21, 69:1, 69:15, 69:21, 70:2, 70:8, 70:16, 70:19, 71:15, 71:20, 72:6, 72:12, 72:21, 73:1, 73:13, 73:14, 74:5, 74:6, 74:12, 74:15, 75:5, 75:10, 76:11, 76:17, 77:14, 78:2, 78:6, 79:8, 79:17, 80:6, 80:18, 81:18, 82:1, 83:20, 83:22, 83:25, 84:2, 84:10, 84:14, 85:1, 86:23, 87:1, 87:6, 87:14, 87:18, 88:1, 88:16, 89:11, 89:16, 89:21, 90:9, 92:2, 92:18, 92:24, 93:7, 93:11, 93:15, 93:17, 93:20, 94:18, 95:9, 95:13, 95:22, 95:24, 96:20, 96:24, 97:21, 98:1, 98:6, 98:11, 98:16, 98:21, 98:25, 99:4, 99:15, 99:20, 100:15, 100:20, 100:25, 101:3, 101:6, 101:12, 101:19, 101:23, 102:3, 102:7,

102:23, 103:1, 103:8, 103:13, 103:17, 103:22, 104:1, 104:8, 104:14, 104:24, 105:8, 105:11, 105:25, 106:2, 106:7, 106:12, 106:18, 106:23, 107:2, 107:12, 107:16, 108:1, 108:7, 108:11, 108:13, 108:14, 108:16, 108:17, 109:1, 109:17, 109:24, 110:5, 110:11, 110:22, 111:6, 111:18, 111:24, 112:14, 112:19, 112:24, 113:6, 113:9, 113:12, 113:18, 114:4, 114:6, 114:7, 114:10, 114:15, 114:16, 114:19, 115:4, 116:23, 117:12, 118:14, 118:17, 121:3, 121:8, 122:11, 122:15, 122:19, 123:1, 123:13, 123:15, 124:19, 125:5, 125:18, 125:19, 126:6, 126:10, 128:25, 129:4, 129:7, 129:8, 129:11, 129:15, 130:14, 130:19, 132:7, 132:10, 133:7, 133:9, 134:9, 134:13, 134:15, 134:21, 135:3, 135:6, 136:1, 136:3, 137:8, 137:15, 138:14, 138:24, 139:3, 139:7, 141:18, 141:24, 142:10, 142:15, 142:22, 142:23, 143:1, 143:8, 143:22, 144:11, 144:17, 144:21, 145:21, 146:4, 146:14, 146:20, 146:25, 147:13, 148:13, 148:18, 149:3, 149:6, 149:17, 150:12, 150:24, 151:1, 151:3, 151:7, 151:9, 151:12, 151:24,

152:23, 153:3, 153:10, 153:12, 153:17, 153:24, 154:11, 154:19, 154:24, 155:4, 155:7, 155:18, 155:23, 156:5, 156:10, 156:20, 157:3, 157:8, 157:10, 157:12, 157:20, 157:23, 158:4, 158:8, 158:9, 158:14, 158:16, 158:17, 158:19, 158:21, 159:1, 159:10, 159:15, 159:23, 159:25, 160:4, 161:9, 161:13, 162:9, 162:17, 163:5, 163:11, 164:4, 164:8, 164:17, 164:23, 166:11, 166:20, 166:25, 167:7, 168:10, 168:13, 168:18, 168:22, 171:10, 171:14, 171:20, 172:5, 172:20, 173:11, 173:16, 173:24, 174:15, 174:19, 174:23, 175:1, 175:10, 175:19, 177:1, 180:17, 180:21, 181:7, 181:17, 182:7, 182:11, 182:21, 183:17, 184:3, 184:12, 184:14, 184:15, 184:22, 184:24, 185:1, 185:3, 185:12, 188:3, 188:15, 188:22, 189:1, 189:5, 189:14, 189:19, 189:23, 190:4, 190:15, 190:21, 190:23, 191:2, 191:4, 191:10, 191:14, 192:6, 193:24, 194:4, 194:14, 194:24, 195:5, 195:15, 195:24, 196:4, 196:17, 196:23, 197:18, 197:23, 199:16, 199:19, 202:11, 202:17, 204:12, 205:25, 206:3, 208:23,

209:5, 210:7, 210:12, 212:1, 212:6, 212:11, 212:13, 212:21, 215:10, 215:13, 215:16, 215:20
**must** [3] - 86:1, 118:25, 211:22

**N**

**N-I-K-I-T-O-V-I-C** [1] - 8:8
**name** [18] - 3:22, 8:5, 8:7, 10:9, 10:25, 13:22, 52:23, 53:1, 83:18, 112:1, 120:23, 128:22, 129:19, 144:5, 144:9, 203:10, 207:19, 207:21
**names** [2] - 9:1, 10:16
**Nassau** [3] - 215:10, 215:12, 215:13
**nature** [2] - 119:14, 148:10
**navigate** [1] - 99:23
**NAVIGATOR** [6] - 13:25, 14:3, 15:24, 133:20, 133:23, 135:15
**near** [3] - 48:22, 177:11, 191:22
**nearby** [1] - 210:1
**necessarily** [5] - 71:12, 71:18, 94:22, 156:18, 201:18
**necessary** [3] - 76:19, 86:2, 117:9
**need** [23] - 21:23, 21:24, 26:23, 26:24, 27:4, 28:3, 33:22, 37:9, 40:13, 45:2, 46:10, 92:10, 99:7, 101:16, 105:9, 114:23, 116:21, 117:10, 158:4, 174:16, 176:15, 184:12, 184:18
**needed** [2] - 190:7, 200:20
**needs** [1] - 100:6
**Nelson** [1] - 207:2
**never** [7] - 59:19, 59:20, 79:14, 106:5, 117:6, 153:2, 164:25
**nevertheless** [1] - 117:11
**new** [1] - 5:4

**next** [19] - 18:6, 18:14, 18:22, 24:16, 24:19, 40:6, 41:6, 43:10, 135:7, 140:23, 165:2, 165:5, 205:3, 205:4, 206:23, 207:21, 210:9, 210:14, 212:17
**nicely** [1] - 151:6
**Nicholas** [1] - 2:4
**Nick** [9] - 3:11, 108:16, 113:18, 157:11, 166:1, 166:3, 166:19, 193:3, 212:5
**night** [2] - 72:23, 121:19
**nightclubs** [2] - 144:2, 147:25
**Nikitovic** [2] - 8:7, 8:10
**nine** [3] - 143:14, 202:4, 211:21
**NO** [2] - 1:3, 219:10
**nobody** [5] - 8:21, 9:2, 28:21, 183:14, 186:24
**non** [1] - 66:12
**none** [15] - 28:22, 146:3, 146:6, 171:2, 175:17, 176:13, 176:17, 181:10, 183:7, 183:10, 187:22, 191:6, 210:23, 210:25
**NONE** [1] - 2:24
**nonskid** [16] - 58:19, 58:20, 61:11, 65:18, 66:7, 66:13, 66:17, 67:5, 77:16, 140:8, 140:18, 140:20, 142:6, 142:12, 142:14, 194:11
**normal** [2] - 214:1
**North** [2] - 2:6, 219:6
**nose** [3] - 112:4, 123:9, 123:18
**nosing** [1] - 77:21
**Notary** [3] - 1:20, 217:16, 218:20
**notations** [1] - 42:14
**notes** [1] - 216:7
**nothing** [16] - 9:13, 18:19, 30:24, 75:14, 82:12, 88:6, 96:4, 118:20, 167:19, 167:20, 169:6, 171:4, 172:10, 173:9, 181:16, 207:25

*Jeannie Reporting*
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

**notice** [10] - 3:25, 4:3, 4:5, 4:13, 12:6, 12:10, 17:22, 73:20, 156:6, 219:20
**Notice** [2] - 1:21, 2:17
**Notices** [1] - 160:17
**notices** [3] - 160:24, 161:20, 161:22
**notified** [2] - 73:23, 79:20
**November** [18] - 18:7, 18:8, 21:16, 22:3, 22:15, 23:4, 25:19, 27:13, 39:9, 40:5, 111:3, 111:4, 111:10, 111:25, 202:23, 211:9, 213:6, 219:18
**number** [12] - 15:11, 15:17, 15:18, 73:19, 120:3, 148:8, 148:11, 149:12, 149:16, 150:20, 174:5, 174:8
**numerous** [2] - 155:20, 156:3
**nurse** [5] - 25:3, 137:4, 137:5, 137:10

## O

**OATH** [1] - 217:1
**oath** [1] - 219:13
**object** [191] - 12:22, 15:7, 16:18, 17:8, 17:16, 18:12, 19:8, 21:17, 22:17, 26:10, 28:4, 28:18, 29:6, 29:18, 30:1, 31:1, 31:22, 32:15, 34:22, 35:16, 35:24, 36:9, 37:20, 38:21, 42:18, 44:7, 45:16, 46:9, 48:11, 49:22, 50:17, 52:11, 54:2, 54:12, 54:21, 58:11, 59:5, 59:14, 59:25, 60:18, 61:2, 61:13, 61:25, 62:8, 63:20, 64:13, 65:23, 66:10, 66:20, 67:1, 67:9, 68:15, 68:21, 69:15, 70:2, 70:16, 71:15, 72:6, 72:21, 73:13, 74:5, 75:5, 76:11, 78:2, 79:8, 80:6, 81:18, 83:20, 83:25, 84:10, 86:23, 87:6, 87:18, 88:16, 89:16, 92:2, 92:24, 93:11, 93:17,

95:9, 95:22, 96:20, 97:21, 98:6, 98:16, 98:25, 99:15, 100:15, 100:25, 101:6, 101:19, 102:3, 102:23, 103:8, 103:17, 104:1, 104:14, 105:8, 105:25, 106:12, 106:23, 107:12, 108:7, 110:22, 111:18, 112:14, 118:14, 121:3, 122:11, 122:19, 123:13, 124:19, 125:18, 126:6, 128:25, 129:7, 130:14, 132:7, 133:7, 134:9, 134:10, 134:15, 135:3, 136:1, 137:8, 138:14, 139:3, 141:18, 142:10, 142:22, 143:22, 144:17, 145:21, 146:14, 146:25, 148:13, 149:3, 149:17, 150:24, 152:23, 153:10, 153:24, 154:24, 155:7, 155:23, 156:10, 157:3, 159:1, 159:15, 159:25, 162:9, 163:5, 164:4, 164:17, 166:11, 166:25, 168:10, 168:18, 171:10, 171:20, 172:20, 173:16, 174:15, 174:23, 175:10, 180:17, 181:7, 182:7, 182:21, 184:3, 188:3, 188:22, 189:5, 189:19, 190:4, 190:21, 191:2, 191:14, 193:24, 194:14, 195:5, 195:24, 196:17, 197:18, 199:16, 202:11, 205:25, 208:23, 210:7
**objection** [5] - 108:21, 109:11, 129:11, 143:1, 157:25
**objections** [3] - 108:15, 108:24, 151:5
**obscured** [13] - 169:2, 169:9, 169:21,

169:22, 170:12, 171:7, 172:19, 173:13, 173:15, 174:13, 175:8, 182:19, 191:12
**obscuring** [3] - 165:23, 181:5, 195:18
**observed** [2] - 209:24, 210:6
**obtained** [1] - 192:10
**obvious** [3] - 91:22, 92:6, 92:13
**obviously** [2] - 76:22, 152:14
**occupation** [1] - 5:19
**occur** [10] - 33:5, 44:5, 135:1, 152:2, 152:22, 153:22, 165:18, 167:2, 181:15, 183:15
**occurred** [16] - 18:7, 53:4, 53:13, 120:13, 120:16, 121:24, 121:25, 124:18, 127:22, 129:17, 144:1, 145:25, 157:2, 160:11, 187:22, 207:24
**occurring** [4] - 146:10, 172:4, 172:13, 183:4
**occurs** [8] - 35:23, 103:16, 103:25, 104:13, 107:11, 111:8, 125:22, 156:19
**October** [10] - 129:17, 129:24, 130:8, 132:12, 133:13, 203:9, 203:14, 216:12, 217:11, 219:9
**OF** [34] - 1:2, 1:15, 2:2, 2:5, 13:7, 13:15, 15:23, 15:24, 16:15, 21:10, 38:1, 129:18, 130:1, 130:9, 130:10, 131:15, 132:5, 133:20, 135:16, 139:12, 140:25, 141:2, 141:4, 142:17, 142:24, 143:25, 160:11, 208:1, 216:1, 216:2, 216:3, 217:1, 217:3, 217:4
**offer** [1] - 25:2
**offered** [1] - 115:22
**office** [2] - 166:3,

219:16
**officer** [32] - 7:21, 10:23, 11:9, 11:11, 11:12, 11:14, 20:14, 23:17, 47:10, 47:18, 47:23, 48:1, 60:20, 63:24, 73:18, 74:11, 74:16, 75:8, 80:9, 166:6, 167:12, 167:24, 171:21, 171:22, 172:16, 172:25, 183:8, 183:15, 187:12, 199:3, 199:13, 220:3
**officers** [1] - 53:9
**official** [6] - 37:7, 37:10, 88:11, 90:11, 95:20, 217:10
**often** [2] - 35:10, 71:13
**ON** [2] - 2:2, 2:5
**once** [3] - 26:3, 122:5
**one** [93] - 10:19, 12:12, 16:4, 16:9, 17:9, 21:19, 22:11, 22:12, 22:18, 22:19, 24:19, 39:5, 44:1, 46:3, 51:24, 55:3, 55:4, 57:16, 60:4, 60:13, 63:24, 64:15, 68:10, 68:14, 69:9, 74:23, 77:3, 77:8, 80:3, 89:18, 105:24, 109:13, 111:20, 114:16, 120:12, 121:23, 124:1, 124:16, 125:1, 125:11, 135:7, 135:23, 135:24, 142:11, 143:6, 154:12, 155:22, 159:16, 159:20, 160:15, 163:23, 164:10, 169:12, 170:7, 170:21, 171:17, 172:10, 175:6, 175:16, 179:20, 179:21, 185:22, 185:24, 185:25, 186:10, 187:6, 187:7, 187:8, 192:7, 197:14, 197:22, 198:17, 198:21, 202:3, 202:8, 202:12, 203:12, 205:3, 205:12, 205:13, 208:2, 208:6, 211:20, 211:25, 212:10, 213:1, 215:9

**ones** [11] - 13:13, 46:2, 124:6, 140:21, 147:7, 155:8, 155:10, 206:16, 206:17, 214:14, 214:16
**open** [11] - 24:20, 71:10, 71:14, 71:19, 71:24, 72:17, 72:23, 85:20, 91:22, 92:5, 92:13
**opened** [1] - 215:3
**opening** [2] - 198:15, 198:25
**operates** [1] - 153:8
**operating** [1] - 86:22
**operator** [1] - 179:9
**opportunity** [2] - 115:16, 192:18
**opposed** [6] - 16:4, 18:10, 44:4, 71:14, 139:1, 164:10
**option** [1] - 123:25
**orange** [2] - 57:5, 65:18
**orangey** [1] - 66:3
**order** [4] - 70:12, 81:2, 144:5, 170:2
**ordinary** [5] - 20:25, 91:23, 92:7, 99:24, 105:14
**original** [3] - 117:21, 184:10, 219:19
**originally** [3] - 30:9, 80:12, 204:24
**otherwise** [2] - 108:23, 109:15
**outer** [1] - 14:6
**outside** [10] - 6:2, 14:11, 15:2, 16:21, 19:23, 23:6, 27:21, 94:10, 184:4, 206:7
**overall** [1] - 8:25
**oversee** [3] - 6:2, 6:3, 75:20
**own** [17] - 32:3, 32:11, 59:20, 83:9, 84:20, 91:5, 91:18, 92:12, 92:16, 94:16, 95:4, 125:9, 126:20, 127:13, 145:16, 146:19, 150:10
**Own** [21] - 2:20, 81:19, 82:18, 82:23, 83:6, 83:11, 83:14, 83:18, 84:12, 85:3, 85:12, 85:15, 85:18, 86:10, 86:14, 87:13, 88:10, 88:13, 88:17, 88:20, 89:3


Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

ownership [1] - 85:25

**P**

P.A [1] - 2:2
p.m [11] - 25:4, 26:5, 113:14, 113:17, 122:2, 154:15, 154:18, 185:8, 185:11, 215:23, 215:25
page [11] - 23:13, 26:13, 38:10, 39:7, 119:9, 206:20, 206:23, 206:25, 218:10, 220:3
PAGE [4] - 2:14, 2:16, 2:23, 218:1
Page [1] - 2:25
PAGE/LINE [1] - 220:6
pages [2] - 216:7, 218:7
pain [2] - 135:19, 135:20
Palm [2] - 2:7, 219:7
panoramic [3] - 200:1, 200:2, 200:8
parameters [4] - 141:12, 141:14, 141:17, 146:22
parcel [1] - 118:6
part [45] - 11:19, 14:18, 15:3, 16:13, 19:19, 42:25, 52:7, 52:14, 52:17, 53:25, 55:25, 56:4, 56:15, 60:17, 64:8, 65:14, 65:15, 67:17, 71:17, 73:10, 76:20, 77:25, 85:7, 90:25, 97:3, 117:13, 117:22, 118:2, 118:6, 120:4, 126:23, 127:4, 128:4, 128:7, 128:8, 128:19, 154:8, 168:4, 171:17, 183:21, 205:22, 206:17, 209:11, 209:21
PART [1] - 220:2
particular [39] - 13:12, 13:14, 37:14, 37:17, 51:8, 54:6, 58:20, 59:11, 66:8, 67:6, 67:19, 71:7, 72:4, 77:21, 94:13, 96:18, 98:2, 99:12, 100:24, 102:2, 103:7, 120:5, 130:20, 135:22, 141:25, 143:21,

144:16, 149:13, 150:15, 151:25, 156:7, 162:18, 195:21, 201:10, 204:15, 208:16, 208:17
parties [2] - 216:9, 219:20
parties' [1] - 216:10
partly [1] - 67:6
parts [3] - 114:14, 114:18, 202:14
party [1] - 219:20
passenger [40] - 6:7, 7:2, 12:20, 13:4, 13:6, 13:8, 20:14, 28:14, 36:25, 38:18, 43:5, 43:12, 43:13, 47:24, 48:2, 51:3, 82:24, 103:24, 112:1, 112:10, 114:21, 117:2, 117:7, 120:23, 122:3, 123:8, 126:1, 127:12, 128:15, 131:11, 136:25, 137:6, 137:10, 153:23, 160:12, 164:11, 164:14, 168:6, 203:10, 207:16
Passenger [1] - 125:25
passengers [25] - 70:10, 71:5, 72:2, 72:8, 72:10, 99:7, 99:11, 99:23, 100:3, 100:7, 100:22, 101:16, 102:20, 104:10, 105:21, 107:9, 117:16, 123:23, 149:16, 156:23, 159:11, 163:1, 201:2, 201:10, 205:5
patella [2] - 50:12, 50:15
pathway [1] - 197:21
patience [2] - 119:5, 215:18
patient [1] - 109:5
Patient [1] - 26:14
Paul [3] - 6:10, 6:12, 6:13
pavement [2] - 121:11, 123:9
pay [2] - 95:10, 95:11
paying [1] - 150:1
people [48] - 9:2, 9:5, 10:9, 10:14, 37:9,

38:15, 75:19, 92:10, 96:7, 96:11, 96:14, 96:17, 96:22, 100:9, 105:14, 107:22, 110:12, 144:19, 144:23, 145:3, 145:4, 145:9, 145:12, 145:15, 145:19, 145:25, 146:2, 146:17, 147:7, 148:23, 149:12, 149:23, 150:1, 150:20, 151:18, 151:21, 151:22, 152:16, 154:22, 155:2, 155:9, 155:22, 156:13, 156:22, 159:4, 159:6, 200:24, 207:2
per [3] - 188:7, 188:9, 190:14
perceivable [1] - 91:23
perceived [1] - 92:6
percent [5] - 15:16, 68:24, 70:5, 75:18, 96:11
period [10] - 110:25, 111:1, 111:4, 117:24, 119:15, 143:23, 145:13, 147:11, 187:2, 204:19
person [16] - 6:23, 7:5, 8:4, 10:22, 43:4, 43:8, 63:24, 64:17, 64:18, 94:5, 102:13, 102:16, 109:2, 150:9, 209:4
personal [7] - 17:13, 17:18, 126:24, 127:5, 168:15, 190:3, 190:11
personally [1] - 154:3
personnel [6] - 7:18, 56:12, 60:15, 63:16, 73:5, 167:10
pertinent [1] - 202:14
photograph [50] - 52:21, 54:19, 56:9, 56:14, 56:17, 56:23, 58:9, 59:1, 60:15, 63:17, 65:3, 65:14, 65:16, 65:24, 66:2, 67:18, 67:25, 68:2, 68:4, 68:5, 69:3, 69:25, 73:7, 73:9, 74:20, 74:22, 76:5, 77:2, 77:3, 77:4,

77:7, 77:9, 77:19, 99:10, 103:2, 124:16, 124:17, 142:11, 142:14, 181:19, 181:23, 181:24, 182:1, 190:19, 192:23, 193:1, 193:6, 197:12, 197:15
Photograph [1] - 2:19
photographed [2] - 56:12, 64:8
Photographs [2] - 2:19, 2:22
photographs [82] - 47:19, 50:3, 51:7, 51:11, 51:14, 51:24, 51:25, 52:5, 52:6, 52:7, 52:13, 52:16, 53:4, 53:6, 53:22, 55:25, 56:3, 63:25, 64:15, 76:23, 79:4, 89:13, 124:11, 124:15, 124:21, 125:2, 128:9, 128:13, 133:25, 134:5, 134:6, 134:7, 134:18, 134:20, 135:5, 136:22, 137:20, 137:23, 137:25, 138:1, 138:7, 138:10, 138:19, 140:7, 140:9, 140:15, 140:17, 140:19, 142:5, 142:9, 163:21, 164:3, 168:16, 169:15, 189:3, 192:10, 192:12, 193:14, 194:21, 195:10, 195:21, 196:13, 196:19, 196:25, 197:2, 197:4, 197:7, 197:10, 199:7, 211:8, 211:12, 211:14, 211:17, 211:18, 212:7, 213:1, 213:5, 213:6, 214:1, 214:10
photos [3] - 136:11, 140:22, 199:12
physical [1] - 4:9
pick [5] - 86:9, 86:11, 86:13, 86:18, 89:8
picked [1] - 186:25
picking [1] - 191:24
picture [5] - 59:3, 65:9, 98:19, 98:22, 170:6

pictures [6] - 60:20, 62:14, 63:7, 198:18, 199:3
piece [2] - 76:16, 89:5
pinpoint [1] - 136:10
PL8 [2] - 199:1, 199:5
PL9 [2] - 199:1, 199:5
place [17] - 31:25, 79:21, 97:12, 99:9, 106:5, 107:8, 107:21, 107:24, 107:25, 108:24, 115:11, 118:1, 150:14, 152:2, 152:21, 159:13
placed [15] - 47:20, 58:13, 93:1, 100:2, 107:18, 109:20, 110:4, 160:17, 160:25, 161:22, 161:23, 184:8, 190:6, 190:8, 190:14
placement [3] - 109:19, 183:19, 183:24
plaintiff [2] - 3:12, 91:4
Plaintiff [1] - 1:6
PLAINTIFF [1] - 2:2
plaintiff's [4] - 73:23, 90:11, 91:20, 117:25
PLAINTIFF'S [1] - 2:16
Plaintiff's [12] - 12:1, 21:6, 34:1, 51:20, 56:8, 77:12, 84:23, 90:7, 112:22, 176:23, 204:10, 212:19
plans [1] - 190:1
plateau [1] - 105:7
plateaus [2] - 54:20, 54:23
point [13] - 4:24, 29:13, 34:11, 37:13, 103:19, 105:1, 108:9, 108:20, 158:13, 171:17, 172:10, 184:19, 192:9
pointed [6] - 52:22, 173:17, 177:21, 185:24, 191:19, 192:2
pointing [11] - 89:1, 173:18, 175:22, 178:11, 192:14, 193:12, 193:16, 194:19, 196:1, 196:2, 196:5

policies [11] - 81:6, 81:9, 82:7, 84:21, 87:3, 88:12, 127:1, 150:13, 168:5, 190:2, 210:15

policy [32] - 50:25, 79:19, 81:15, 83:5, 83:8, 83:11, 83:12, 83:14, 83:18, 84:7, 84:20, 85:3, 85:6, 85:13, 86:20, 86:25, 87:16, 87:23, 88:4, 88:6, 88:11, 88:14, 88:17, 88:21, 127:9, 152:1, 188:1, 188:7, 188:9, 188:12, 190:14, 209:23

Policy [1] - 2:20

popular [3] - 71:21, 71:24, 71:25

portion [4] - 57:15, 65:21, 135:2, 137:17

position [14] - 17:21, 91:21, 92:20, 95:21, 102:20, 110:3, 117:1, 117:5, 117:6, 126:3, 144:22, 175:6, 175:15, 176:18

positioned [1] - 189:25

positive [1] - 59:8

possible [2] - 82:3, 116:9

possibly [3] - 79:10, 185:17, 212:11

post [1] - 92:8

posted [7] - 91:11, 91:14, 105:6, 107:11, 108:5, 186:2, 189:16

potential [2] - 82:8, 108:3

potentially [1] - 119:23

power [1] - 109:5

practicing [1] - 5:16

precaution [4] - 100:1, 100:5, 100:8, 100:19

preceding [1] - 117:24

precise [5] - 104:11, 107:11, 166:23, 188:20, 188:24

precisely [1] - 103:25

preclude [1] - 195:19

predominantly [2] - 154:21, 155:2

prefer [1] - 213:10

preparation [13] - 8:18, 11:19, 12:7,

13:5, 19:19, 51:15, 55:25, 79:1, 82:9, 91:1, 117:14, 167:14, 167:15

prepare [4] - 7:12, 7:13, 38:18, 113:1

prepared [3] - 38:15, 39:3, 47:18

prepares [1] - 38:14

PRESENT [1] - 2:9

preserve [1] - 169:2

preserved [4] - 168:17, 168:21, 169:6, 169:10

pretty [6] - 44:15, 70:3, 98:17, 160:13, 194:17, 203:12

prevent [6] - 66:14, 66:15, 149:25, 153:22, 195:19

prevented [1] - 163:3

previous [1] - 170:25

pride [1] - 85:25

priors [7] - 110:18, 110:20, 113:21, 120:11, 206:22, 208:4

privilege [6] - 158:1, 211:3, 211:4, 211:7, 213:22, 214:10

problem [6] - 111:13, 113:6, 113:12, 156:9, 156:17, 184:14

procedure [7] - 36:5, 51:1, 79:21, 84:7, 152:2, 152:20, 188:2

procedures [14] - 8:25, 9:1, 9:5, 9:9, 86:22, 87:3, 88:12, 127:1, 150:14, 153:7, 168:5, 168:9, 190:3, 210:15

proceed [2] - 117:11, 219:19

process [3] - 88:21, 89:3, 126:24

produce [4] - 115:13, 115:23, 116:8, 165:8

produced [35] - 34:17, 51:13, 52:1, 74:21, 77:4, 79:4, 82:13, 87:20, 110:19, 111:19, 112:7, 113:22, 115:14, 116:16, 118:9, 120:12, 128:17, 130:22, 154:21, 156:1, 179:17, 185:15, 185:22,

192:25, 193:10, 197:15, 203:1, 204:3, 204:14, 208:17, 211:18, 212:25, 213:16, 213:24, 214:11

production [1] - 128:20

Professional [3] - 1:20, 216:5, 216:15

professional [1] - 158:6

professionalism [1] - 213:25

program [2] - 45:7, 47:1

prohibited [3] - 188:1, 188:5, 188:14

prolong [2] - 45:1, 204:4

pronounce [1] - 8:6

properly [4] - 8:6, 99:24, 138:23, 192:5

protected [2] - 117:3, 123:4

provide [5] - 101:15, 104:10, 128:5, 200:17, 210:5

provided [20] - 10:22, 11:4, 12:17, 36:23, 37:3, 39:3, 43:13, 45:24, 53:24, 84:5, 84:6, 110:24, 114:21, 114:23, 115:1, 117:8, 117:22, 118:2, 120:13, 123:11

PROVIDES [1] - 220:2

providing [1] - 6:22

Public [3] - 1:20, 217:16, 218:20

public [9] - 9:16, 9:17, 9:24, 10:2, 10:5, 10:8, 52:24, 85:19, 144:10

pubs [1] - 144:2

pull [5] - 34:12, 160:23, 194:2, 194:23, 195:11

pulled [3] - 46:24, 46:25, 113:20

pulling [2] - 46:18, 198:2

punches [1] - 115:3

purpose [9] - 9:4, 9:7, 75:4, 78:20, 93:16, 94:19, 94:20, 101:8, 173:14

purposes [6] - 177:3, 180:4, 180:11,

180:13, 180:18, 180:19

pursuant [3] - 1:21, 3:25, 190:1

put [17] - 20:16, 28:3, 31:12, 31:15, 32:4, 32:5, 32:6, 47:3, 53:18, 80:23, 97:12, 101:21, 110:1, 114:20, 137:12, 192:14, 207:19

putting [3] - 20:6, 43:9, 147:3

## Q

questioned [1] - 210:4

questioning [2] - 63:5, 80:12

questions [16] - 11:3, 11:5, 11:15, 34:11, 90:18, 109:18, 109:21, 116:22, 158:7, 158:10, 158:11, 158:19, 176:19, 196:9, 200:21, 211:2

QUESTIONS [1] - 2:24

quick [2] - 55:14, 185:5

quite [14] - 37:9, 48:19, 65:25, 68:23, 78:23, 93:24, 101:10, 102:18, 110:19, 119:22, 126:21, 169:11, 172:21, 213:9

quote [3] - 29:4, 49:5, 59:16

quote-unquote [1] - 49:5

quoting [1] - 82:21

## R

raining [1] - 94:11

raised [1] - 65:20

ramp [9] - 64:18, 93:3, 93:4, 97:24, 99:2, 102:13, 139:20, 139:22, 139:24

rare [1] - 79:11

rarely [2] - 78:14, 78:18

rather [1] - 113:7

ray [1] - 50:9

rayed [1] - 50:6

RCCL [1] - 219:10

RE [1] - 219:10

reached [1] - 11:14

read [44] - 4:12, 10:12, 18:23, 19:18, 26:2, 30:10, 32:5, 32:14, 33:21, 37:5, 39:10, 39:14, 39:16, 39:18, 40:8, 40:10, 40:13, 40:14, 40:16, 40:19, 40:21, 44:22, 46:17, 46:19, 46:22, 50:20, 73:20, 116:2, 116:5, 118:22, 130:24, 132:16, 134:2, 151:11, 151:15, 158:24, 161:7, 202:6, 202:8, 202:13, 215:21, 218:6, 220:20

readily [1] - 91:23

reading [5] - 19:11, 21:13, 23:10, 46:16, 219:18

real [2] - 52:25, 185:5

realize [3] - 120:12, 196:12, 213:21

really [19] - 33:13, 48:24, 49:2, 49:9, 52:23, 79:16, 122:24, 125:1, 125:12, 149:8, 150:6, 152:4, 186:10, 186:23, 190:10, 190:11, 195:7, 198:1, 214:3

reask [1] - 175:3

reason [10] - 13:12, 13:14, 66:6, 66:7, 66:12, 67:5, 148:24, 152:1, 208:4, 214:23

REASON [1] - 220:6

reasonable [35] - 91:5, 91:7, 91:17, 92:12, 92:15, 94:24, 95:1, 95:3, 95:6, 95:8, 95:15, 95:18, 95:19, 95:21, 96:1, 96:3, 96:12, 99:25, 100:8, 101:5, 104:7, 105:4, 105:15, 105:20, 107:5, 107:20, 107:24, 110:3, 125:9, 126:4, 126:20, 127:13, 146:18, 150:2, 150:10

reasons [2] - 96:23, 220:4

recess [4] - 55:20, 113:15, 154:16, 185:9



Jeannie Reporting
Your Wish Is Our Job!

www.jeanniereporting.com
305-577-1705

**recognize** [6] - 34:5, 54:7, 54:8, 67:24, 90:15, 181:24
**recollection** [1] - 160:8
**record** [32] - 3:10, 11:24, 24:7, 26:9, 42:14, 55:19, 55:22, 73:21, 108:17, 113:14, 113:17, 114:2, 114:15, 114:20, 115:7, 130:24, 132:16, 140:11, 154:11, 154:15, 154:18, 157:16, 157:18, 157:25, 176:3, 185:8, 185:11, 185:13, 202:7, 214:16, 215:23, 216:7
**Record** [1] - 219:24
**recorded** [3] - 33:14, 39:6, 48:5
**recording** [4] - 175:8, 179:9, 186:11, 187:4
**records** [13] - 26:25, 28:14, 29:16, 29:20, 30:18, 43:23, 43:24, 44:6, 50:21, 110:17, 122:23, 140:3
**red** [2] - 186:19, 186:20
**refer** [3] - 45:7, 83:23, 98:5
**reference** [13] - 12:20, 30:22, 41:23, 43:18, 43:20, 83:5, 83:15, 85:2, 98:13, 98:18, 138:12, 146:10, 219:12
**referenced** [4] - 29:3, 38:11, 88:14, 169:1
**references** [5] - 85:20, 144:14, 155:20, 156:1, 156:4
**referencing** [1] - 45:11
**referred** [11] - 24:19, 24:20, 27:10, 31:16, 37:16, 89:13, 136:7, 192:24, 193:6, 193:10, 195:22
**referring** [36] - 21:4, 31:18, 40:1, 43:5, 43:24, 45:18, 46:11, 46:15, 57:15, 58:4, 65:1, 81:16, 81:17, 85:16, 97:3, 97:7, 98:12, 106:21, 107:8, 129:23,

136:15, 160:8, 169:9, 169:20, 170:12, 173:25, 174:12, 177:13, 182:9, 182:20, 186:6, 188:12, 192:21, 194:12, 194:16, 199:25
**refrain** [1] - 151:4
**refreshes** [1] - 160:7
**regarding** [1] - 81:11
**regards** [1] - 11:3
**regular** [2] - 38:7, 94:15
**reiterate** [2] - 16:7, 145:23
**related** [6] - 6:7, 7:2, 7:4, 7:7, 11:15, 33:2
**relation** [3] - 7:2, 169:7, 207:25
**relative** [2] - 216:9, 216:9
**relayed** [1] - 166:19
**relook** [1] - 163:18
**remain** [1] - 158:6
**remark** [1] - 46:7
**remarks** [9] - 27:11, 29:2, 30:23, 44:20, 46:21, 47:5, 59:23, 164:24, 172:14
**remedied** [2] - 81:14, 152:17
**remedy** [1] - 152:10
**remember** [5] - 27:14, 27:15, 79:12, 82:22, 215:7
**Remote** [1] - 1:11
**remotely** [2] - 119:5, 217:8
**removed** [2] - 58:10, 58:15
**repeat** [1] - 127:15
**repeatedly** [3] - 109:4, 109:8, 110:2
**replaced** [2] - 58:10, 58:16
**replicate** [1] - 206:18
**report** [41] - 6:8, 6:10, 18:9, 19:16, 19:22, 20:3, 20:6, 23:5, 23:8, 25:13, 25:17, 27:18, 36:20, 36:22, 37:6, 46:19, 47:5, 47:18, 47:21, 49:24, 75:17, 79:1, 79:13, 116:2, 124:2, 126:8, 126:11, 126:19, 127:25, 135:14, 139:15, 143:25, 160:6, 166:16,

203:10, 205:8, 207:13, 207:18, 208:11, 208:12, 216:5
**reported** [67] - 18:4, 18:5, 18:7, 18:13, 19:5, 21:16, 22:15, 23:16, 23:23, 24:2, 24:15, 25:24, 26:8, 27:24, 27:25, 28:11, 28:23, 29:24, 30:24, 31:14, 31:20, 45:14, 46:7, 51:2, 54:10, 59:12, 59:23, 60:16, 62:6, 63:14, 63:18, 112:11, 112:16, 112:17, 117:16, 119:18, 119:21, 119:24, 121:23, 121:25, 122:1, 122:3, 123:24, 124:6, 125:22, 126:2, 129:6, 129:12, 129:13, 130:4, 130:8, 139:16, 139:18, 139:20, 142:2, 159:12, 165:1, 165:4, 165:5, 200:24, 202:22, 203:15, 205:15, 206:5, 207:6, 210:9, 210:14
**reporter** [3] - 151:10, 157:19, 184:21
**REPORTER** [1] - 216:1
**Reporter** [6] - 1:20, 157:17, 158:22, 215:20, 216:5, 216:15
**reporting** [7] - 44:6, 49:19, 131:12, 132:1, 156:24, 164:12, 164:14
**reports** [8] - 36:6, 36:11, 37:1, 51:3, 78:9, 121:24, 126:16, 208:5
**represent** [2] - 111:7, 213:5
**representative** [4] - 3:5, 4:19, 6:6, 154:1
**REPRESENTATIVE** [1] - 1:16
**represented** [1] - 114:22
**request** [3] - 20:17, 115:9, 116:13
**requested** [1] - 216:6

**requesting** [1] - 116:12
**require** [2] - 105:19, 168:15
**required** [1] - 115:18
**requirement** [1] - 190:1
**reread** [2] - 83:16, 158:22
**reserve** [1] - 115:15
**respect** [3] - 157:24, 201:10, 211:3
**respond** [2] - 115:6, 116:24
**response** [4] - 49:19, 79:5, 117:21, 129:3
**responses** [3] - 7:16, 9:24, 11:21
**responsibilities** [1] - 85:8
**responsibility** [2] - 145:1, 146:12
**responsible** [6] - 9:9, 9:12, 82:19, 85:23, 88:22, 89:1
**rest** [3] - 24:5, 24:6, 161:7
**restaurant** [2] - 16:4, 16:9
**restaurants** [1] - 85:19
**restroom** [2] - 55:15, 185:5
**result** [8] - 36:12, 122:9, 122:10, 138:13, 146:3, 150:21, 156:22, 157:2
**resulted** [1] - 124:5
**RETAINED** [1] - 2:20
**revenue** [1] - 215:13
**review** [14] - 13:8, 51:14, 55:24, 78:25, 110:17, 113:25, 114:25, 116:21, 118:3, 124:1, 165:19, 167:16, 208:18, 216:6
**reviewed** [17] - 7:14, 7:15, 9:11, 9:23, 9:24, 11:20, 12:6, 12:13, 12:19, 13:4, 13:6, 56:3, 79:3, 82:9, 90:25, 118:3, 122:22
**reviewing** [5] - 13:13, 126:11, 136:22, 140:17, 140:22
**right-hand** [1] - 194:21
**risk** [2] - 6:16, 6:19

**Riskonnect** [6] - 140:14, 147:16, 166:14, 207:19, 207:23, 208:3
**road** [1] - 109:4
**ROBINSON** [2] - 2:6, 219:6
**rocking** [1] - 209:8
**role** [1] - 5:25
**roll** [1] - 115:2
**roommate** [1] - 24:25
**root** [1] - 127:6
**rough** [2] - 208:21, 208:22
**route** [1] - 114:18
**ROYAL** [2] - 1:8, 1:16
**Royal** [198] - 3:3, 3:6, 3:14, 4:16, 4:20, 5:19, 5:25, 6:23, 7:6, 8:15, 17:20, 17:23, 20:12, 20:22, 20:25, 21:14, 28:16, 28:25, 29:8, 32:1, 36:5, 36:7, 38:8, 39:4, 43:24, 44:3, 47:8, 47:12, 48:9, 48:16, 48:18, 49:10, 49:13, 51:17, 52:7, 52:14, 52:17, 53:3, 53:8, 53:23, 53:24, 56:4, 56:12, 56:15, 58:10, 58:13, 58:16, 60:14, 62:15, 63:8, 63:15, 64:8, 65:14, 73:5, 73:10, 73:11, 76:1, 76:18, 77:4, 77:9, 77:24, 78:14, 79:19, 79:20, 80:2, 80:25, 81:6, 81:12, 82:6, 83:8, 84:4, 84:9, 84:21, 85:6, 86:21, 87:2, 87:12, 87:23, 88:9, 88:11, 89:13, 90:11, 90:18, 91:9, 91:21, 91:25, 92:3, 92:4, 92:8, 92:20, 92:21, 92:25, 93:4, 93:8, 93:12, 93:23, 94:23, 95:7, 95:17, 95:20, 96:13, 96:16, 97:4, 97:8, 99:5, 99:13, 99:18, 99:22, 100:2, 100:6, 100:11, 101:14, 101:21, 101:24, 102:19, 104:7, 105:4, 107:9, 107:18, 108:2, 110:2, 115:12, 124:24, 125:6,

126:1, 126:3, 126:25, 127:11, 136:23, 140:1, 144:15, 144:19, 144:22, 144:25, 145:6, 145:13, 145:18, 146:11, 146:16, 148:19, 148:22, 149:1, 149:11, 149:15, 149:19, 150:3, 150:13, 152:1, 152:25, 153:5, 153:8, 153:14, 153:19, 154:1, 154:8, 155:19, 156:2, 156:6, 156:11, 156:15, 156:18, 159:12, 165:7, 166:21, 167:8, 167:9, 167:16, 167:25, 168:5, 168:14, 169:2, 170:16, 171:6, 171:8, 171:13, 171:15, 174:20, 175:5, 175:14, 176:17, 179:17, 181:12, 183:19, 183:25, 185:16, 188:2, 190:2, 194:9, 196:15, 196:20, 204:3, 205:4, 209:6, 209:11, 209:23, 210:16

**RULE** [1] - 220:2

**ruler** [3] - 73:8, 73:10, 74:22

**rumblings** [1] - 154:4

**run** [3] - 35:4, 35:6, 201:12

**runs** [1] - 35:3

## S

**safety** [73] - 7:20, 11:8, 11:11, 11:12, 32:19, 32:24, 33:2, 33:3, 33:4, 33:7, 33:11, 33:16, 33:18, 34:15, 34:19, 35:1, 35:10, 35:13, 35:14, 35:22, 37:15, 37:16, 37:25, 38:7, 39:1, 41:7, 43:17, 43:23, 47:10, 47:17, 47:22, 48:1, 48:13, 53:17, 60:20, 63:24, 73:18, 74:11, 74:16, 75:8,

80:8, 85:7, 86:22, 91:6, 91:18, 92:12, 92:16, 94:16, 95:4, 125:9, 126:5, 126:20, 127:13, 144:15, 145:16, 146:19, 148:19, 150:11, 152:5, 153:23, 166:6, 167:12, 167:23, 171:21, 171:22, 172:25, 183:8, 183:14, 187:12, 190:12, 199:3, 199:13

**sailing** [1] - 215:14

**satisfaction** [1] - 86:3

**save** [5] - 170:3, 172:2, 172:11, 188:11

**saved** [12] - 165:11, 165:13, 165:20, 168:17, 170:1, 171:2, 173:10, 176:14, 176:16, 181:16, 188:13

**saw** [7] - 28:22, 48:13, 82:12, 155:9, 159:17, 159:20

**scene** [2] - 211:8, 211:13

**schedule** [8] - 9:18, 9:19, 9:25, 10:3, 10:4, 10:9, 72:20, 72:24

**schematic** [13] - 175:25, 176:2, 178:1, 178:15, 185:21, 186:9, 188:16, 194:2, 194:23, 195:11, 197:8, 198:2, 198:7

**schematics** [3] - 179:18, 179:22, 185:15

**School** [1] - 5:11

**SCHWARTZ** [1] - 2:2

**scope** [6] - 20:25, 38:8, 110:18, 146:21, 147:4, 184:4

**screen** [6] - 28:6, 52:20, 161:17, 179:12, 193:4, 199:5

**screenshotted** [1] - 118:25

**sea** [1] - 208:22

**seal** [1] - 217:10

**SeaPass** [2] - 24:9, 24:10

**search** [18] - 114:24,

115:22, 116:17, 117:23, 120:5, 130:12, 136:19, 141:12, 141:13, 141:17, 146:22, 147:21, 147:23, 162:16, 201:12, 203:13, 205:5, 205:23

**searched** [3] - 130:16, 141:22, 147:14

**SEAS** [24] - 13:7, 13:15, 15:23, 15:24, 16:15, 21:10, 38:2, 129:18, 130:1, 130:9, 130:10, 131:15, 132:5, 133:20, 135:16, 139:12, 141:1, 141:2, 141:4, 142:17, 142:24, 143:25, 160:11, 208:1

**seas** [1] - 208:22

**sec** [1] - 211:25

**second** [21] - 12:10, 25:21, 58:7, 62:24, 64:24, 65:5, 65:13, 83:5, 84:12, 89:22, 94:3, 114:13, 121:24, 127:14, 145:6, 154:12, 170:6, 176:1, 194:6, 195:16, 197:6

**seconds** [1] - 23:4

**secretary** [1] - 38:16

**section** [1] - 161:24

**security** [9] - 10:23, 11:14, 63:16, 63:23, 172:16, 183:20, 184:2, 184:6, 199:22

**see** [100] - 12:8, 18:20, 18:22, 19:2, 21:22, 22:11, 23:3, 28:2, 34:14, 37:8, 38:11, 39:22, 46:1, 47:15, 47:17, 51:24, 54:19, 54:25, 56:9, 56:24, 56:25, 57:4, 64:14, 65:16, 65:22, 65:24, 66:1, 77:2, 77:5, 77:19, 77:22, 77:23, 80:15, 82:24, 84:13, 86:17, 87:5, 87:10, 87:20, 88:19, 91:15, 91:16, 102:14, 110:17, 111:13, 125:2, 127:24, 129:18, 129:23, 129:25, 134:4,

134:19, 135:4, 135:10, 135:11, 138:1, 145:7, 152:8, 160:12, 160:19, 161:8, 161:16, 161:17, 164:2, 165:17, 166:13, 167:2, 169:3, 171:22, 171:25, 173:1, 173:22, 174:5, 175:2, 175:3, 177:4, 179:1, 181:15, 181:20, 182:8, 183:9, 183:15, 186:3, 186:14, 191:20, 191:24, 193:7, 195:12, 198:12, 207:12, 207:22, 208:24, 209:1, 213:1, 213:2, 213:24, 214:14, 214:19

**seeing** [4] - 87:10, 152:6, 161:17, 192:3

**sees** [1] - 81:12

**send** [1] - 113:24

**sense** [4] - 105:15, 190:16, 192:4, 213:15

**senses** [4] - 91:24, 92:7, 99:24, 100:9

**sent** [4] - 9:14, 12:9, 60:14, 63:16

**separate** [4] - 6:17, 47:3, 220:3

**separated** [1] - 65:18

**September** [3] - 135:9, 135:15, 206:4

**sequentially** [1] - 77:8

**series** [1] - 51:24

**serious** [1] - 145:19

**serve** [1] - 6:5

**served** [3] - 72:13, 72:15, 90:18

**service** [9] - 19:16, 19:18, 19:20, 22:14, 44:19, 46:6, 46:19, 46:20, 47:5

**Services** [1] - 2:17

**services** [31] - 19:21, 20:5, 20:8, 20:11, 20:13, 20:15, 20:20, 20:24, 21:9, 23:1, 23:17, 24:3, 24:5, 24:15, 25:23, 26:1, 26:20, 27:3, 27:9, 27:11, 28:2, 29:3, 30:3, 44:25, 45:7, 45:12, 45:23, 45:25,

46:3, 47:4, 204:18

**set** [1] - 218:9

**seven** [9] - 51:25, 52:6, 52:20, 53:5, 53:7, 202:4, 211:12, 211:20, 214:7

**several** [3] - 116:16, 192:24, 193:6

**severe** [1] - 42:8

**severity** [1] - 205:20

**SGSO** [1] - 25:2

**shaky** [1] - 47:15

**shall** [3] - 219:18, 219:19, 220:3

**SHEET** [1] - 220:1

**shell** [5] - 14:7, 14:10, 15:1, 16:19, 141:9

**ship** [58] - 7:17, 7:25, 8:25, 10:14, 13:16, 33:1, 33:12, 36:7, 37:17, 43:17, 67:6, 69:10, 69:18, 71:22, 72:1, 78:9, 78:25, 79:1, 81:22, 86:2, 86:12, 88:23, 88:24, 89:14, 89:20, 117:18, 120:18, 130:11, 132:6, 133:10, 141:5, 141:9, 143:21, 144:16, 147:12, 149:14, 149:20, 152:7, 152:15, 156:8, 156:25, 159:18, 159:21, 161:25, 164:1, 164:6, 164:7, 190:12, 199:21, 200:13, 201:1, 201:13, 204:15, 209:9, 209:19, 215:4, 215:6

**ship's** [1] - 85:24

**shipboard** [6] - 32:19, 32:24, 34:15, 34:19, 37:25, 38:25

**Shipboard** [2] - 2:18, 34:6

**ships** [34] - 13:9, 13:18, 14:2, 14:16, 14:20, 14:23, 15:1, 16:12, 16:16, 16:20, 72:16, 84:9, 117:19, 117:24, 117:25, 119:15, 120:7, 120:9, 120:19, 130:13, 130:17, 141:16, 145:12, 146:9, 147:11, 149:14, 150:15,

152:3, 152:13, 153:8, 156:8, 159:22, 183:19, 201:1
**shoe** [1] - 140:5
**shoes** [1] - 124:22
**shore** [4] - 152:11, 152:12, 152:14, 152:18
**short** [4] - 55:20, 113:15, 154:16, 185:9
**SHORTHAND** [1] - 216:1
**shoulder** [2] - 135:17, 135:19
**show** [37] - 11:24, 21:3, 33:24, 45:17, 46:10, 51:18, 56:7, 67:16, 84:18, 103:11, 112:20, 129:22, 134:7, 140:18, 140:19, 140:20, 160:5, 160:6, 165:15, 167:9, 167:17, 169:3, 169:14, 171:9, 176:21, 178:14, 181:19, 192:10, 194:3, 195:16, 197:7, 197:9, 204:2, 212:16, 213:20
**showed** [2] - 187:23, 191:7
**showing** [11] - 62:11, 64:17, 64:18, 85:13, 97:23, 104:21, 105:13, 105:17, 172:3, 177:10, 192:12
**shows** [10] - 64:20, 93:2, 102:6, 104:4, 104:5, 105:2, 134:17, 170:7, 197:13, 197:16
**side** [24] - 57:16, 57:18, 70:15, 70:23, 70:24, 135:19, 152:11, 152:12, 152:14, 152:18, 174:5, 176:7, 192:13, 193:14, 194:15, 194:20, 194:21, 196:13, 196:14, 197:2, 197:22, 198:16, 198:19, 198:22
**sides** [2] - 194:18, 198:23

**Siebel** [20] - 30:11, 30:17, 31:4, 31:13, 31:16, 32:4, 44:14, 44:15, 44:17, 44:19, 44:21, 45:1, 45:8, 45:13, 45:24, 46:2, 46:7, 47:2, 59:22, 60:3
**sign** [57] - 37:4, 37:6, 37:10, 64:15, 64:19, 68:5, 75:20, 91:11, 91:14, 91:17, 92:9, 92:15, 93:1, 94:4, 95:2, 97:2, 97:7, 97:11, 97:14, 97:18, 98:2, 98:12, 99:8, 100:1, 100:2, 100:5, 100:13, 100:22, 101:9, 101:25, 102:6, 102:9, 102:11, 102:15, 102:21, 103:3, 103:7, 103:11, 103:15, 103:23, 104:5, 105:4, 105:6, 106:20, 107:4, 107:8, 107:19, 107:21, 108:5, 110:1, 163:9, 164:20, 164:22, 169:13, 170:8, 195:22
**signage** [4] - 107:10, 109:18, 109:19, 109:20
**signature** [1] - 219:14
**signed** [1] - 90:21
**signing** [1] - 219:19
**signs** [5] - 75:16, 104:19, 105:17, 105:19, 162:2
**silver** [2] - 76:16, 76:24
**similar** [11] - 14:19, 16:12, 117:19, 120:6, 120:8, 120:18, 129:5, 129:9, 130:12, 141:15, 148:10
**similarly** [1] - 132:1
**simple** [1] - 40:18
**Sincerely** [1] - 219:21
**single** [1] - 124:1
**sister** [16] - 14:20, 14:23, 14:25, 16:12, 16:16, 117:19, 120:6, 120:19, 130:13, 130:17, 141:4, 141:15, 146:9, 149:14,

156:8, 201:1
**sit** [7] - 17:3, 75:23, 76:4, 86:19, 146:21, 148:5, 209:6
**sitting** [2] - 62:16, 153:25
**six** [3] - 51:25, 202:3, 211:20
**size** [2] - 114:18, 214:2
**skid** [1] - 67:11
**skidding** [1] - 66:14
**slip** [24] - 29:21, 30:24, 41:5, 43:21, 43:22, 43:25, 44:4, 44:10, 66:15, 77:25, 78:15, 81:21, 82:25, 88:25, 120:17, 133:19, 134:23, 135:1, 138:15, 139:1, 139:16, 151:23, 201:18
**slipped** [12] - 30:20, 43:19, 117:17, 131:1, 133:24, 135:16, 135:18, 136:5, 139:4, 150:21, 155:9, 202:15
**slipping** [2] - 66:14
**slips** [1] - 155:12
**slope** [28] - 61:9, 65:9, 67:7, 89:15, 98:23, 105:23, 144:14, 145:4, 145:24, 146:11, 146:17, 148:25, 150:22, 151:19, 154:22, 155:3, 155:21, 156:2, 156:7, 156:14, 156:23, 157:2, 159:5, 159:7, 163:3, 164:2, 164:12, 164:15
**slopes** [1] - 64:10
**sloping** [12] - 89:12, 131:5, 131:12, 132:2, 135:2, 137:17, 159:14, 161:1, 161:6, 161:23, 162:21, 162:25
**slow** [1] - 27:4
**slower** [1] - 26:24
**small** [12] - 10:12, 33:21, 39:16, 50:11, 50:13, 96:10, 161:3, 178:2, 208:25, 214:24, 214:25
**smaller** [1] - 161:19

**Smith** [1] - 39:6
**snapshot** [1] - 163:21
**so..** [1] - 27:1
**sole** [1] - 140:4
**someone** [21] - 23:16, 29:24, 30:4, 32:6, 32:7, 36:6, 36:10, 37:1, 39:3, 51:2, 76:18, 78:9, 78:10, 88:25, 137:13, 144:14, 153:5, 156:17, 159:19, 183:20, 195:20
**sometimes** [5] - 33:8, 35:17, 35:19, 186:23
**somewhat** [1] - 137:22
**somewhere** [2] - 4:25
**soon** [1] - 116:9
**sorry** [34] - 20:2, 21:11, 21:20, 22:10, 25:20, 26:23, 35:25, 43:7, 47:15, 49:13, 55:2, 55:12, 59:19, 60:11, 61:21, 62:1, 62:2, 69:5, 74:8, 82:15, 113:11, 123:21, 124:20, 127:14, 131:22, 149:10, 158:23, 162:5, 172:8, 192:4, 201:22, 202:18
**sort** [3] - 57:6, 76:20, 102:13
**sounds** [1] - 197:10
**source** [1] - 30:14
**SOUTHERN** [1] - 1:2
**spaces** [1] - 85:19
**speaking** [7] - 9:4, 11:8, 108:15, 108:24, 112:5, 151:5, 154:3
**specific** [34] - 9:2, 10:16, 26:24, 39:5, 41:17, 41:20, 53:1, 53:12, 62:12, 64:3, 85:18, 86:20, 86:25, 87:16, 87:21, 87:22, 87:24, 88:6, 96:13, 98:13, 101:15, 104:10, 121:18, 141:11, 144:4, 144:5, 144:8, 147:22, 148:4, 189:7, 189:11, 193:12, 196:21
**specifically** [17] - 10:15, 15:14, 16:2, 53:19, 53:20, 53:21, 71:2, 84:8, 86:15,

136:16, 138:9, 155:11, 164:19, 174:2, 183:6, 196:11, 200:15
**specify** [1] - 10:9
**speckled** [3] - 57:5, 57:10, 65:19
**spill** [6] - 83:23, 85:9, 86:6, 86:15, 88:19, 89:7
**Spill** [21] - 2:20, 81:20, 82:18, 82:23, 83:6, 83:11, 83:14, 83:19, 84:12, 85:3, 85:13, 85:15, 85:18, 86:10, 86:15, 87:13, 88:10, 88:14, 88:17, 88:21, 89:4
**spills** [1] - 89:9
**spirit** [1] - 115:21
**split** [1] - 198:24
**spoken** [2] - 153:2, 187:18
**spreadsheet** [1] - 115:15
**SQM** [1] - 87:23
**SS** [2] - 216:3, 218:2
**staff** [10] - 11:10, 11:17, 36:23, 37:5, 37:11, 75:12, 75:14, 75:16, 75:21, 76:3
**staircase** [9] - 192:11, 193:15, 194:22, 195:14, 198:8, 198:13, 198:14, 199:8, 199:13
**stairs** [4] - 178:13, 203:4, 203:6, 208:8
**stance** [1] - 181:13
**stand** [1] - 52:4
**standard** [1] - 86:21
**starboard** [1] - 174:5
**staring** [1] - 191:19
**start** [3] - 93:22, 113:4, 206:25
**starting** [1] - 213:6
**starts** [3] - 105:2, 178:7, 207:9
**State** [3] - 1:21, 217:16, 218:20
**state** [7] - 3:9, 3:22, 24:7, 41:3, 115:7, 131:19, 205:11
**STATE** [2] - 216:2, 217:3
**statement** [34] - 6:15, 18:3, 18:21, 19:11, 19:13, 24:10, 28:15, 31:17, 43:3, 43:6, 43:8, 43:12, 47:20,

47:23, 47:24, 47:25, 48:3, 79:4, 114:17, 115:18, 122:6, 128:16, 130:21, 130:23, 131:2, 134:2, 136:25, 137:6, 160:8, 160:9, 160:12, 207:17, 210:2, 220:4
**statements** [17] - 12:20, 13:5, 13:7, 13:9, 48:5, 113:21, 114:22, 115:13, 116:5, 116:8, 116:13, 117:2, 117:7, 118:6, 159:17, 209:13, 210:19
**staterooms** [1] - 15:11
**states** [22] - 19:21, 25:1, 26:6, 28:8, 42:13, 42:16, 42:20, 73:22, 121:10, 123:8, 129:1, 131:8, 132:18, 132:20, 132:25, 133:2, 139:4, 139:6, 139:25, 160:15, 162:23, 166:17
**STATES** [1] - 1:1
**stating** [6] - 28:20, 66:1, 106:20, 107:4, 131:18, 137:19
**stationary** [3] - 200:4, 200:5, 200:8
**steering** [4] - 34:16, 34:20, 37:24, 38:1
**Steering** [2] - 2:18, 34:6
**stenographic** [1] - 216:7
**stenographically** [1] - 216:5
**step** [21] - 64:16, 91:16, 93:2, 97:7, 97:19, 97:20, 97:24, 98:3, 98:14, 100:23, 101:16, 101:25, 102:9, 102:12, 102:16, 102:17, 109:10, 133:1, 170:7, 195:23
**sticking** [1] - 27:2
**still** [9] - 27:5, 59:8, 75:20, 86:10, 89:7, 149:8, 176:19, 183:2, 212:9
**stop** [6] - 25:4, 108:14, 133:5, 149:25, 157:9,

157:11
**stopped** [2] - 116:14, 132:21
**stops** [1] - 105:19
**store** [1] - 106:9
**straight** [2] - 27:2, 30:14
**strategically** [3] - 189:25, 190:5, 190:7
**strike** [9] - 33:5, 50:4, 50:5, 58:24, 73:3, 110:13, 148:6, 170:17, 208:15
**strip** [20] - 56:24, 57:4, 57:12, 57:14, 57:16, 57:17, 57:18, 57:21, 58:1, 58:3, 58:5, 58:8, 61:11, 65:5, 65:18, 77:16, 140:8, 140:18, 194:11
**strips** [17] - 58:19, 58:20, 66:7, 66:13, 66:18, 67:6, 67:11, 140:20, 142:6, 142:12, 142:14, 161:23, 162:1, 163:7, 163:25, 164:20, 164:21
**structures** [1] - 107:6
**stuck** [3] - 140:5, 205:17, 206:6
**styled** [2] - 3:2, 219:13
**subject** [8] - 66:24, 91:22, 92:5, 117:18, 120:18, 130:5, 156:8, 200:25
**subscribed** [1] - 218:17
**subsequent** [2] - 33:12, 80:9
**substance** [3] - 66:19, 144:24, 220:2
**substantiating** [1] - 117:5
**subtle** [1] - 99:11
**suddenly** [4] - 131:5, 131:21, 148:25, 162:21
**sufficient** [1] - 99:10
**suggest** [2] - 54:14, 219:16
**suit** [1] - 146:7
**suitable** [1] - 219:17
**Suite** [2] - 2:7, 219:7
**summarize** [2] - 91:25, 153:21
**summary** [3] - 26:7, 202:15, 205:16
**supplemental** [1] - 90:1

**support** [1] - 91:7
**suppose** [1] - 67:3
**supposed** [4] - 10:10, 86:18, 168:16, 197:4
**surface** [28] - 41:13, 54:5, 54:7, 54:11, 54:18, 56:25, 57:4, 57:19, 58:2, 58:23, 59:3, 60:25, 61:1, 65:21, 67:8, 76:7, 98:15, 99:12, 100:12, 101:18, 104:12, 105:22, 105:23, 106:10, 108:4, 121:1, 126:3, 127:22
**surfaces** [1] - 56:19
**surroundings** [2] - 95:12, 150:2
**sustained** [2] - 189:12, 205:19
**sustaining** [1] - 131:13
**swaying** [1] - 209:9
**sworn** [3] - 3:18, 6:22, 217:9
**Sworn** [1] - 218:17
**Sylvia** [1] - 39:6
**system** [7] - 12:25, 120:1, 140:14, 147:10, 166:13, 166:14, 168:21
**systems** [1] - 44:6

## T

**Taiana** [5] - 3:3, 3:12, 4:1, 25:24, 206:22
**TAIANA** [2] - 1:5, 219:10
**talks** [1] - 85:8
**tape** [1] - 66:18
**tape-like** [1] - 66:18
**taped** [1] - 170:1
**Tavern** [4] - 131:2, 131:3, 162:7, 162:20
**team** [4] - 35:8, 63:16, 63:23, 63:24
**tear** [1] - 66:25
**technically** [4] - 58:14, 112:5, 120:11, 136:9
**tecum** [1] - 12:11
**telephone** [1] - 219:16
**television** [1] - 189:25
**ten** [6] - 52:5, 110:9, 202:4, 211:21, 212:9
**terms** [6] - 11:15, 16:24, 118:4, 137:21, 155:24,

156:16
**Terri** [1] - 24:25
**testified** [6] - 3:18, 110:8, 176:4, 179:15, 180:12, 185:16
**testify** [1] - 110:6
**testimony** [21] - 6:22, 8:19, 11:12, 21:14, 22:6, 27:14, 27:16, 31:8, 32:14, 53:3, 99:17, 165:8, 166:22, 170:11, 171:7, 171:11, 181:4, 185:19, 193:18, 194:9, 199:9
**THE** [233] - 2:2, 2:5, 3:2, 3:19, 12:23, 13:7, 13:15, 15:8, 15:23, 15:24, 16:15, 16:19, 17:9, 17:17, 18:13, 19:9, 21:10, 21:18, 22:18, 26:11, 28:19, 29:8, 29:19, 30:2, 31:2, 31:11, 31:24, 32:16, 34:23, 35:17, 35:25, 36:10, 38:1, 38:22, 42:19, 44:8, 45:19, 46:13, 46:15, 48:12, 49:23, 50:18, 54:3, 54:13, 54:22, 55:11, 55:16, 55:18, 55:21, 58:12, 59:6, 59:15, 60:2, 60:19, 61:3, 61:14, 62:1, 62:9, 63:3, 63:21, 64:14, 65:24, 66:21, 67:2, 67:10, 68:22, 69:16, 70:3, 70:17, 71:16, 72:7, 72:22, 74:13, 75:7, 76:12, 78:3, 79:9, 80:7, 81:19, 83:21, 84:1, 84:11, 86:24, 87:7, 87:19, 88:17, 89:17, 92:3, 92:25, 93:12, 93:19, 93:22, 95:10, 96:21, 97:22, 98:7, 98:17, 99:1, 99:18, 100:16, 101:1, 101:8, 101:20, 102:5, 102:24, 103:9, 103:20, 104:3, 104:15, 105:9, 106:1, 106:3, 106:13, 106:24, 107:14, 107:18, 109:22, 110:7, 110:23, 111:19,

112:15, 113:7, 113:10, 113:13, 113:16, 118:15, 121:4, 122:12, 122:20, 123:14, 124:20, 126:7, 129:1, 129:12, 129:18, 130:1, 130:9, 130:10, 130:15, 131:15, 132:5, 132:8, 133:8, 133:20, 134:11, 134:16, 135:4, 135:16, 136:2, 137:9, 138:15, 139:4, 139:12, 141:1, 141:2, 141:4, 141:19, 142:11, 142:17, 142:24, 143:2, 143:23, 143:25, 144:18, 145:22, 146:16, 147:2, 148:16, 149:18, 151:17, 152:24, 153:11, 153:13, 153:25, 154:13, 154:14, 154:17, 154:25, 155:8, 155:24, 156:11, 159:2, 159:16, 160:1, 160:11, 161:11, 162:10, 163:6, 164:5, 164:18, 166:12, 167:1, 168:11, 168:19, 171:11, 171:21, 172:21, 173:17, 174:16, 174:24, 175:11, 180:18, 181:8, 182:8, 182:23, 184:5, 185:7, 185:10, 188:4, 188:23, 189:6, 189:20, 190:5, 190:22, 191:3, 191:5, 191:15, 193:25, 194:15, 195:6, 195:25, 196:18, 197:19, 199:17, 202:12, 206:1, 208:1, 208:24, 210:8, 212:3, 215:12, 215:15, 215:22
**theater** [1] - 203:7
**them..** [1] - 220:4
**themselves** [4] - 105:16, 149:1, 150:8, 152:17



Jeannie Reporting
Your Wish Is Our Job!
www.jeanniereporting.com
305-577-1705

**thereby** [1] - 91:24
**Thereupon** [20] - 3:1, 3:15, 12:1, 21:6, 34:1, 51:20, 55:20, 77:12, 84:23, 90:7, 112:22, 113:15, 151:15, 154:16, 158:24, 176:23, 185:9, 204:10, 212:19, 215:24
**they've** [6] - 70:13, 70:14, 109:21, 109:22, 184:8, 214:11
**thinking** [2] - 62:2, 188:8
**third** [2] - 26:13, 74:22
**thousand** [1] - 111:2
**thousands** [1] - 145:8
**three** [52] - 51:24, 53:5, 74:23, 75:19, 77:3, 96:8, 107:16, 110:24, 111:1, 111:3, 114:14, 114:17, 117:24, 119:9, 119:15, 120:17, 130:16, 131:24, 132:11, 135:8, 137:25, 138:1, 139:10, 143:6, 143:23, 145:13, 146:24, 147:11, 147:15, 155:21, 155:24, 156:7, 156:13, 176:6, 176:8, 176:10, 177:15, 185:16, 185:22, 185:23, 186:5, 187:5, 198:16, 202:3, 204:18, 207:2, 208:4, 211:20, 211:25, 213:1
**three-page** [1] - 119:9
**three-year** [8] - 110:24, 111:1, 111:3, 117:24, 143:23, 145:13, 147:11, 204:18
**throughout** [4] - 14:9, 14:23, 104:17, 190:9
**tile** [2] - 57:5, 133:24
**tiled** [1] - 163:2
**tiny** [1] - 96:10
**title** [1] - 23:17
**titles** [4] - 9:2, 10:17, 10:18, 10:19
**TO** [1] - 219:5
**today** [18] - 11:20,

12:7, 12:8, 12:15, 13:5, 17:3, 25:4, 62:16, 73:20, 75:23, 86:19, 91:1, 146:21, 148:5, 153:25, 179:22, 183:3, 209:6
**today's** [6] - 7:12, 7:13, 17:22, 19:19, 55:25, 117:14
**together** [1] - 220:22
**ton** [1] - 184:23
**tone** [1] - 158:4
**took** [12] - 47:18, 47:19, 47:23, 60:20, 62:14, 63:6, 63:25, 74:16, 118:1, 197:2, 197:4, 219:20
**top** [11] - 38:13, 40:4, 40:22, 54:20, 59:2, 65:5, 82:18, 92:11, 105:6, 152:7, 185:23
**topic** [1] - 17:22
**topics** [2] - 179:20, 179:22
**total** [14] - 13:20, 52:5, 53:5, 120:3, 120:10, 120:14, 128:9, 142:16, 143:15, 201:23, 204:22, 211:12, 211:13, 214:9
**touch** [5] - 7:22, 8:14, 73:17, 75:8, 187:19
**toward** [2] - 61:11, 162:19
**towards** [16] - 18:1, 28:21, 30:20, 49:21, 106:16, 106:25, 112:12, 131:3, 162:6, 162:7, 162:20, 193:19, 193:21, 194:19, 199:4
**traffic** [2] - 69:13, 69:19
**transcribed** [1] - 219:14
**transcript** [6] - 216:6, 216:7, 218:7, 219:14, 219:20, 220:20
**traveling** [1] - 193:21
**traverse** [4] - 72:3, 72:9, 72:11, 100:9
**traversed** [1] - 96:8
**traversing** [6] - 91:18, 92:16, 93:5, 93:9, 95:16, 144:20
**travertine** [1] - 164:13
**trend** [1] - 152:8

**trends** [6] - 150:14, 152:2, 152:12, 152:21, 153:8, 153:21
**triangle** [1] - 188:17
**tried** [3] - 75:7, 172:24
**trip** [33] - 19:13, 24:15, 37:17, 41:5, 43:21, 44:4, 49:20, 78:15, 80:4, 81:21, 83:1, 83:9, 83:15, 83:17, 84:21, 86:25, 87:11, 88:25, 111:14, 120:18, 122:10, 130:5, 131:17, 131:22, 131:25, 139:2, 139:18, 140:6, 140:25, 142:18, 143:20, 164:15, 201:18
**tripped** [55] - 18:10, 19:6, 19:24, 22:16, 23:7, 27:12, 27:21, 28:1, 28:9, 28:17, 29:4, 29:16, 31:21, 42:16, 42:20, 45:14, 46:8, 48:10, 53:25, 54:10, 59:12, 59:21, 59:24, 60:6, 60:7, 60:16, 61:23, 62:6, 63:18, 78:9, 80:21, 112:3, 117:17, 120:24, 121:11, 123:8, 126:2, 131:2, 131:5, 131:12, 131:20, 131:22, 132:2, 132:25, 133:11, 139:22, 139:24, 142:2, 150:21, 155:13, 155:14, 162:22, 200:25, 205:18, 206:6
**tripping** [25] - 18:21, 78:11, 79:20, 79:23, 80:23, 80:25, 81:1, 81:4, 81:7, 81:9, 81:11, 81:12, 81:13, 82:2, 82:4, 82:8, 84:8, 84:22, 86:12, 86:21, 87:4, 87:5, 87:9, 87:17, 88:13
**trips** [7] - 43:25, 87:24, 88:7, 88:10, 111:16, 111:22, 131:25
**true** [13] - 45:5, 54:9, 60:25, 88:2, 88:8, 94:12, 94:14, 111:25, 127:4,

189:24, 216:7, 218:8, 220:23
**truth** [1] - 116:25
**try** [5] - 152:9, 203:23, 208:12, 211:22, 212:3
**trying** [21] - 16:6, 39:15, 45:6, 45:19, 45:20, 45:21, 46:4, 78:10, 90:13, 118:19, 131:6, 136:10, 149:10, 158:8, 178:21, 179:21, 197:20, 202:20, 204:4, 205:12, 206:13
**Tuesday** [1] - 1:12
**turn** [2] - 187:1, 187:3
**twenty** [1] - 185:3
**two** [37] - 47:2, 47:3, 51:24, 57:24, 74:23, 77:3, 110:20, 111:2, 111:11, 111:12, 124:21, 129:17, 130:2, 130:3, 131:9, 131:10, 135:8, 139:10, 140:24, 143:6, 143:14, 163:23, 185:22, 188:19, 193:23, 193:25, 195:12, 195:13, 197:21, 201:21, 202:3, 204:25, 211:20, 211:25, 213:1
**type** [3] - 40:9, 44:1, 164:13
**typed** [1] - 23:22
**types** [2] - 20:18, 44:5
**typically** [3] - 72:22, 80:14, 127:8

## U

**unable** [12] - 75:9, 78:24, 96:6, 114:23, 135:20, 136:24, 165:8, 167:11, 168:1, 171:25, 173:22, 187:19
**under** [15] - 20:20, 86:10, 94:24, 95:1, 96:1, 96:3, 97:22, 99:25, 119:23, 123:4, 146:18, 194:12, 198:12, 198:13, 219:13
**undergraduate** [1] - 5:9
**undersigned** [1] -

217:7
**understood** [2] - 161:21, 187:22
**undertake** [2] - 166:8, 201:1
**uneven** [8] - 41:13, 112:3, 121:11, 123:9, 126:2, 127:21, 128:23, 150:22
**Uneven** [1] - 129:3
**UNITED** [1] - 1:1
**University** [2] - 5:10, 5:11
**unless** [1] - 137:12
**unlevel** [1] - 67:7
**unleveled** [1] - 89:15
**unquote** [1] - 49:5
**unreasonable** [11] - 96:4, 96:5, 100:21, 101:14, 103:14, 104:9, 104:16, 104:22, 105:5, 107:7, 109:25
**unsure** [1] - 124:24
**unusual** [1] - 209:8
**up** [45] - 20:14, 28:6, 34:12, 46:18, 52:25, 65:10, 65:16, 76:15, 83:2, 86:9, 86:11, 86:13, 86:18, 89:2, 89:8, 93:21, 112:21, 130:17, 132:21, 133:4, 138:20, 139:20, 139:22, 139:24, 160:20, 160:23, 161:10, 177:16, 185:4, 185:23, 186:25, 189:10, 191:24, 192:14, 193:4, 194:2, 194:23, 195:11, 195:13, 198:2, 204:8, 211:1, 213:7, 214:4
**upward** [3] - 61:9, 64:10, 103:6
**upwards** [4] - 131:5, 131:13, 132:3, 162:21
**uses** [1] - 83:17

## V

**various** [4] - 34:25, 35:13, 117:4, 175:22
**Varsha** [2] - 24:19, 24:24
**verbalized** [2] - 140:2,



140:4
**versed** [2] - 168:8, 168:12
**version** [2] - 40:11, 161:19
**versus** [1] - 3:3
**vessel** [3] - 72:4, 130:13, 146:9
**vessels** [4] - 13:22, 152:22, 153:22, 156:12
**Via** [3] - 2:4, 2:8, 2:10
**VIA** [1] - 1:15
**via** [2] - 39:12, 116:17
**vicinity** [2] - 185:18, 186:12
**video** [72] - 3:4, 163:14, 165:8, 165:10, 165:12, 165:15, 165:16, 165:19, 165:20, 166:9, 166:13, 166:17, 166:24, 167:2, 167:5, 168:16, 168:23, 169:1, 169:3, 169:9, 169:22, 170:11, 170:18, 171:6, 171:7, 171:9, 171:16, 171:23, 171:25, 172:2, 172:3, 172:11, 172:12, 172:17, 173:1, 173:3, 173:8, 173:13, 174:21, 175:6, 179:9, 179:23, 180:23, 182:19, 185:17, 187:6, 187:25, 188:11, 188:13, 190:13, 190:16, 190:17, 190:20, 190:25, 191:3, 191:5, 191:6, 191:12, 191:18, 191:20, 191:23, 192:1, 193:9, 193:17, 194:7, 194:18, 195:17, 195:18, 195:25, 199:25
**Videoconference** [3] - 2:4, 2:8, 2:10
**VIDEOCONFERENC E** [1] - 1:15
**VIDEOGRAPHER** [10] - 3:2, 55:18, 55:21, 113:13, 113:16, 154:14, 154:17, 185:7, 185:10,

215:22
**Videographer** [1] - 2:10
**videos** [2] - 188:5, 188:7
**VIDEOTAPED** [1] - 1:15
**view** [10] - 67:21, 77:15, 165:23, 169:21, 181:5, 181:18, 182:15, 187:14, 191:21, 195:18
**viewed** [1] - 165:16
**viewing** [1] - 140:15
**virtue** [1] - 100:13
**Visual** [1] - 1:11
**voyager** [1] - 13:17
**Voyager** [6] - 13:19, 13:23, 14:1, 117:23, 119:14, 147:12
**VOYAGER** [14] - 13:24, 14:3, 129:18, 130:1, 130:8, 130:10, 131:15, 132:5, 160:11, 162:4, 163:4, 163:7, 163:9, 163:23
**VP** [1] - 6:13
**vs** [1] - 1:7

## W

**wait** [13] - 22:18, 31:7, 59:19, 62:21, 62:25, 93:17, 137:25, 172:7, 178:25
**waived** [1] - 219:19
**walk** [17] - 70:13, 70:14, 70:24, 70:25, 71:1, 71:3, 71:4, 96:6, 96:14, 106:10, 132:21, 133:4, 145:9, 145:10, 179:8, 179:10, 198:23
**walked** [1] - 30:19
**walking** [56] - 18:1, 18:14, 18:22, 28:21, 29:5, 30:20, 43:10, 49:21, 61:11, 64:18, 64:19, 68:19, 70:23, 71:6, 71:7, 91:12, 91:15, 95:5, 98:19, 98:23, 103:10, 105:22, 106:24, 107:6, 107:23, 112:2, 112:12, 112:17, 121:1,

131:3, 131:20, 132:20, 132:25, 133:4, 139:20, 139:22, 139:24, 148:23, 160:25, 161:2, 162:6, 162:19, 170:23, 174:6, 178:12, 179:12, 179:25, 180:2, 180:5, 180:9, 189:10, 195:4, 196:12, 198:25, 199:4, 199:10
**walkway** [45] - 17:5, 53:12, 53:19, 58:21, 65:2, 70:14, 70:15, 70:24, 70:25, 72:1, 72:9, 72:11, 94:1, 102:2, 124:22, 130:17, 130:23, 131:3, 131:4, 131:13, 131:21, 134:17, 135:2, 136:12, 136:19, 138:20, 138:21, 142:13, 149:13, 150:22, 159:14, 161:2, 161:6, 161:23, 162:7, 162:15, 162:21, 162:25, 178:12, 189:3, 189:4, 196:3, 196:6, 197:1, 197:21
**walkways** [1] - 195:13
**wants** [4] - 19:25, 20:3, 23:8, 220:3
**warn** [4] - 91:24, 94:20, 99:10, 100:7
**warned** [1] - 92:21
**warning** [8] - 93:16, 94:4, 94:19, 94:20, 94:22, 97:8, 100:11, 159:20
**warnings** [2] - 159:13, 159:22
**warns** [1] - 107:9
**wasting** [1] - 116:4
**watch** [18] - 64:16, 91:15, 93:2, 97:6, 97:18, 97:19, 97:20, 97:24, 98:3, 98:14, 100:22, 101:16, 101:25, 102:9, 102:12, 102:15, 170:7, 195:23
**watching** [1] - 102:17
**water** [2] - 85:20, 155:10
**ways** [5] - 68:18, 69:22, 193:23,

193:25, 198:24
**wear** [1] - 66:24
**weather** [5] - 208:16, 208:21, 208:22, 209:4, 209:7
**week** [1] - 117:4
**weeks** [9] - 129:17, 130:2, 130:3, 131:10, 131:24, 135:8, 139:10, 139:11
**West** [2] - 2:7, 219:7
**wet** [3] - 83:23, 133:24, 202:16
**whatsoever** [1] - 145:2
**whichever** [1] - 70:24
**white** [3] - 54:25, 57:20, 65:20
**whittled** [1] - 148:1
**whole** [3] - 82:23, 104:17, 202:13
**wide** [1] - 191:21
**willing** [2] - 86:1, 116:19
**witness** [15] - 3:17, 109:4, 109:7, 109:16, 109:18, 158:3, 158:9, 158:10, 158:12, 158:15, 210:1, 210:2, 220:3, 220:4
**WITNESS** [198] - 3:19, 12:23, 15:8, 16:19, 17:9, 17:17, 18:13, 19:9, 21:18, 22:18, 26:11, 28:19, 29:8, 29:19, 30:2, 31:2, 31:11, 31:24, 32:16, 34:23, 35:17, 35:25, 36:10, 38:22, 42:19, 44:8, 45:19, 46:13, 46:15, 48:12, 49:23, 50:18, 54:3, 54:13, 54:22, 55:11, 55:16, 58:12, 59:6, 59:15, 60:2, 60:19, 61:3, 61:14, 62:1, 62:9, 63:3, 63:21, 64:14, 65:24, 66:21, 67:2, 67:10, 68:22, 69:16, 70:3, 70:17, 71:16, 72:7, 72:22, 74:13, 75:7, 76:12, 78:3, 79:9, 80:7, 81:19, 83:21, 84:1, 84:11, 86:24, 87:7, 87:19, 88:17, 89:17, 92:3, 92:25, 93:12, 93:19, 93:22, 95:10, 96:21,

97:22, 98:7, 98:17, 99:1, 99:18, 100:16, 101:1, 101:8, 101:20, 102:5, 102:24, 103:9, 103:20, 104:3, 104:15, 105:9, 106:1, 106:3, 106:13, 106:24, 107:14, 107:18, 109:22, 110:7, 110:23, 111:19, 112:15, 113:7, 113:10, 118:15, 121:4, 122:12, 122:20, 123:14, 124:20, 126:7, 129:1, 129:12, 130:15, 132:8, 133:8, 134:11, 134:16, 135:4, 136:2, 137:9, 138:15, 139:4, 141:19, 142:11, 143:2, 143:23, 144:18, 145:22, 146:16, 147:2, 148:16, 149:18, 151:17, 152:24, 153:11, 153:13, 153:25, 154:13, 154:25, 155:8, 155:24, 156:11, 159:2, 159:16, 160:1, 161:11, 162:10, 163:6, 164:5, 164:18, 166:12, 167:1, 168:11, 168:19, 171:11, 171:21, 172:21, 173:17, 174:16, 174:24, 175:11, 180:18, 181:8, 182:8, 182:23, 184:5, 188:4, 188:23, 189:6, 189:20, 190:5, 190:22, 191:3, 191:5, 191:15, 193:25, 194:15, 195:6, 195:25, 196:18, 197:19, 199:17, 202:12, 206:1, 208:24, 210:8, 212:3, 215:12, 215:15, 217:10
**witnesses** [4] - 209:13, 209:17, 209:24
**word** [19] - 18:20,

18:23, 19:12, 30:11, 46:23, 59:21, 61:4, 83:17, 88:18, 118:12, 155:2, 155:12, 156:1, 169:24, 170:4, 185:25

**word-for-word** [3] - 30:11, 46:23, 88:18

**wording** [1] - 91:13

**words** [2] - 29:9, 155:1

**works** [1] - 166:3

**worth** [2] - 110:20, 212:2

**write** [2] - 135:20, 137:13

**writing** [3] - 30:4, 30:12, 30:13

**written** [13] - 60:5, 60:6, 82:7, 83:12, 83:14, 84:7, 85:6, 87:16, 87:23, 88:5, 90:17, 132:15, 210:18

**wrote** [12] - 23:22, 29:24, 30:10, 30:16, 30:17, 31:17, 32:11, 49:25, 54:13, 59:20, 116:11

### X

**X-ray** [1] - 50:9
**X-rayed** [1] - 50:6

### Y

**year** [8] - 110:24, 111:1, 111:3, 117:24, 143:23, 145:13, 147:11, 204:18

**years** [18] - 5:17, 14:24, 78:13, 79:15, 80:1, 84:3, 96:8, 110:20, 119:15, 120:17, 130:16, 146:24, 147:15, 155:21, 155:25, 156:7, 156:13, 184:1

**yellow** [10] - 57:8, 66:3, 177:13, 179:5, 180:23, 186:19, 186:20, 187:1, 187:3, 188:19

**yellow-ish** [1] - 57:8

**yesterday** [5] - 19:22, 23:5, 26:15, 115:7,

115:21

**yourself** [3] - 7:6, 192:20, 194:7

**YOURSELF** [1] - 219:12

### Z

**Zoom** [1] - 39:13
**zoom** [1] - 39:18